# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 19-cv-22842-DPG

---

SUCESORES DE DON CARLOS NUÑEZ Y DOÑA
PURA GALVEZ, INC., d/b/a BANCO NUÑEZ,

      Plaintiff,

v.

SOCIÉTÉ GÉNÉRALE, S.A., d/b/a SG AMERICAS,
INC.; THE BANK OF NOVA SCOTIA, d/b/a SCOTIA
HOLDINGS (US) INC., a/k/a THE BANK OF NOVA
SCOTIA, MIAMI AGENCY; THE NATIONAL
BANK OF CANADA, d/b/a NATIONAL BANK OF
CANADA FINANCIAL GROUP, INC.; AND
BANCO BILBAO VIZCAYA ARGENTARIA, S.A.,
d/b/a/ BBVA, USA,

      Defendants.

---

**DEFENDANT SOCIÉTÉ GÉNÉRALE, S.A.'S MOTION TO DISMISS
THE AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF
CIVIL PROCEDURE 12(b)(1), 12(b)(2) AND 12(b)(6) AND
ACCOMPANYING MEMORANDUM OF LAW IN SUPPORT**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL AND LEGAL BACKGROUND ............................................................ 5

ARGUMENT ............................................................................................................ 7

I.  SG IS NOT SUBJECT TO PERSONAL JURISDICTION IN FLORIDA ..................... 7

    A.  Legal standard ............................................................................... 8

    B.  Plaintiff has not alleged a *prima facie* case of personal jurisdiction .................. 10

        1.  Plaintiff fails to allege a *prima facie* case of general jurisdiction............ 10

        2.  Plaintiff fails to allege a *prima facie* case of specific jurisdiction .......... 12

    C.  SG has established that it is not subject to personal jurisdiction in Florida ........ 13

        1.  SG also has established affirmatively that it is not subject to general jurisdiction................................................................................. 14

        2.  SG has established that it is not subject to specific jurisdiction ............. 15

            i.  Plaintiff cannot satisfy the long-arm statute ............................... 15

            ii.  The assertion of specific jurisdiction would violate due process................................................................................. 18

II.  PLAINTIFF LACKS STANDING TO PURSUE ITS ACTION AGAINST SG........... 21

III.  THE AMENDED COMPLAINT FAILS TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED ........................................................................ 25

    A.  Legal standard ............................................................................. 25

    B.  Plaintiff is precluded from bringing its action because it acquired the "claim" after the date Helms-Burton was enacted ................................................ 25

    C.  Plaintiff fails to plead that SG trafficked in confiscated property ...................... 27

        1.  The language and legislative history of Title III make clear that the defendant must have trafficked in the same property that the plaintiff alleges was confiscated ............................................................ 28

        2.  Plaintiff does not plead that SG trafficked in the particular property that Plaintiff asserts was confiscated ...................................... 32

    D.  Plaintiff fails to state a basis for Title III relief, because the property was alleged to have been confiscated from Cuban citizens ........................................ 35

        1.  Only property confiscated from U.S. citizens gives rise to a Title III action................................................................................. 35

        2.  Claims to property confiscated by Cuba, from Cuban nationals, are not actionable under Helm-Burton................................................. 36

i

i.      Title III requires "proof of ownership" of "the claim" to
        "confiscated property" that is cognizable under
        international law..................................................................... 37

ii.     A domestic taking does not give rise to an international law
        claim.......................................................................................... 40

CONCLUSION............................................................................................ 40

REQUEST FOR HEARING........................................................................... 41

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Re [Redacted]*,
    Decision No. LIB III-044 (F.C.S.C. Jan. 16, 2018)................................................38

*Almanza v. United Airlines, Inc.*,
    851 F.3d 1060 (11th Cir. 2017) ..........................................................................33

*Am. Ass'n for Advancement of Sci. v. Periodicals Publicacoes Tecnicas*,
    2008 WL 11333109 (S.D. Fla. Sept. 8, 2008) (Altonaga, J.) ..................................25

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).............................................................................................9

*In Re Armando Sosa.*,
    Decision No. CU-831 (F.C.S.C. Dec. 14, 1967)........................................................39

*Asahi Metal Indus. Co. v. Super. Ct.*,
    480 U.S. 102 (1987)............................................................................................18

*Baban v. Intercontinental Hotels Grp. PLC*,
    2006 WL 8418675 (S.D. Fla. Mar. 8, 2006) (Cooke, J.) ........................................11

*Beg v. Islamic Rep. of Pakistan*,
    353 F.3d 1323 (11th Cir. 2003) ..........................................................................40

*Betteroads Asphalt Corp. v. United States*,
    106 F. Supp. 2d 262 (D.P.R. 2000)......................................................................29

*Blue Water Int'l, Inc. v. Hattrick's Irish Sports Pub, LLC*,
    2017 WL 4182405 (M.D. Fla. Sept. 21, 2017) ......................................................19

*Bochese v. Town of Ponce Inlet*,
    405 F.3d 964 (11th Cir. 2005) ............................................................................22

*Borislow v. Canaccord Genuity Grp. Inc.*,
    2014 WL 12580259 (S.D. Fla. June 27, 2014) (Ryskamp, J.)................................13

*Burban v. City of Neptune Beach, Fla.*,
    920 F.3d 1274 (11th Cir. 2019) ..........................................................................24

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)..............................................................................................9

*Carmouche v. Tamborlee Mgmt., Inc.*,
   789 F.3d 1201 (11th Cir. 2015) ...........................................................8, 9, 14, 15

*CCTV Outlet, Corp. v. Desert Sec. Sys. LLC*,
   2017 WL 5640717 (S.D. Fla. Aug. 7, 2017) (Cohn, J.)..........................................21

*Chamber of Commerce of U.S. v. NLRB*,
   721 F.3d 152 (4th Cir. 2013) ...................................................................................30

*Comparelli v. Republica Bolivariana De Venezuela*,
   891 F.3d 1311 (11th Cir. 2018) ...............................................................................40

*Consol. Dev. Corp. v. Sherritt, Inc.*,
   216 F.3d 1286 (11th Cir. 2000) ...............................................................................14

*Courboin v. Scott*,
   596 F. App'x 729 (11th Cir. 2014) ............................................................................8

*Crist v. Republic of Turkey*,
   995 F. Supp. 5 (D.D.C. 1998) ..................................................................................34

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014)...................................................................................10, 14, 18

*Davidson v. Georgia*,
   622 F.2d 895 (11th Cir. 1980) .................................................................................25

*Day v. Taylor*,
   400 F.3d 1272 (11th Cir. 2005) ...............................................................................25

*Day-Petrano v. State of Florida*,
   2003 WL 23773548 (M.D. Fla. Dec. 29, 2003)........................................................8

*DeZinno v. McClain Printing Co.*,
   2007 WL 9709709 (S.D. Fla. Apr. 19, 2007) (Ungaro, J.)......................................16

*Don King Prods., Inc. v. Mosley*,
   2016 WL 3950930 (S.D. Fla. Jan. 27, 2016) (Williams, J.) ...............................16, 21

*Re Estate of Clippard, et al.*,
   Decision No. LIB III-045 (F.C.S.C. Jan. 16, 2018)..................................................38

*Fast SRL v. Direct Connection Travel LLC*,
   2018 WL 7822711 (S.D. Fla. Aug. 3, 2018) (Martinez, J.)...............................12, 17

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000)..................................................................................................30

*Fickling v. Commonwealth of Austl.*,
    775 F. Supp. 66 (E.D.N.Y. 1991) ........................................................34

*FOGADE v. ENB Revocable Tr.*,
    263 F.3d 1274 (11th Cir. 2001) ..........................................................40

*Fox v. Loews Corp.*,
    309 F. Supp. 3d 1241 (S.D. Fla. 2018) (Altonaga, J.) ........................11

*Fraser v. Smith*,
    594 F.3d 842 (11th Cir. 2010) ............................................................19

*Freund v. Republic of France*,
    592 F. Supp. 2d 540 (S.D.N.Y. 2008)..................................................34

*Garcia-Bengochea v. Carnival Corp.*,
    2019 WL 4015576 (S.D. Fla. Aug. 26, 2019) (King, J.) ....................38

*Glen v. Club Méditerranée, S.A.*,
    450 F.3d 1251 (11th Cir. 2006) ..........................................................35

*Goodyear Atomic Corp. v. Miller*,
    486 U.S. 174 (1988)............................................................................29

*Griffin Indus., Inc. v. Irvin*,
    496 F.3d 1189 (11th Cir. 2007) ..........................................................25

*GSW, Inc. v. Long Cty., Ga.*,
    999 F.2d 1508 (11th Cir. 1993) ..........................................................25

*Gunder's Auto Ctr. v. State Farm Mut. Auto. Ins. Co.*,
    422 F. App'x 819 (11th Cir. 2011) .......................................................8

*In re Harbor East Dev. Ltd.*,
    2011 WL 45335 (S.D. Fla. Bankr. Jan. 6, 2011) (Cristol, J.) .............28

*Havana Docks Corp. v. Carnival Corp.*,
    No. 1:19-cv-21724, (S.D. Fla. Aug. 28, 2019) (Bloom, J.) ...............38

*Hesterly v. Royal Caribbean Cruises, Ltd.*,
    2008 WL 516495 (S.D. Fla. Feb. 25, 2008) (Gold, J.) .......................18

*High Tech Indus., Inc. v. Bethel Trans, Ltd.*,
    2018 WL 6331889 (S.D. Fla. June 6, 2018) (Marra, J.) ......................13

*Hinkle v. Cirrus Design Corp.*,
    775 F. App'x 545 (11th Cir. 2019) .....................................................16

*Horsley v. Feldt*,
    304 F.3d 1125 (11th Cir. 2002) ...........................................................25

*Hunter v. Erickson*,
    393 U.S. 385 (1969)............................................................................29

*iRenew Bio Energy Sols., LLC v. Harvest Direct, LLC*,
    2012 WL 13019197 (S.D. Fla. July 10, 2012) (Middlebrooks, J.) .........................11

*ISO Claims Servs., Inc. v. Bradford Techs., Inc.*,
    2011 WL 13176209 (M.D. Fla. Sept. 28, 2011) ....................................13

*Ivanovic v. Overseas Mgmt. Co.*,
    2011 WL 5508824 (S.D. Fla. Nov. 9, 2011) (Vitunac, M.J.) ................13

*Johns v. Taramit*,
    132 F. Supp. 2d 1021 (S.D. Fla. 2001) (Gold, J.)................................8

*Kawa Orthodontics, LLP v. Sec'y, U.S. Dep't of the Treasury*,
    773 F.3d 243 (11th Cir. 2014) .......................................................22, 24

*Lamb v. ITT Corp.*,
    2010 WL 376858 (D. Neb. Jan. 26, 2010)......................................36, 40

*Leon v. Cont'l AG*,
    301 F. Supp. 3d 1203 (S.D. Fla. 2017) (Williams, J.) ....................10, 17

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)......................................................................22, 24

*Madara v. Hall*,
    916 F.2d 1510 (11th Cir. 1990) ..........................................................8

*McKinnon v. Blue Cross & Blue Shield of Ala.*,
    935 F.2d 1187 (11th Cir. 1991) .........................................................37

*Mezerhane v. Venezuela*,
    785 F.3d 545 (11th Cir. 2015) ......................................................36, 40

*In re Mid-W. Tar Prod. Corp.*,
    150 F. Supp. 163 (D. Md. 1956)........................................................28

*Multimodal Dev. Grp., LLC v. Chemonics Int'l, Inc.*,
    2016 WL 3059083 (S.D. Fla. May 31, 2016) (Gayles, J.)....................20

*Musiker v. Projectavision, Inc.*,
    960 F. Supp. 292 (S.D. Fla. 1997) (Moore, J.) .................................17

*Ocampo v. Carrington Mortg. Servs., LLC*,
    288 F. Supp. 3d 1327 (S.D. Fla. 2017) (Gayles, J.) .................................................. 21, 22, 24

*Odebrecht Constr., Inc. v. Prasad*,
    876 F. Supp. 2d 1305 (S.D. Fla. 2012) (Moore, J.) ................................................................ 36

*Oldfield v. Pueblo De Bahia Lora, S. A.*,
    558 F.3d 1210 (11th Cir. 2009) ................................................................ 10

*Omni Capital Int'l, Ltd. v. Rudolph Wolff & Co.*,
    484 U.S. 97 (1987) ................................................................ 8

*Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*,
    701 F.2d 889 (11th Cir. 1983) ................................................................ 16, 17

*Re Perle, et al.*,
    Decision No. 1025 (F.C.S.C. Oct. 20, 1954) ................................................................ 38

*Peruyero v. Airbus S.A.S.*,
    83 F. Supp. 3d 1283 (S.D. Fla. 2014) (Cooke, J.) ................................................................ 12

*Pestana v. Miami-Dade Cty. Bd. of Comm'rs.*,
    282 F. Supp. 3d 1284 (S.D. Fla. 2017) (Lenard, J.) ................................................................ 33

*In re Petrobras Sec. Litig.*,
    393 F. Supp. 3d 376 (S.D.N.Y. 2019) ................................................................ 11

*Prakash v. Altadis U.S.A. Inc.*,
    2012 WL 1109918 (N.D. Ohio Mar. 30, 2012) ................................................................ 36

*Prunty v. Arnold & Itkin LLP*,
    753 F. App'x 731 (11th Cir. 2018) ................................................................ 17

*Rana Fin., LLC v. City Nat'l Bank of N.J.*,
    2018 WL 4999806 (S.D. Fla. Aug. 7, 2018) (Cohn, J.) ................................................................ 26

*Regan v. Wald*,
    468 U.S. 222 (1984) ................................................................ 30

*Regent Grand Mgmt. Ltd. v. Tr. Hosp. LLC*,
    2019 WL 1112553 (S.D. Fla. Jan. 9, 2019) ................................................................ 14

*Riley v. Donatelli*,
    2017 WL 3316479 (M.D. Fla. Aug. 3, 2017) ................................................................ 13

*RMS Titanic, Inc. v. Kingsmen Creatives, Ltd.*,
    579 F. App'x 779 (11th Cir. 2014) (per curiam) ................................................................ 16

*Santivanez v. Estado Plurinacional De Bolivia*,
   512 F. App'x 887 (11th Cir. 2013) ....................................................................40

*Schulman v. Inst. for Shipboard Educ.*,
   624 F. App'x 1002 (11th Cir. 2015) ..................................................................11

*Silver v. Glinkenhouse*,
   2007 WL 9701847 (S.D. Fla. Jan. 31, 2007) (Middlebrooks, J.) ...........................13

*Slaihem v. Sea Tow Bahamas Ltd.*,
   148 F. Supp. 2d 1343 (S.D. Fla. 2001) (Moreno, J.) ..............................................9

*Snow v. DirecTV, Inc.*,
   450 F.3d 1314 (11th Cir. 2006) .................................................................10, 17

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016).............................................................................22, 24

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998).........................................................................................22

*Sullivan v. Stroop*,
   496 U.S. 478 (1990)........................................................................................39

*Taylor v. Moskow*,
   717 F. App'x 836 (11th Cir. 2017) ...................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..................................................................................25, 26

*Textile USA, Inc. v. Diageo N. Am., Inc.*,
   2017 WL 10187642 (S.D. Fla. July 31, 2017) (Williams, J.)................................20

*Tri-Lady Marine, Ltd. v. Aqua-Air Mfg.*,
   2017 WL 1345113 (S.D. Fla. Apr. 12, 2017) (Gayles, J.)....................................18

*United States v. Jin Fuey Moy*,
   241 U.S. 394 (1916)........................................................................................24

*United Techs. Corp. v. Mazer*,
   556 F.3d 1260 (11th Cir. 2009) ...............................................................9, 10, 13

*Universal Express, Inc. v. S.E.C.*,
   177 F. App'x 52 (11th Cir. 2006) .....................................................................26

*Ure v. Oceania Cruises, Inc.*,
   2017 WL 2378200 (S.D. Fla. June 1, 2017) (Gayles, J.).....................................16

*Vision Media TV Grp., LLC v. Forte*,
   724 F. Supp. 2d 1260 (S.D. Fla. 2010) (Marra, J.) ..............................................................21

*Waite v. All Acquisition Corp.*,
   901 F.3d 1307 (11th Cir. 2018) ...................................................................9, 18, 19, 20

*Walden v. Fiore*,
   571 U.S. 277 (2014) ........................................................................................9, 12, 19, 20

*Westchester Fire Ins. Co. v. Vector Aerospace*,
   2017 WL 4326097 (S.D. Fla. Sep. 27, 2017) (Moreno, J.) ......................................18

*Wray v. Peterson*,
   2018 WL 3719323 (M.D. Fla. July 17, 2018) ........................................................20

*Zia v. CitiMortgage, Inc.*,
   210 F. Supp. 3d 1334 (S.D. Fla. 2016) (Gayles, J.) .................................................22

## Statutes

22 U.S.C. § 1623 ........................................................................................................38

22 U.S.C. § 1643 ....................................................................................................37, 39

22 U.S.C. § 2370 ........................................................................................................30

22 U.S.C. § 6003 ........................................................................................................30

22 U.S.C. § 6021 .................................................................................................1, 28, 29

22 U.S.C. § 6022 ...............................................................................................28, 29, 35

22 U.S.C. § 6023 ..............................................................................................5, 28, 29

22 U.S.C. § 6081 ................................................................................28, 29, 31, 35, 38

22 U.S.C. § 6082 .................................................................................................. *passim*

22 U.S.C. § 6083 ...............................................................................................37, 38, 39

50 U.S.C. § 4303 ........................................................................................................30

Fla. Stat. § 48.193(1)(a) ..................................................................9, 12, 15, 16, 17, 18

Fla. Stat. § 48.193(2) .....................................................................................................9

## Other Authorities

31 C.F.R. § 515.201(b) ................................................................................................30

104 Cong. Rec. S15083 (1995)...................................................................................31

Cuban Liberty and Democratic Solidarity Act, Hearings before the Senate
    Subcommittee on Western Hemisphere and Peace Corps Affairs of the
    Committee on Foreign Relations, 104th Cong. at 141 (1995)................................31

Fed. R. Civ. P 12(b)(1).............................................................................1, 3, 21, 40, 41

Fed. R. Civ. P. 12(b)(2)................................................................................. *passim*

Fed. R. Civ. P. 12(b)(6).............................................................................1, 33, 40, 41, 26

Fed. R. Evid. 201 ...................................................................................................26

H.R. Rep. No. 104-202 (1995).............................................................................27, 29

H.R. Rep. No. 104-468 (1996).............................................................................27, 29

Hearing before the House Committee on International Relations, 104th Cong.
    (1995)...................................................................................................31

Lorena Barberia, *Remittances to Cuba: An Evaluation of Cuban and U.S.
    Government Policy Measures* (September 2002)
    http://balseros.miami.edu/pdf/15_remittances.pdf....................................................6

President Statement on Helms-Burton Waiver Exercise, July 16, 1996, 1996 WL
    396122.................................................................................................36

Restatement (Fourth) on Foreign Relations Law § 455 (Am. Law Inst. 2018)...........................40

Defendant, Société Générale, S.A. ("SG"), pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(6), and Southern District of Florida Local Rule 7.1, respectfully moves to dismiss the Amended Complaint ("AC") filed by Plaintiff, Sucesores De Don Carlos Nuñez Y Doña Pura Galvez, Inc., for lack of lack of personal jurisdiction, lack of subject-matter jurisdiction, and failure to state a claim. For the reasons below, the motion should be granted.

## MEMORANDUM OF LAW

### PRELIMINARY STATEMENT

Plaintiff has sued SG—a French bank that has no presence or operations in Florida—under Title III of the Cuban Liberty and Democratic Solidarity Act, 22 U.S.C. § 6021, *et. seq.* ("Helms-Burton," "Title III," or "the Act"). The Act creates a right of action against entities that "traffic in" assets that were "confiscated" by the Cuban Government.

Plaintiff alleges that the assets that were confiscated by the Cuban Government in 1960, and absorbed into "the state-controlled entity Banco Nacional de Cuba" (AC ¶ 4), were: (i) the equity of Banco Nuñez, a bank owned by Cuban nationals (*id.* ¶¶ 7, 50); (ii) a deposit account that Banco Nuñez had at Banco Nacional de Cuba ("BNC") (*id.* ¶¶ 10, 50); and (iii) shares of BNC that were held by Banco Nuñez (*id.* ¶¶ 11, 50).

Plaintiff asserts that the injury for which it seeks a remedy in this action is the failure by BNC and the Cuban Government to compensate the owners of Banco Nuñez for the confiscation of those assets. *See* AC ¶ 8 ("BNC should have paid the Founders the fair value of Banco Nuñez at the time of confiscation."); *id.* ¶ 10 ("Plaintiff has never been compensated by BNC or the Cuban Government for the loss of this cash [in the deposit account at BNC]."); *id.* ¶ 11 ("BNC confiscated [Banco Nuñez's] shares [in BNC] on October 14, 1960, and Plaintiff has never been compensated by BNC or the Cuban Government for its equity interest in BNC."); *id.* ¶ 50 ("Banco Nuñez was

1

entirely absorbed into BNC and the Cuban Government failed to pay the Founders for any of Banco Nuñez's stolen property, including: the equity of Banco Nuñez, Banco Nuñez's $9.9 million in cash deposited at BNC, or Banco Nuñez's $194,900 worth of shares of BNC.").

Although Plaintiff offers conclusory allegations that SG engaged in "trafficking," Plaintiff does *not* allege that SG trafficked in any of the assets that were confiscated, *i.e.*, the equity of Banco Nuñez, the deposit account of BNC, or the shares of BNC that were held by Banco Nuñez. Instead, Plaintiff alleges only that SG engaged in "commercial activities" with BNC starting in 2000 (AC ¶¶ 12-13), and asserts that "trafficking" under the Act equates to simply "doing business with BNC." In Plaintiff's view, "Plaintiff is entitled to relief under Title III of Helms-Burton from any entity doing business with BNC—*i.e.* 'trafficking' in Plaintiff's 'property.'" AC ¶ 42. In short, Plaintiff does not allege that SG obtained any benefit *from any of those confiscated assets*.

Nor does Plaintiff allege that SG's commercial activities with BNC commencing in 2000 caused Plaintiff any injury. Rather, Plaintiff is suing for its losses from the Cuban Government's confiscation of Banco Nuñez in 1960. In Plaintiff's words: "For Plaintiff's losses attributable to the Cuban Government's confiscation of Banco Nuñez, Plaintiff seeks damages from [SG] in accordance with § 6082(a) of Helms-Burton, including treble damages." AC ¶ 68.

At bottom, Plaintiff's case rests on the assertion that Congress created a cause of action permitting anyone whose assets were confiscated by the Castro regime to recover the value of those assets (in some cases, trebled) from *anyone* who did *any* business, at *any* time after (even many decades after) the confiscation, with a Cuban-owned entity that benefited from the confiscation—even if (as is true here) the defendant never benefited from or used the particular assets that Cuba confiscated from the plaintiff, and the plaintiff does not assert any causal connection between the defendant's alleged conduct and the plaintiff's injury.

This improbable assertion is wrong as a matter of law for at least five reasons.

*First*, SG is not subject to personal jurisdiction in Florida. Plaintiff fails to make even a *prima facie* showing of personal jurisdiction: Plaintiff's own allegations make clear that SG is a French bank headquartered in Paris and therefore is not amenable to general jurisdiction in Florida or the United States. The AC also does not establish specific jurisdiction over SG in Florida, failing to allege any SG conduct in Florida that is connected to Plaintiff's allegations. Rather, the AC alleges that the relevant SG transactions all occurred in New York. SG's affidavit in support of its Rule 12(b)(2) motion to dismiss shows that Plaintiff *could not* establish jurisdiction in Florida: SG has no headquarters or offices in Florida; has no employees in Florida; has no operations, branches, agency offices, or representative offices in Florida; is not incorporated or chartered in Florida; and has not engaged in *any* activities in Florida that relate to Plaintiff's allegations in any respect. Accordingly, the AC must be dismissed for lack of personal jurisdiction.

*Second*, the AC should be dismissed for the additional and independent reason that Plaintiff lacks standing under Article III of the U.S. Constitution. Specifically, Plaintiff has not met its burden of satisfying a bedrock element of Article III standing—an injury "fairly traceable to the challenged conduct of the defendant." Here, there is no alleged or reasonably inferable connection between Plaintiff's claimed injury (the uncompensated confiscation of its property by the Cuban Government in 1960 and its absorption into BNC) and the conduct identified in the AC, occurring forty years later (entering into and profiting from credit facilities involving BNC, commencing in 2000). When, as here, there is no alleged causal connection between the plaintiff's injury and the defendant's conduct, the plaintiff lacks standing to bring suit. The absence of Article III standing deprives the Court of subject-matter jurisdiction to adjudicate Plaintiff's claim, and the AC therefore must be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

*Third*, Plaintiff is statutorily ineligible to seek Title III relief. The Act unequivocally states that for property confiscated before March 12, 1996, only U.S. nationals who acquired their claims *prior* to that date may assert a cause of action under the Act. Plaintiff fails to allege that it acquired its claims prior to that date, and judicially noticeable documents demonstrate that it did not. On this basis alone, the AC must be dismissed.

*Fourth*, the AC fails to allege that SG "trafficked" in the property that Plaintiff alleges was confiscated. The Act's language and legislative history make clear that a Helms-Burton action may proceed only when the defendant is alleged to have used, profited, or benefited from the *particular* property that Plaintiff alleges was confiscated. But the AC makes no such allegation. It alleges that the confiscated property consisted of the equity of Banco Nuñez, cash that had been deposited in an account at BNC, and shares of BNC that Banco Nuñez held. But it does not allege that SG trafficked in such equity, such an account, or such shares. Instead, Plaintiff alleges only that SG was "doing business" with BNC. That assertion has no basis in the statutory language.

*Finally*, Plaintiff fails to allege a basis for Title III relief because it alleges that the property at issue was confiscated from Cuban nationals. As the Eleventh Circuit has recognized, the Act's language shows that it applies only to property confiscated from U.S. nationals. Moreover, Helms-Burton *also* requires that a plaintiff allege a legally valid "claim" to the confiscated asset. The language, history, and structure of the Act show that such a claim must be valid as a matter of international law. That is not the case here. The Banco Nuñez assets were confiscated from *Cuba's own* nationals. The Eleventh Circuit has repeatedly held that international law does not recognize such purely "domestic" takings and that claims arising from such "takings" are not actionable in federal court. Each one of these fundamental flaws independently requires dismissal of the AC.

## FACTUAL AND LEGAL BACKGROUND

**1. The Helms-Burton Act.** This case concerns Title III of the Helms-Burton Act, which provides that anyone who "traffics in property" confiscated by the Cuban Government on or after January 1, 1959, may be liable for money damages in specified amounts to "any United States national who owns the claim to such property." 22 U.S.C. § 6082(a)(1)(A). Under the Act, a person "traffics" in confiscated property if that person knowingly and intentionally engages in a commercial activity "using or otherwise benefiting from confiscated property," or "causes, directs, participates in, or profits from" trafficking by another person, or otherwise engages in trafficking through another person. *Id.*, §§ 6023(13)(A)(ii)-(iii).

In limiting the cause of action under Title III to a U.S. national who owns the claim to the particular property—*i.e.*, "owns the claim to *such* property" (emphasis added)—in which the defendant traffics, Title III is considerably narrower than other laws directed at limiting trade with Cuba, which proscribe commercial transactions broadly speaking. *See, e.g.*, Trading with the Enemy Act of 1917 ("TWEA"); Foreign Assistance Act of 1961 ("FAA"); Cuban Assets Control Regulations of 1963 ("CACR"); Cuban Democracy Act of 1992 ("CDA"); Trade Sanctions Reform and Export Enhancement Act of 2000 ("TSRA"). These broader statutory and regulatory provisions go far beyond imposing liability for trafficking in identifiable and specific confiscated property, instead imposing sanctions for virtually all activities or transactions involving Cuba, subject only to limited, qualified exceptions.[1]

---

[1] On November 18, 2018, SG and the United States Attorney's Office for the Southern District of New York entered into a Deferred Prosecution Agreement (the "DPA"). AC Ex. 4. Pursuant to the DPA, SG consented to the filing of a one-count Information, charging SG with conspiring to violate the TWEA and the CACR. *Id.* Although the DPA and Information are exhibits to the AC and are cited in support of some of Plaintiff's allegations in the AC, they do not purport to address, let alone support, Plaintiff's assertion that SG violated Helms-Burton or engaged in the trafficking of any confiscated assets.

**2. Banco Nuñez.** According to the AC, Banco Nuñez was a Cuban-owned bank founded and solely owned by Carlos and Pura Nuñez (the "Founders"). AC ¶ 18. Plaintiff alleges that on October 14, 1960, all Cuban-owned banks, including Banco Nuñez, were nationalized and absorbed into BNC, a state-controlled entity. AC ¶¶ 5-6. According to a source cited in the AC, BNC initially was the "only banking entity allowed to operate [in Cuba] from 1960 to 1984," but at that point "newly created State-owned commercial banks" entered the Cuban market and "in May 1997 . . . [BNC] was split into a regulatory central bank, the Banco Central de Cuba ("BCC"), and a commercial bank, which retained the bank's original name, BNC." Lorena Barberia, *Remittances to Cuba: An Evaluation of Cuban and U.S. Government Policy Measures*, 16, 21 (September 2002) (cited at AC ¶ 5 n.6) ("Working Paper"). The AC does *not* allege that SG engaged in transactions with BCC.

In 1996, the thirteen individuals who allegedly inherited the Founders' claim to Banco Nuñez formed Plaintiff "to hold and preserve a unified claim." AC ¶ 40. After incorporating Plaintiff, these individuals "transferred their interests in Banco Nuñez to Plaintiff." AC ¶ 41.

Plaintiff alleges that as of December 31, 1958, Banco Nuñez had equity with a book value of $7.8 million. AC ¶ 7. Plaintiff further alleges that in December 1959, Banco Nuñez "had $9.9 million in cash deposited at BNC" and held "at least $194,900 in shares of BNC," which BNC also confiscated. AC ¶¶ 10, 11. Plaintiff also alleges that "the Founders owned the land on which Banco Nuñez built its branches, through an entity called Inmobiliaria Norka, S.A. ('Norka')" (AC ¶ 2, 19, 38), but does not directly allege that Cuba confiscated the land or the equity of Norka.

**3. Defendant SG.** As the AC recognizes, SG "is a French multinational bank and financial services company headquartered in Paris, France." AC ¶ 20. Plaintiff does not allege that SG has any branches, agency offices, or representative offices in Florida and, in fact, SG does not. *See*

6

Declaration of Dominique Bourrinet ¶ 4 ("Bourrinet Decl."). Plaintiff does not allege that SG is licensed to do business in Florida and, in fact, it is not. *See id.* ¶ 4.

The AC does assert that SG extended "credit facilities" (*i.e.*, loans) to BNC and processed certain transactions related to those loans. *E.g.*, AC ¶¶ 58-65. But, as noted above, the AC does not allege that the transactions involving SG utilized any Banco Nuñez equity, deposit accounts, shares in BNC, or any other confiscated Banco Nuñez property.

Nor does the AC allege that the "credit facilities" or the processing of transactions related to those loans occurred in Florida or had any connection to Florida. Plaintiff's only allegations as to those transactions by SG state that the conduct occurred in New York. *See* AC ¶ 65 (alleging payments "made through [SG] New York"); *id.* ¶ 27 (alleging that SG does business in the U.S. through a subsidiary headquartered in New York); *id.* Ex. 4 (describing funds transferred to New York). The Bourrinet Declaration confirms that all transactions involving the Cuban credit facilities occurred outside of Florida, and no employees of SG who handled the Cuban credit facilities acted in this State. *See* Bourrinet Decl. ¶ 11.

## ARGUMENT

## I.   SG IS NOT SUBJECT TO PERSONAL JURISDICTION IN FLORIDA.

At the outset, the AC should be dismissed for lack of personal jurisdiction. SG is a French incorporated company with its headquarters in France; it is being sued because of transactions with an entity in Cuba that were processed in New York and had no connection with Florida. SG is not licensed to conduct business in Florida, has no physical presence in Florida, and has engaged in no suit-related conduct in the State. In fact, Plaintiff's residence is this litigation's *only* connection with Florida. Until this suit was filed, SG did not even know of Plaintiff or that Plaintiff was incorporated in Florida. *See* Bourrinet Decl. at ¶ 12. In such circumstances, it is black-letter law that a foreign enterprise may not be haled into a Florida court.

A.      **Legal standard.**

Before taking any action, a court must first determine whether it may exercise personal jurisdiction over the defendant. *See Madara v. Hall*, 916 F.2d 1510, 1513-14 (11th Cir. 1990) ("The court should have addressed the personal jurisdiction question first."). This requires a two-part inquiry. *See Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1203 (11th Cir. 2015).

*First*, contrary to Plaintiff's suggestion in the AC, Helms-Burton does not authorize nationwide service of process, and thus Plaintiff must satisfy Florida's long-arm statute. As the Supreme Court has held, "Congress knows how to authorize nationwide service of process when it wants to provide for it." *See Omni Capital Int'l, Ltd. v. Rudolph Wolff & Co.*, 484 U.S. 97, 106 (1987). If "Congress failed to do so," that omission "argues forcefully that such authorization was not its intention." *Id.* That holding governs Helms-Burton. This is confirmed by "[s]ubsequent cases [that] have cited *Omni* for the proposition that statutory grants of personal jurisdiction must be explicit." *Johns v. Taramit*, 132 F. Supp. 2d 1021, 1026 (S.D. Fla. 2001) (Gold, J.) (holding that Federal Arbitration Act does not authorize nationwide service of process because it is silent on the issue); *Day-Petrano v. State of Florida*, 2003 WL 23773548 (M.D. Fla. Dec. 29, 2003) (same, as to Americans with Disabilities Act). In short, where the federal statute "does not contain a nationwide service-of-process provision," the court must "look to the long-arm statute of Florida to determine whether it authorizes exercising jurisdiction over the defendants." *Courboin v. Scott*, 596 F. App'x 729, 734 (11th Cir. 2014).[2]

---

[2] The AC's assertion of the legal conclusion that Helms-Burton jurisdiction should be based on nationwide contacts, without citations, cannot be credited and has no legal weight. *Cf.* AC ¶ 32; *see Gunder's Auto Ctr. v. State Farm Mut. Auto. Ins. Co.*, 422 F. App'x 819, 821 (11th Cir. 2011) ("[P]leadings offering only labels and legal conclusions couched as factual allegations enjoy no presumption of truth and offer no support to the sufficiency of the complaint.").

Florida's long-arm statute, in turn, "restricts jurisdiction over non-residents to specifically enumerated instances" and "is to be strictly construed." *Slaihem v. Sea Tow Bahamas Ltd.*, 148 F. Supp. 2d 1343, 1349 (S.D. Fla. 2001) (Moreno, J.); *see also Carmouche*, 789 F.3d at 1203-04. Under the long-arm statute, there may be either (i) "specific personal jurisdiction—that is, jurisdiction over suits that arise out of or relate to a defendant's contacts with Florida"; or (ii) "general personal jurisdiction—that is, jurisdiction over any claims against a defendant, whether or not they involve the defendant's activities in Florida." *Id.* (*citing* § 48.193(1)(a) and (2), Fla. Stat.).

*Second*, if the long-arm statute is satisfied, the court next must determine whether the exercise of personal jurisdiction would violate the Due Process Clause. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). This analysis focuses on "the relationship among the defendant, the forum, and the litigation." *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018) (*quoting Walden v. Fiore*, 571 U.S. 277, 284 (2014)). Due process ensures that a defendant only is "haled into court in a forum State *based on his own affiliation with the State*, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Walden*, 571 U.S. at 286 (*citing Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (emphasis added)). In particular, *"[t]he plaintiff cannot be the only link between the defendant and the forum*." *Walden*, 571 U.S. at 277 (emphasis added).

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a *prima facie* case of jurisdiction." *United Techs.*, 556 F.3d at 1274. Allegations of a "mere existence of a scintilla of evidence" are insufficient to establish a *prima facie* case. *See Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 252 (1986). Conclusory jurisdictional allegations are likewise insufficient. *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006).

Even when a plaintiff establishes a *prima facie* case of personal jurisdiction, if the defendant challenges jurisdiction "by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *United Techs.*, 556 F.3d at 1274 (internal quotation marks omitted). And in any case, "the plaintiff bears the *ultimate burden* of establishing that personal jurisdiction is present." *Oldfield v. Pueblo De Bahia Lora, S. A.*, 558 F.3d 1210, 1217 (11th Cir. 2009) (emphasis added).

**B.   Plaintiff has not alleged a *prima facie* case of personal jurisdiction.**

Here, Plaintiff fails to satisfy its "initial burden of alleging in the complaint sufficient facts to make out a *prima facie* case of jurisdiction." *United Techs.*, 556 F.3d at 1274.

**1.   *Plaintiff fails to allege a* prima facie *case of general jurisdiction.***

Plaintiff's allegations themselves affirmatively establish the absence of general jurisdiction. Plaintiff alleges that SG "is a French multinational bank and financial services company headquartered in Paris, France." AC ¶ 20. Under the heading "Jurisdiction and Venue," the AC alleges that SG "is . . . headquartered . . . [in] Paris, France" and asserts that SG "does business in the [U.S.] through its wholly owned subsidiary SG Americas, Inc., headquartered at 245 Park Avenue, New York, New York 10167." AC ¶ 27. Because the paradigmatic bases for general jurisdiction over a corporation are place of incorporation and principal place of business (*see Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)), these allegations—which acknowledge that SG is based in France and assert that it conducts its U.S. operations from New York—demonstrate a lack of general jurisdiction in the United States, let alone Florida.

In such circumstances, courts of this State routinely find no *prima facie* showing of general jurisdiction. *See*, *e.g.*, *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1214-16 (S.D. Fla. 2017)

10

(Williams, J.) (no *prima facie* showing where plaintiff alleged that defendant was a California corporation with its principal place of business in California and the allegation that defendant "conduct[ed] substantial business in this District" was not supported "with facts"); *Fox v. Loews Corp.*, 309 F. Supp. 3d 1241, 1246 (S.D. Fla. 2018) (Altonaga, J.) (holding that when—as here— plaintiff alleged that defendants were not Florida corporations, had their principal place of business outside of Florida, and "[n]o other jurisdictional allegations appear in the pleading" plaintiff had failed to allege a *prima facie* case of general jurisdiction).

Further, Plaintiff's allegation that SG has American Depository Receipts ("ADRs") is irrelevant to general jurisdiction. *See In re Petrobras Sec. Litig.*, 393 F. Supp. 3d 376, 383 (S.D.N.Y. 2019) (sale of ADRs in New York was "far from sufficient to subject [it] to the general personal jurisdiction of courts in New York"); *Baban v. Intercontinental Hotels Grp. PLC*, 2006 WL 8418675, at *3 (S.D. Fla. Mar. 8, 2006) (Cooke, J.) (same, granting 12(b)(2) motion).

Finally, Plaintiff cannot establish general jurisdiction with the conclusory allegation that SG and its subsidiary SG Americas, Inc. "share a unity of corporate interest and operate as part of a single enterprise." AC ¶ 27. A subsidiary's jurisdictional contacts may not be imputed to its parent based on such threadbare allegations. *See iRenew Bio Energy Sols., LLC v. Harvest Direct, LLC*, 2012 WL 13019197, at *1 (S.D. Fla. July 10, 2012) (Middlebrooks, J.). And, in any event, there is no allegation that SG Americas, Inc. is itself subject to general jurisdiction in Florida. *See* AC ¶¶ 20, 27 (paragraphs in the AC concerning SG Americas, Inc. do not allege that it took any actions in Florida, let alone that its headquarters or principal place of business is in the State); *Schulman v. Inst. for Shipboard Educ.*, 624 F. App'x 1002, 1005 (11th Cir. 2015) (affirming 12(b)(2) dismissal of French defendant that "has no subsidiaries based in Florida").

### 2.   *Plaintiff fails to allege a* **prima facie** *case of specific jurisdiction.*

Plaintiff also fails to make a *prima facie* showing of specific jurisdiction. In fact, Plaintiff does not make even a conclusory allegation that, as required by the relevant portions of Florida's long-arm statute, "the asserted cause of action 'arises from' th[e] defendant's actions within the forum." *Fast SRL v. Direct Connection Travel LLC*, 2018 WL 7822711, at *3 (S.D. Fla. Aug. 3, 2018) (citing § 48.193(1)(a), Fla. Stat.) (Martinez, J.). Instead, the full scope of Plaintiff's forum-specific allegations as to SG is a single paragraph stating in relevant part: "In 2016, [SG] provided $210 million in refinancing loans to the Ritz-Carlton in South Beach, Miami, Florida." AC ¶ 36. But Plaintiff does not and could not allege that this refinancing was connected to Plaintiff's action. *Id.*; *see also* Bourrinet Decl. ¶ 9. Such unrelated activity cannot support specific jurisdiction.

For example, in *Peruyero v. Airbus S.A.S.*, 83 F. Supp. 3d 1283, 1290 (S.D. Fla. 2014) (Cooke, J.), the court held that plaintiff had failed to make a *prima facie* showing of specific jurisdiction where plaintiffs' injury (exposure to asbestos while performing maintenance on aircraft) did not arise from the defendant's alleged conduct in Florida (selling an aircraft to a third party, Capital Airlines, for use in Miami). The court explained the fundamental flaw in plaintiff's argument: "[plaintiff] does not rely on [defendant's] transactions with Capital Airlines [in Florida]" as the basis for his claim. *Id.* at 1289. The same is true here: Plaintiff does not (and could not) rely on SG's refinancing of Ritz-Carlton debt as the basis for its Helms-Burton action.

Plaintiff tries to overcome these jurisdictional defects with its allegation that, "[b]ecause of the substantial number of potential Helms-Burton plaintiffs residing in Miami, Defendants should reasonably have anticipated the possibility of a suit arising in the Southern District of Florida." AC ¶ 35. However, it is well-settled law that "mere injury to a forum resident is not a sufficient connection to the forum." *Walden*, 571 U.S. at 290. If defendant's conduct was not intentionally aimed at Florida, dismissal is appropriate notwithstanding allegations that plaintiff's

injury was felt in the forum. *See Riley v. Donatelli*, 2017 WL 3316479, at *6 (M.D. Fla. Aug. 3, 2017) (granting 12(b)(2) dismissal for failure to allege a *prima facie* case of personal jurisdiction where "[defendant's] alleged misconduct was not aimed or directed toward Florida, nor even directed at [plaintiff] in Florida"); *ISO Claims Servs., Inc. v. Bradford Techs., Inc.*, 2011 WL 13176209, at *7 (M.D. Fla. Sept. 28, 2011) (holding that plaintiffs failed to allege a *prima facie* case of jurisdiction where they "fail[ed] to set forth any factual allegations demonstrating that [defendant's] tortious conduct was 'expressly aimed' at Florida").

Given the absence of sufficient or relevant jurisdictional allegations (general or specific), this Court need undertake no further analysis. "Where a complaint includes no properly pleaded facts pertinent to the conduct and activities of the defendant in the forum state, a defendant wishing to properly challenge such a legally insufficient assertion of jurisdiction need not do anything more than file a simple (unsupported) motion." *Borislow v. Canaccord Genuity Grp. Inc.*, 2014 WL 12580259, at *5 (S.D. Fla. June 27, 2014) (Ryskamp, J.) (internal quotation marks omitted); *see also Silver v. Glinkenhouse*, 2007 WL 9701847, at *3 (S.D. Fla. Jan. 31, 2007) (Middlebrooks, J.) (no *prima facie* case because the complaint lacked factual allegations establishing jurisdiction under Florida's long-arm statute); *High Tech Indus., Inc. v. Bethel Trans, Ltd.*, 2018 WL 6331889, at *4 (S.D. Fla. June 6, 2018) (Marra, J.) (same); *Ivanovic v. Overseas Mgmt. Co.*, 2011 WL 5508824, at *2-3 (S.D. Fla. Nov. 9, 2011) (Vitunac, M.J.) (same). The AC should, therefore, be dismissed.

### C.      SG has established that it is not subject to personal jurisdiction in Florida.

Although the facial insufficiency of the AC's jurisdictional allegations itself requires dismissal, SG affirmatively shows below, through the submission of evidence, that personal jurisdiction is absent. *United Techs.*, 556 F.3d at 1274-80 (affirming dismissal for lack of personal jurisdiction based upon affidavits submitted with 12(b)(2) motion). SG respectfully submits that

this court need not consider this evidence to conclude that jurisdictional dismissal is required by the obvious absence in the AC of sufficient and relevant facts.

### 1.    *SG also has established affirmatively that it is not subject to general jurisdiction.*

The Bourrinet Declaration confirms that SG is not subject to general jurisdiction in Florida. As the Declaration shows, SG is not incorporated in Florida and does not have its principal place of business here. *See* Bourrinet Decl. ¶ 2. Rather, SG is a corporation organized and existing under the laws of France, with its principal place of business in Paris, France. *See id.* ¶ 2. SG has no employees or operations in Florida. *See id.* ¶ 5. And SG is not licensed to do business in Florida and has no registered agent for service of process in Florida. *See id.* ¶ 4. Accordingly, SG is not at home in Florida and is not subject to general jurisdiction in Florida courts. *See Daimler*, 571 U.S. at 137; *Carmouche*, 789 F.3d at 1205.

Further, the Bourrinet Declaration establishes that the contacts of SG Americas, Inc. cannot be attributed to SG. As the Eleventh Circuit has explained, to impute the contacts of a subsidiary to its parent, the plaintiff "would have to show that [the subsidiary's] corporate existence was simply a formality, and that it was merely [its parent's] agent." *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1293-94 (11th Cir. 2000) (imputation impermissible where the subsidiary "has its own officers and boards of directors, determines its own pricing and marketing practices, has its own bank accounts[,] offices, and employees"); *Regent Grand Mgmt. Ltd. v. Tr. Hosp. LLC*, 2019 WL 1112553, at *4 (S.D. Fla. Jan. 9, 2019) (Torres, M.J.) (same). Here, SG Americas, Inc.'s existence is not a formality; it is an independent company with its own personnel and objectives. *See* Bourrinet Decl. ¶ 14.

In any event, SG Americas, Inc. is not itself subject to general jurisdiction in Florida. The Bourrinet Declaration explains that SG Americas, Inc. is a Delaware corporation with its principal

place of business in New York. *See* Bourrinet Decl. ¶ 13. And all of the other statements above related to SG (*e.g.*, SG has no employees or operations in Florida) are equally true for SG Americas, Inc. *See id.* ¶ 15.

### 2. SG has established that it is not subject to specific jurisdiction.

The Bourrinet Declaration also confirms that SG is not subject to specific jurisdiction in Florida. The conduct at issue in this case is the alleged "processing [of] transactions . . . through [SG]'s Cuban credit facilities." AC ¶ 14. This allegation refers to the transactions referenced in the Statement of Facts. *Id*. The Bourrinet Declaration makes clear that none of those transactions occurred in Florida: "SG does not have employees or branches located in Florida. . . . SG did not initiate or administer any of the Cuban Credit Facilities in Florida." Bourrinet Decl. ¶ 11. Further, "[a]ny transactions involving the Cuban Credit Facilities could not have been cleared through Florida (and in fact did not clear through Florida), as SG has no correspondent bank in Florida (and did not have any correspondent bank in Florida in the period 2000 to 2010)." *Id.* ¶ 11. Instead, "the U.S. dollar transactions involving the Cuban Credit Facilities passed through financial institutions located in the County of New York, including SG's New York branch." *Id.* ¶ 11. Finally, there can be no plausible suggestion that the alleged conduct was directed at Florida or calculated to cause harm in Florida. *See id.* ¶ 12. Thus, this suit does not "arise out of or relate to a defendant's contacts with Florida." *Carmouche*, 789 F.3d at 1204.

### i. Plaintiff cannot satisfy the long-arm statute.

Because no SG conduct related to Plaintiff's Title III claim occurred in Florida, Plaintiff cannot satisfy the specific personal jurisdiction element of Florida's long-arm statute.

*First*, Plaintiff cannot establish specific personal jurisdiction under Section 48.193(1)(a)(2)—which allows for the assertion of specific jurisdiction over suits alleging a "tortious act within [Florida]"—because a "critical factor in deciding whether a tort committed out

of state may subject the tortfeasor to personal jurisdiction in Florida is whether the cause of action *arose from* the [defendant's] contact with the forum state." *Don King Prods., Inc. v. Mosley*, 2016 WL 3950930, at *3 (S.D. Fla. Jan. 27, 2016) (Williams, J.) (emphasis added) (dismissing tortious interference with contract claim for lack of connexity as required under 48.193(1)(a)(2)); *RMS Titanic, Inc. v. Kingsmen Creatives, Ltd.*, 579 F. App'x 779, 786 (11th Cir. 2014) (per curiam); *Hinkle v. Cirrus Design Corp.*, 775 F. App'x 545, 549 (11th Cir. 2019) (affirming dismissal; "[t]he problem is that the [plaintiffs'] asserted causes of action did not arise out of that alleged business activity" in Florida).[3] Here, there is no connection between Plaintiff's Helms-Burton cause of action and any SG activities in, contact with, or communications into Florida—because the single Florida transaction alleged (the refinancing of the Ritz-Carlton's debt) had nothing to do with Plaintiff and nothing to do with Cuba. *See* Bourrinet Decl. ¶ 9. Defendant's counsel are not aware of any Florida decision finding the long-arm statute satisfied in comparable circumstances.

Plaintiff also cannot establish specific personal jurisdiction under Section 48.193(1)(a)(2) for an additional, independent reason: "For personal jurisdiction to attach under the tortious activity provision of the Florida long-arm statute, the plaintiff must demonstrate that the non-resident defendant committed a substantial aspect of the alleged tort in Florida by establishing that the activities in Florida were essential to the success of the tort." *DeZinno v. McClain Printing Co.*, 2007 WL 9709709, at *8 (S.D. Fla. Apr. 19, 2007) (Ungaro, J.) (internal quotation marks omitted); *see also Taylor v. Moskow*, 717 F. App'x 836, 840 (11th Cir. 2017) ("In analyzing whether tortious conduct has occurred within Florida, courts have looked to whether the nonresident defendant committed a substantial aspect of the alleged tort in Florida."); *Oriental*

---

[3] This requirement is termed "connexity between a defendant's contact with the state and a plaintiff's cause of action." *See Ure v. Oceania Cruises, Inc.*, 2017 WL 2378200, at *2 n.5 (S.D. Fla. June 1, 2017) (Gayles, J.).

*Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 894 (11th Cir. 1983) (reversing exercise of jurisdiction under the long-arm statute, holding that "[t]he occurrence of the injury alone in the forum state does not satisfy the statutory test"); *Fast SRL*, 2018 WL 7822711, at *5-6 (applying *Oriental Imports* and granting 12(b)(2) dismissal for failure to satisfy the long-arm statute); *Musiker v. Projectavision, Inc*., 960 F. Supp. 292, 294-97 (S.D. Fla. 1997) (Moore, J.) (same). Here, again, the only thing SG is alleged to have done in Florida—refinancing of the Ritz-Carlton's debt in Miami—obviously was not connected to, much less "essential to the success" of the Cuban Credit Facilities cited by Plaintiff.

*Second*, Plaintiff cannot establish specific personal jurisdiction under Section 48.193(1)(a)(6) of the long-arm statute—which supports jurisdiction in cases (a) alleging injuries "to persons or property" and (b) arising from (i) the defendant's "solicitation or service activities with this state" or (ii) "[p]roducts" or the like that were "used or consumed within this state in the ordinary course of commerce"—because Plaintiff meets neither requirement.

"[A]llegations of economic injury alone do not establish the type of injury *to persons or property* within Florida required to establish personal jurisdiction pursuant to Section 48.193(1)(a)(6)." *See Leon*, 301 F. Supp. 3d. at 1216 n.7 (emphasis added). Rather, Section 48.193(1)(a)(6) applies only where a defendant's out-of-state action causes *personal* injury (*i.e.*, physical or emotional injury) or damage to physical property in Florida. *See Prunty v. Arnold & Itkin LLP*, 753 F. App'x 731, 735-36 (11th Cir. 2018); *Snow*, 450 F.3d at 1318 (holding that the Florida long-arm statute did not apply because the plaintiff did not allege any personal injury or damage to physical property). Plaintiff, however, alleges only economic injury.

Further, "[l]ike the rest of § 48.193(1), this subsection [48.193(1)(a)(6)] provides specific jurisdiction arising out of the defendant's activities in Florida which are related to the cause of

action being litigated," and therefore "there must be connexity between plaintiff's alleged injury and defendant's solicitation and service activities in Florida." *Hesterly v. Royal Caribbean Cruises, Ltd.*, 2008 WL 516495, at \*8 (S.D. Fla. Feb. 25, 2008) (Gold, J.); *Tri-Lady Marine, Ltd. v. Aqua-Air Mfg.*, 2017 WL 1345113, at \*2 (S.D. Fla. Apr. 12, 2017) (Gayles, J.) (holding that the Florida long-arm statute was not satisfied where—although defendant contracted with a Florida plaintiff—the defendant had not solicited plaintiffs' business through any of defendant's actions in Florida). Here, as discussed above, there is no connection between any SG action in Florida and Plaintiff's alleged injury. And, of course, SG did not engage in solicitation or service activities in Florida or sell products that were used or consumed in the State, as the plain terms of Section 48.193(1)(a)(6) require.

### ii.    *The assertion of specific jurisdiction would violate due process.*

The exercise of specific jurisdiction over SG also would not comport with due process. Due process requires courts to consider, *first*, "whether the plaintiffs have established that their claims 'arise out of or relate to' at least one of the defendant's contacts with the forum," and *second*, "whether the plaintiffs have demonstrated that the defendant purposefully availed itself of the privilege of conducting activities within the forum state." *Waite*, 901 F.3d at 1313 (internal quotation marks omitted). Here, Plaintiff satisfies neither prong.[4]

---

[4] Due process concerns are at their apex here, given the nature of the case. The Supreme Court has emphasized that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 115 (1987) (internal quotation marks omitted). The Court, moreover, has emphasized the importance of international comity in determining whether personal jurisdiction may be exercised over a foreign defendant. *Daimler*, 571 U.S. at 139-41; *see also Westchester Fire Ins. Co. v. Vector Aerospace*, 2017 WL 4326097, at \*2 (S.D. Fla. Sep. 27, 2017) (Moreno, J.) (under *Daimler*, "in a transnational context . . . federal courts must also heed principles of international comity and should not employ an expansive view of general jurisdiction"). These considerations confirm that dismissal is appropriate here, as SG is a non-U.S. bank.

As to the first prong, the Due Process Clause requires that "*defendant's suit-related conduct* must create a substantial connection with the forum" and that this relationship with the forum "arise[s] out of contacts that the 'defendant *himself*' creates with the forum." *Walden*, 571 U.S. at 284 (citation omitted) (emphasis added); *Fraser v. Smith*, 594 F.3d 842, 850 (11th Cir. 2010). The "mere fact that [defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Walden*, 571 U.S. at 291. "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* at 290; *Blue Water Int'l, Inc. v. Hattrick's Irish Sports Pub, LLC*, 2017 WL 4182405, at *3 (M.D. Fla. Sept. 21, 2017) ("An analysis that considers the location of the plaintiff's injury 'impermissibly allows a plaintiff's contacts with the defendant and the forum to drive the jurisdictional analysis.'") (quoting *Walden*, 571 U.S. at 289).

Here, as explained above, SG had no suit-related connections with Florida that *it* created. To the contrary, all of SG's alleged Cuba-related activities identified in the AC and its exhibits occurred in New York. *See*, *e.g.*, AC ¶ 65; AC Ex. 4 [DE 1] ¶ 6. In materially identical circumstances, courts consistently have dismissed suits as violating due process.

For instance, in *Waite*, the Eleventh Circuit, affirming a Rule 12(b)(2) dismissal, held that exercise of specific personal jurisdiction over defendant Union Carbide would violate due process where—as here—the sole jurisdictional basis asserted was that the plaintiff was injured in Florida. 901 F.3d at 1315. The court, after analyzing the Supreme Court's decision in *Walden*, held that to establish a sufficient "connection between the forum and the [non-residents'] specific claim," the defendant's "contacts with Florida must be the but-for cause of the torts" that plaintiff alleges. *Id.* at 1314. That test was not satisfied where the defendant's alleged in-state conduct, *e.g.*, maintaining a plant in Florida, had "nothing to do with the torts Union Carbide allegedly

committed [in exposing plaintiff to asbestos]." *Id.* at 1315. Likewise, due process does not permit specific jurisdiction here because SG's alleged Florida conduct (the refinancing of a Ritz-Carlton loan) is not the *but-for cause* of (rather, it is wholly unrelated to) the alleged "trafficking."

Moreover, in *Waite* the plaintiff sought to avoid dismissal under the Due Process Clause by arguing that Union Carbide had an ongoing duty to warn him to avoid future asbestos exposure and that Union Carbide breached that duty, which was owed to him in Florida and injured him while he was in Florida. The Eleventh Circuit disagreed, noting that plaintiff's arguments would allow him to assert jurisdiction wherever he happened to move, which "would impermissibly allow the plaintiffs' choices—rather than the defendant's contacts—to drive the jurisdictional analysis." *Id.* at 1316 (internal quotation marks omitted). District courts in the Eleventh Circuit repeatedly have affirmed this principle, holding that the "plaintiff cannot be the only link between the defendant and the forum. Rather it is the defendant's conduct that must form the necessary connection with the forum." *Textile USA, Inc. v. Diageo N. Am., Inc.*, 2017 WL 10187642, at *7 (S.D. Fla. July 31, 2017) (Williams, J.) (*citing Walden*, 571 U.S. at 285); *see also Wray v. Peterson*, 2018 WL 3719323, at *1 (M.D. Fla. July 17, 2018) ("[r]efocusing the courts' analyses on the contacts that the Defendant—not the Plaintiff—created with the forum state, *Walden* made explicit 'that mere injury to a forum resident is not a sufficient connection to the forum'"), *report and recommendation adopted*, 2018 WL 3707904 (M.D. Fla. Aug. 3, 2018).

As in *Waite*, *Textile USA*, and *Wray*, Plaintiff has not alleged that SG took *any* actions in Florida that relate to the alleged "trafficking," *i.e.*, the commercial activities with BNC. *See also Multimodal Dev. Grp., LLC v. Chemonics Int'l, Inc.*, 2016 WL 3059083, at *3 (S.D. Fla. May 31, 2016) (Gayles, J.) (in breach of contract action, failure to make "payment [that] was to be performed in Florida" not enough to satisfy due process). Rather, this action's *only* "connection"

to Florida is that Plaintiff is headquartered and incorporated here, but this is entirely due to the acts of Plaintiff (and those forming it). The Due Process Clause establishes that such a "connection" is insufficient to establish jurisdiction.

As for the second prong of the due process inquiry—*i.e.*, purposeful availment—in cases involving intentional torts, the plaintiff must allege that the tort "[was] aimed at the forum state" and "caused harm that the defendant should have anticipated would be suffered in the forum state." *CCTV Outlet, Corp. v. Desert Sec. Sys. LLC*, 2017 WL 5640717, at *3 (S.D. Fla. Aug. 7, 2017) (Cohn, J.). Here, as set forth in the Bourrinet Declaration, none of the transactions alleged in the AC were aimed at Florida. *See* Bourrinet Decl. ¶ 12. Indeed, SG did not know of Plaintiff or that it was incorporated in Florida prior to Plaintiff asserting its Helms-Burton action. *See id.* ¶ 12. Because Plaintiff has failed to establish that SG's conduct targeted Florida, it has failed to establish purposeful availment. *CCTV Outlet*, 2017 WL 5640717, at *3 (granting 12(b)(2) motion where "Plaintiff has not established that Defendants' activities were aimed at Florida"); *Vision Media TV Grp., LLC v. Forte*, 724 F. Supp. 2d 1260, 1266 (S.D. Fla. 2010) (Marra, J.) (dismissing libel suit for lack of personal jurisdiction where there was no evidence "showing that the website at issue targeted Florida or that Defendants acted to aim their conduct at a Florida audience"); *Don King*, 2016 WL 3950930, at *5 (granting 12(b)(2) motion where "there is no evidence that the promotional materials were purposefully directed at Florida or its citizens").

## II.   PLAINTIFF LACKS STANDING TO PURSUE ITS ACTION AGAINST SG.

The AC also should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) because Plaintiff has not satisfied its burden of alleging facts showing that it has standing under Article III of the U.S. Constitution to bring this action against SG. *See Ocampo v. Carrington Mortg. Servs., LLC*, 288 F. Supp. 3d 1327, 1331 (S.D. Fla. 2017) (Gayles, J.) (dismissing complaint where plaintiff lacked

21

Article III standing and noting that the party invoking federal jurisdiction "bears the burden of demonstrating that he has standing to sue"). Standing is a "threshold jurisdictional question" that must be addressed "prior to and independent of the merits of a party's claims." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005) (affirming dismissal of action where plaintiff lacked standing and, as a result, the court lacked jurisdiction to examine the merits of plaintiff's claims).

To establish Article III standing, a plaintiff must show: (i) that it suffered an injury in fact, (ii) that is fairly traceable to the challenged conduct of the defendant, and (iii) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *Ocampo*, 288 F. Supp. 3d at 1331; *Zia v. CitiMortgage, Inc.*, 210 F. Supp. 3d 1334, 1336-37 (S.D. Fla. 2016) (Gayles, J.) (dismissing complaint for lack of standing). Failure to establish any one of the three standing elements deprives the court of subject-matter jurisdiction to hear the suit. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103-04 (1998).

Here, Plaintiff fails to meet the second, "fairly traceable" prong of the Article III standing test, which requires a "causal connection" between the plaintiff's injury and the defendant's alleged conduct. *See Lujan*, 504 U.S. at 560; *Kawa Orthodontics, LLP v. Sec'y, U.S. Dep't of the Treasury*, 773 F.3d 243, 247 (11th Cir. 2014) ("To establish causation, [plaintiff] must demonstrate its alleged injury is fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.") (internal quotation marks omitted). In this case, there is no alleged or even arguable "causal connection" between: (i) Plaintiff's asserted injury (that the Founders were not compensated by BNC or the Cuban Government when, in 1960, BNC allegedly confiscated Banco Nuñez's equity, deposit account at

BNC, and shares of BNC (AC ¶¶ 7, 10-11, 25, 50, 68)); and (ii) SG's alleged conduct in this case (engaging in and profiting from commercial activity with BNC commencing in 2000) (AC ¶¶ 12-13, 25, 51, 56-67, 81-82)).

Plaintiff has not alleged any injury "fairly traceable" to SG's alleged conduct, either at the time of taking or subsequently. Rather, Plaintiff alleges that the injury incurred was the failure by the Cuban Government and BNC to compensate the Founders when Banco Nuñez was confiscated—some 40 or 50 years *before* SG's alleged conduct. *See*, *e.g.*, AC ¶ 25 ("On October 14, 1960, [BNC] nationalized Banco Nuñez without paying any compensation to the Founders."); AC ¶ 50 ("Banco Nuñez was entirely absorbed into BNC and the Cuban Government failed to pay the Founders for any of Banco Nuñez's stolen property, including: the equity of Banco Nuñez, Banco Nuñez's $9.9 million in cash deposited at BNC, or Banco Nuñez's $194,900 worth of shares of BNC. BNC could have compensated the Founders either with cash or with equity in BNC"); *see also* AC ¶¶ 7, 10-11. It is BNC and the Cuban Government that are alleged to have caused the injury for which Plaintiff seeks a remedy in this action.

Plaintiff does not allege that SG's commercial activities with BNC caused Plaintiff any harm. In fact, the AC reveals that Plaintiff is intentionally *not* alleging *any* causal connection between the alleged injury and SG's conduct. Plaintiff sums up its case as follows: "For Plaintiff's losses *attributable to the Cuban Government's confiscation of Banco Nuñez*, Plaintiff seeks damages from [SG] in accordance with § 6082(a) of Helms-Burton, including treble damages." AC ¶ 68 (emphasis added). This failure to plead the required "causal connection" could not be more striking.

As explained in more detail below, Title III does not impose liability on anyone who simply did business with an entity that held confiscated assets, and Plaintiff's argument to the contrary is

flawed as a matter of statutory construction. In creating remedies against persons who "use" or "benefit" from confiscated property, it seems evident that Congress did not intend to make liable those—like SG—whose "use of" or "benefit" from property is not alleged to have directly involved the property claimed by the plaintiff. Indeed, the Act must be construed to apply only to those whose conduct is alleged to have had the constitutionally required causal connection to the plaintiff's alleged injury. *See United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916) ("A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score."); *see also Burban v. City of Neptune Beach, Fla.*, 920 F.3d 1274, 1282 (11th Cir. 2019) ("We avoid statutory interpretations that raise constitutional problems."); Section III.C.1, *infra*. In any event, Congress *cannot* override a constitutional requirement, and thus could not, even if it wanted to, "erase Article III's standing requirements [including traceability] by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *See Spokeo, Inc.*, 136 S. Ct. at 1547-48.

Whatever the outer limits of Helms-Burton statutory liability, Plaintiff has not asserted *any* causal connection between the asserted injury and SG's alleged conduct, much less has it alleged facts showing that the injury is "fairly traceable" to SG's conduct. *Lujan*, 504 U.S. at 560. Cuban entities are alleged to have caused the injury, and they are "not [currently] before the Court." *See Lujan*, 504 U.S. at 560. Where that is the case, the court must dismiss the action for lack of standing. *Id*; *Kawa Orthodontics, LLP*, 773 F.3d at 247 (affirming dismissal of action where the defendant's alleged conduct did not cause plaintiff's monetary injury); *Ocampo*, 288 F. Supp. 3d at 1331 (dismissing complaint where plaintiff failed to meet the "causation" element of Article III standing).

24

III.   **THE AMENDED COMPLAINT FAILS TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED.**

Lack of jurisdiction is not the only reason this suit must be dismissed: Plaintiff's action also suffers from several independently dispositive failings on the merits.

A.   **Legal standard.**

On a motion to dismiss for failure to state a claim, a court may consider the complaint, the written instruments attached to it as exhibits, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *GSW, Inc. v. Long Cty., Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993). If documents attached to the complaint are central to the plaintiff's action and the authenticity of the document is not challenged, a court may consider the documents on a motion to dismiss without converting the motion into one for summary judgment. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (*citing Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)). When "the exhibits contradict the general and conclusory allegations of the pleadings, the exhibits govern." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007). And "[w]hen the allegations contained in a complaint are wholly conclusory and fail to set forth *facts* which, if proved, would warrant the relief sought, it is proper to dismiss for failure to state a claim." *Am. Ass'n for Advancement of Sci. v. Periodicals Publicacoes Tecnicas*, 2008 WL 11333109, at *2 (S.D. Fla. Sept. 8, 2008) (Altonaga, J.) (*citing Davidson v. Georgia*, 622 F.2d 895, 897 (11th Cir. 1980)).

B.   **Plaintiff is precluded from bringing its action because it acquired the "claim" after the date Helms-Burton was enacted.**

The AC must be dismissed because Plaintiff simply falls outside the category of entities that Congress authorized to bring suit under the Act. The Act expressly limits the "[a]pplicability" of its civil remedy: "In the case of property confiscated before March 12, 1996 [the date of the

25

Act's enactment], a United States national may not bring an action under this section on a claim to the confiscated property unless such national acquires ownership of the claim *before March 12, 1996*." 22 U.S.C. § 6082(a)(4)(B) (emphasis added). Plaintiff cannot establish that element here.

Plaintiff tacitly recognizes this pleading requirement because it attempts—but fails—to plead around it. Specifically, Plaintiff pleads that it acquired ownership of a claim to the confiscated property "[i]n 1996," while not saying *when* in 1996 it acquired that claim. AC ¶¶ 18, 40-42, 55. Plaintiff artfully avoids saying when "[i]n 1996" it was formed to hold and preserve a claim on behalf of the thirteen individuals who are alleged to have inherited a claim to the equity of Banco Nuñez and to have assigned their claims to Plaintiff. *Id.* Notably, the AC alleges that the *Founders' heirs* inherited their interest in Banco Nuñez prior to March 12, 1996 (AC ¶ 55), yet fails to allege when *Plaintiff*, itself, acquired ownership of *its* "claim." The failure to allege this central element puts Plaintiff outside the "[a]pplicability" provisions of the Act.

In fact, a review of judicially noticeable documents establishes that Plaintiff's failure to allege ownership of the claim prior to March 12, 1996, was not an oversight. Plaintiff did not allege it because it *cannot*. Corporate public records show that Plaintiff did not come into existence until August 19, 1996, *five months* after the cut-off date of the Act. *See* Exhibit A, Florida Secretary of State's records (showing that Plaintiff, a Florida corporation, was incorporated on August 19, 1996).[5] Thus, Plaintiff *could not* have "acquire[d] ownership" of the claim before March 12, 1996,

---

[5] A court ruling on a 12(b)(6) motion may consider "matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322. This includes corporate public records because they are publicly available and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also Universal Express, Inc. v. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006) (holding that a district court may take judicial notice of public records without converting a motion to dismiss into a motion for summary judgment); *Rana Fin., LLC v. City Nat'l Bank of N.J.*, 2018 WL 4999806, at *1 n.1 (S.D. Fla. Aug. 7, 2018) (Cohn, J.) (taking judicial notice of Georgia Secretary of State's website to confirm the name of an LLC).

as the Act requires, because Plaintiff did not yet exist on that date. For this additional reason, the AC must be dismissed.

Indeed, Congress specifically anticipated just this situation. As the House Committee that was responsible for development of the legislative language explained: "[I]t is not the intention of the committee that the right of action be available to entities that are incorporated in the United States after the date of enactment, inasmuch as such entities could not have owned the claim to confiscated property on the date of enactment because they did not then exist." H.R. Rep. No. 104-202, at 40 (1995); *see also* H.R. Rep. No. 104-468, at 59 (1996) ("Entities that are incorporated in the United States after the date of enactment cannot use the remedy with respect to property confiscated before the date of enactment[.]"). That congressional directive requires dismissal of the AC.

### C.   Plaintiff fails to plead that SG trafficked in confiscated property.

Plaintiff's Title III action against SG fails for an additional, independent reason. The Act provides that someone who traffics in property "which was confiscated by the Cuban Government" is liable to any United States national who owns the claim to "*such property*." 22 U.S.C. § 6082(a)(1)(A) (emphasis added). But it is apparent from the face of the AC that SG did not traffic in the specific property that Plaintiff alleges was confiscated. The Act therefore does not provide a cause of action in the circumstances here.

Plaintiff—likely aware of its inability to link the confiscated property to SG—seeks to rewrite the Act, asserting that "Plaintiff is entitled to relief under Title III of Helms-Burton from any entity *doing business* with BNC—*i.e.*, 'trafficking' in Plaintiff's 'property.'" AC ¶ 42 (emphasis added). But Plaintiff's standard is wholly untethered to the Act's language and would obliterate the carefully calibrated statutory scheme that requires that the defendant traffic in the

confiscated *property*, not merely do business with an arm of the Cuban Government. Plaintiff's theory would create vast liability for conduct that Congress expressly did not make actionable.

        1.     **The language and legislative history of Title III make clear that the defendant must have trafficked in the same property that the plaintiff alleges was confiscated.**

Title III requires a showing that the defendant used or benefited from the *particular* property that was confiscated by the Cuban Government and that is claimed by the plaintiff. That is apparent from the statutory language, which defines "traffics" in terms of the defendant's conduct regarding the "confiscated property" (22 U.S.C. § 6023(13)(A)) and confines the private right of action to persons who "own[] the claim to *such* property." *Id.* § 6082(a)(1)(A) (emphasis added); *In re Harbor East Dev. Ltd.*, 2011 WL 45335 (S.D. Fla. Bankr. Jan. 6, 2011) (Cristol, J.) ("Title III of the Act was intended to grant U.S. nationals a private right of action to bring suit . . . against persons who 'traffic' in *their* confiscated property in Cuba.") (emphasis in the original); *cf. In re Mid-W. Tar Prod. Corp.*, 150 F. Supp. 163, 172 (D. Md. 1956) (rule affording ancillary bankruptcy court authority to "hear and adjudge *claims to such property*, . . . refers to the power of the ancillary court to determine ownership, priorities and liens for the benefit of claimants to the *specific property* in its possession") (emphasis added) (internal quotation marks omitted).

Title III's "Findings" provisions underscore the express statutory requirement that the defendant traffic in the specific property that was confiscated.[6] To begin, the Findings reflect Congress's specific disapprobation of "[t]he wrongful confiscation or taking of property belonging to United States nationals by the Cuban Government, and the subsequent exploitation of *this property* at the expense of the rightful owner." 22 U.S.C. § 6081(2) (emphasis added); *id.*,

---

[6] Findings applicable to the entire Act are set forth at 22 U.S.C. § 6021. The Act's purposes are set forth at 22 U.S.C. § 6022. Findings applicable to Title III are set forth at 22 U.S.C. § 6081.

§ 6081(6) (describing the foregoing conduct as "'trafficking' in confiscated property."). By tying the cause of action to transactions involving the *particular* confiscated property claimed by the plaintiff, the Act thus creates a "proportionate remedy for U.S. nationals who were targeted by the Castro regime when their property was confiscated." H.R. Rep. No. 104-202, at 39 (1995); *see also* H.R. Rep. No. 104-468, at 58 (1996) (Helms-Burton "provide[s] an additional remedy for U.S. nationals through which they may take action to *protect their claim to a confiscated property in Cuba*.") (emphasis added); *id*. (Helms-Burton allows avoidance of treble damages "by ceasing to traffic in *the property in question*") (emphasis added).

The point is confirmed by contrasting the Act's language with broader statutes that bar the conduct of any business in and with Cuba, which *omit* any reference to particular property. *See* Factual and Legal Background, *supra*. The "presum[ption] that Congress is knowledgeable about existing law pertinent to the legislation it enacts," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 185 (1988), is particularly compelling here because Congress specifically positioned Helms-Burton within the broader context of the U.S. embargo against Cuba. The Act lists "strengthen[ing] international sanctions against the Castro government" as one of its purposes. 22 U.S.C. § 6022(2). The Act's Findings recognize pre-Helms-Burton Cuba embargo legislation, such as the Foreign Assistance Act of 1961 and the Cuban Democracy Act of 1992. *See* 22 U.S.C. § 6021(11), (12). The Act defines key terms by cross-reference to the TWEA. *See* 22 U.S.C. § 6023(7)(A). As such, these laws should be read together. *See Hunter v. Erickson*, 393 U.S. 385, 388 (1969) (acts "on the same subject" should be "read together"); *Betteroads Asphalt Corp. v. United States*, 106 F. Supp. 2d 262, 266 (D.P.R. 2000) (because "the Helms Amendment and the González Amendment [both addressing denial of foreign aid to nations that fail to pay debts to U.S. citizens] plainly relate to the same subject matter," the court would "read[] these two statutes together").

Here, the other statutes referenced in the Act are far broader than Title III. TWEA broadly prohibits "trade, or attempt to trade, either directly or indirectly, with, to, or from, or for, or on account of, or on behalf of, or for the benefit of [Cuba]." 50 U.S.C. § 4303; *see also Regan v. Wald*, 468 U.S. 222, 224 (1984) (explaining that the regulation implementing TWEA "prohibits any transaction involving property in which Cuba, or any national thereof, has '*any interest of any nature whatsoever*, direct or indirect'") (citing 31 C.F.R. § 515.201(b)). Similarly, the FAA expansively states that "[n]o assistance shall be furnished . . . to the present government of Cuba." 22 U.S.C. § 2370(a)(1). The CDA empowers the President to impose sanctions on "any country that provides assistance to Cuba," including through "the form of a loan, lease, credit or otherwise." 22 U.S.C. § 6003(b).

Compared to these other statutes, the focus on specific property in Title III is noteworthy. Had Congress intended to impose civil liability merely for doing business with Cuban instrumentalities that received confiscated assets—virtually all of Cuba—it knew how to say so— and its decision not to do that in Helms-Burton must be regarded as intentional. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand."); *Chamber of Commerce of U.S. v. NLRB*, 721 F.3d 152, 165-66 (4th Cir. 2013) (because comparable legislation expressly granted authority not mentioned in National Labor Relations Act, its absence in the NLRA can "fairly be considered deliberate"). In short, the Act prohibits trafficking in the specific property confiscated. Plaintiff's theory, which would substitute merely *engaging in business* with a confiscating *party* for the Act's requirement of trafficking in the confiscated *property*, is legally untenable.

Moreover, it is telling that the examples of conduct meant to be actionable under Title III that Congress offered—both in the enacted statutory findings and in the legislative history—*all* involve the actual use of particular confiscated property by the defendant. *See* 22 U.S.C. § 6081(5) ("The Cuban Government is offering foreign investors the opportunity to purchase an equity interest in, manage, or enter into joint ventures using property and assets . . . confiscated from United States nationals."); *Cuban Liberty and Democratic Solidarity Act*, 104th Cong. 31 (1995) ("[I]n the typical case the defendant would be a foreign investor who went into Cuba, [and] acquired a leasehold interest or actual title to property."); 104 Cong. Rec. S15083 (1995) (The Act's "right of action is against the 'tort' of unauthorized, unlawful 'conversion' of property— essentially the act of 'fencing' stolen goods").[7] The defendant's actual dealing in particular property is thus a necessary component of Helms-Burton liability—and it is what Plaintiff conspicuously does not and cannot allege with respect to SG.

By the same token, as noted above (at Section II), the examples of permissible causes of action considered by Congress indicate that Congress also had in mind a separate but related limit on the trafficking cause of action: The statute was intended to apply only to defendants whose conduct was closely enough connected to the particular confiscated property that it had a causal connection to a plaintiff's alleged injury, such as defendants who acquired, managed, or otherwise used the confiscated property. If Plaintiff's unduly expansive reading of the statute were accepted, any entity worldwide that received any payment from BNC for anything would be liable under

---

[7] *See also* Cuban Liberty and Democratic Solidarity Act of 1995, Markup Hearing before the House Committee on International Relations, 104th Cong. at 21, 27-28 (1995); Cuban Liberty and Democratic Solidarity Act, Hearings before the Senate Subcommittee on Western Hemisphere and Peace Corps Affairs of the Committee on Foreign Relations, 104th Cong. at 141 (1995). Of course, even in these hypothetical situations, the Article III standing rules still apply, *i.e.*, every Helms-Burton plaintiff needs to show that the defendant's conduct with respect to that particular property caused an actual injury to plaintiff sufficient to create Article III standing. *See supra*, Section II.

Helms-Burton. *See* AC ¶ 12 ("The Defendants are liable to Plaintiff for 'trafficking' because they conduct commercial activities with BNC and derive profits therefrom."); AC ¶ 42 ("Plaintiff is entitled to relief under Title III of Helms-Burton from any entity doing business with BNC—*i.e.*, 'trafficking' in Plaintiff's 'property.'"). Under Plaintiff's reading, the Act would make liable, among many others, every small-business owner who (for example) was paid for providing maintenance, contracting, HVAC or other services to BNC (in excess of $50,000), regardless of whether the service provider caused any injury to Plaintiff. There is no evidence in the language or legislative history of Helms-Burton that Congress intended the Act to be applied in such a boundless manner.

### 2. *Plaintiff does not plead that SG trafficked in the particular property that Plaintiff asserts was confiscated.*

The requisite identity between property Plaintiff alleges was confiscated and the property in which Plaintiff alleges SG trafficked is wholly absent here. The confiscated property on which Plaintiff premises this action is the property allegedly confiscated from the Founders in 1960: their equity in Banco Nuñez, their deposit account at BNC, and their shares in BNC. AC ¶¶ 7, 10, 11, 50. But the AC does not allege that SG trafficked in *that* property, or that any funds that BNC paid SG (or that otherwise are associated with any exchange between BNC and SG) are "property" that once belonged to the Founders. This omission alone is dispositive.

Rather than allege that SG trafficked in the property said to have been confiscated, Plaintiff merely alleges that SG conducted "commercial activities" and is "doing business" with BNC. Plaintiff's theory is that after BNC absorbed Banco Nuñez in 1960, any subsequent transaction that SG (or, presumably, any business or individual) engaged in with BNC—even those occurring almost half a century later—suffices to establish the requisite identity between the property

allegedly confiscated and the property allegedly trafficked in. But this is insupportable for the reasons set forth in Point III.C.1 above.

Nor can Plaintiff's case be saved by assuming that BNC's assets that were used in connection with its SG transactions were comprised of property that had been confiscated from the Founders decades earlier. Such an assumption is not plausible for myriad reasons. *See Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1071, 1075 (11th Cir. 2017) (declining to make unreasonable inference in plaintiff's favor and affirming 12(b)(6) dismissal); *Pestana v. Miami-Dade Cty. Bd. of Comm'rs.*, 282 F. Supp. 3d 1284, 1287 (S.D. Fla. 2017) (Lenard, J.) ("[U]nwarranted deductions of fact in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations.") (internal quotation marks omitted).

First, BNC is a Cuban Government-owned institution with many sources of funding. There is absolutely no reason to surmise (and the AC does not allege) that BNC funds used in the SG transactions were derived from those assets confiscated from Banco Nuñez.

Second, the AC itself makes clear that even BNC's original capitalization came from the assets of many Cuban banks *other than* Banco Nuñez. AC ¶¶ 4-6. Here again, there is no reason to assume that BNC funds used in the SG transactions originated with Banco Nuñez.

Third, although Plaintiff alleges that the property confiscated from Banco Nuñez was absorbed into BNC in 1960 (AC ¶ 5), Plaintiff does not allege that any such property *still* was owned by BNC in 2000, when SG is alleged to have commenced engaging in the transactions at issue (AC ¶ 14). This is an insurmountable failing in the AC. As the Working Paper cited in the AC explains, in 1997—years before the SG commercial transactions that commenced in 2000— BNC was divided into two separate banks. *See* Factual and Legal Background, *supra.* SG is alleged to have engaged in transactions with only one of those two banks (AC ¶ 14), and Plaintiff does not

allege—even in a conclusory manner—that the predicate property ended up in the possession of *that* Cuban bank.

Fourth, even aside from the division of BNC into separate banks, any allegation that BNC still possessed particular property that allegedly had been confiscated 40 years before the transactions at issue here—*e.g.*, a deposit account—would be so implausible as not to be worthy of any weight on a motion to dismiss. *See Freund v. Republic of France*, 592 F. Supp. 2d 540, 559-60 (S.D.N.Y. 2008) (accepting as true plaintiffs' allegation that an agency of the French government "took property from them and the property was not returned," but *declining to* infer that the agency *still* owned "property that was allegedly taken over sixty years ago," notwithstanding plaintiff's "conclusory" allegation that "[d]efendants . . . retained and converted the [p]roperty and its derivative profits into their own property") (internal quotation marks omitted); *Fickling v. Commonwealth of Austl.*, 775 F. Supp. 66, 72 (E.D.N.Y. 1991) (bald allegations that defendant operated or controlled Holocaust-era property 60 years after theft failed to plead that defendant still operated and controlled such property); *Crist v. Republic of Turkey*, 995 F. Supp. 5, 11 (D.D.C. 1998) (deeming insufficient the "mere allegation that the proceeds derived from [plaintiffs' confiscated] real property located in Cyprus are now somehow connected to . . . commercial activity conducted by the Republic of Turkey"). Consequently, because Plaintiff has not, and cannot, allege that BNC held the confiscated property when SG is alleged to have transacted with BNC, Plaintiff cannot (and, in fact, does not) allege that SG trafficked in those assets.[8]

---

[8] Plaintiff's allegations that SG engaged in transactions with Banco Popular de Ahorro ("BPA"), AC ¶ 25, 67 (alleging that SG derives profits from BNC by providing currency conversions through BPA), suffer from the same defect. Plaintiff does not allege that BPA ever received property confiscated from Banco Nuñez from any source, including BNC.

**D.      Plaintiff fails to state a basis for Title III relief, because the property was alleged to have been confiscated from Cuban citizens.**

Finally, Plaintiff's claim cannot proceed because Title III authorizes an action only when the property at issue was confiscated from a U.S. national, and therefore in violation of international law. But the property here was confiscated from *Cuban* citizens by their own government. Plaintiff's suit thus falls outside the terms of the Act and therefore must be dismissed.

*1.      Only property confiscated from U.S. citizens gives rise to a Title III action.*

In *Glen v. Club Méditerranée, S.A.*, 450 F.3d 1251 (11th Cir. 2006), the Eleventh Circuit expressed its skepticism that Title III claims could ever apply to cases in which the property at issue was not confiscated from U.S. citizens:

> The Glens repeatedly state that there is no question that Club Med is a "trafficker" in confiscated property, as defined by [Helms-Burton]. . . . [W]e do note that the [] property at issue in this litigation was owned by Cuban nationals at the time of its expropriation and thus may not be the proper subject of a trafficking claim under the statute. *See* 22 U.S.C. § 6081(5), (6) (defining "'trafficking' in confiscated property" as transactions in "property and assets[,] some of which were confiscated from United States nationals."); 22 U.S.C. § 6081(11) ("United States nationals who were the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States. . . .").

*Id.* at 1255 n.3; *see also* 22 U.S.C. § 6081(2) (Congressional finding in Helms-Burton that "[t]he wrongful confiscation or taking of *property belonging to United States nationals* by the Cuban Government, and the subsequent exploitation of this property at the expense of the rightful owner, undermines the comity of nations, the free flow of commerce, and economic development") (emphasis added); *id.* §6081(10) ("The United States Government has an obligation to its citizens to provide protection against wrongful confiscations by foreign nations."); *id.* §§6022(3), (6) (stating that a purpose of the Act is "to provide for the continued national security of the United States in the face of … theft of property from United States nationals by the Castro government" and "to protect United States nationals against confiscatory takings"). The Executive Branch

35

agreed. *See* President Statement on Helms-Burton Waiver Exercise, July 16, 1996, 1996 WL 396122, at *1 ("Title III allows U.S. nationals to sue foreign companies that profit from *American-owned* property confiscated by the Cuban regime.") (emphasis added).

Other courts that have interpreted Helms-Burton have reached the same conclusion. *See, e.g.*, *Odebrecht Constr., Inc. v. Prasad*, 876 F. Supp. 2d 1305, 1311 (S.D. Fla. 2012) (Moore, J.) ("Title III, 'Protection of Property Rights of United States Nationals,' creates a statutory right of action against any person or entity who traffics property confiscated by the Cuban government *from any American citizen or company*."), *aff'd sub nom. Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268 (11th Cir. 2013) (emphasis added); *Lamb v. ITT Corp.*, 2010 WL 376858, at *2 (D. Neb. Jan. 26, 2010) (under "Title III of the Act, United States nationals who *owned property in Cuba* confiscated by the Cuban government since January 1, 1959, were provided a private right of action for recovery of damages") (emphasis added); *see also Prakash v. Altadis U.S.A. Inc.*, 2012 WL 1109918, at *24 (N.D. Ohio Mar. 30, 2012) ("Plaintiff lacks standing to assert a claim under the Helms-Burton Act, specifically 22 U.S.C. § 6082, because he never alleges that he is a United States national *whose property was confiscated* by the Cuban government.") (emphasis added).

### 2. *Claims to property confiscated by Cuba, from Cuban nationals, are not actionable under Helm-Burton.*

Other elements of Title III's language also make clear that the Helms-Burton private right of action under Title III is limited to circumstances where the property at issue was confiscated from a U.S. national. U.S. courts, including the Eleventh Circuit, vigorously enforce the so-called "domestic takings" rule—the "long-standing rule that closes the doors of American courts to international-law claims based on a foreign country's domestic taking of property." *Mezerhane v. Venezuela*, 785 F.3d 545, 549 (11th Cir. 2015). The domestic takings rule bars international-law

36

claims based on the Cuban Government's confiscation of property belonging to Cuban nationals. Helms-Burton, like myriad statutes before it, implements this rule. And under this rule, Plaintiff—which claims property that allegedly was confiscated by Cuba from Cuban citizens—has no cause of action.

       *i.*      *Title III requires "proof of ownership" of "the claim" to "confiscated property" that is cognizable under international law.*

To begin, Title III relief is available exclusively to a plaintiff that owns the underlying "claim" to "property that was confiscated by the Cuban Government." 22 U.S.C. § 6082(a)(1)(A). The Act makes clear that such a predicate "claim" is not created by the Act itself. Section 6083(a)(1) provides that proof of ownership of an interest in confiscated property can be conclusively established if "certification of a claim to ownership of that interest" was issued by the Foreign Claims Settlement Commission ("FCSC"), an independent, quasi-judicial federal administrative agency within the Department of Justice, under its first Cuba Program between 1965 and 1967,[9] well before Helms-Burton was enacted. The term "claim," therefore, refers to a type of right that existed long before Helms-Burton did, and the Act itself does not create the "claim" to the confiscated property. Indeed, the Act does not define the word "claim" or set forth any elements of the underlying "claim," as would be expected had it created the "claim" at issue, and therefore "the law may presume Congress did not intend to create causes of action unmentioned by the statute." *McKinnon v. Blue Cross & Blue Shield of Ala.*, 935 F.2d 1187, 1193 (11th Cir. 1991).

---

[9] Under Title V of the International Claims Settlement Act of 1949 ("ISCA"), the FCSC is authorized to evaluate the amount and validity of international law claims of U.S. nationals against the Cuban Government based on, among other things, losses from the expropriation of property by the Cuban Government after January 1, 1959 (when the Castro regime took power). *See* 22 U.S.C. § 1643.

Title III, in turn, makes clear that the existence, validity, and value of a "claim" is determined by international law. As noted, Section 6083(a)(1) sets forth rules governing proof of ownership of the "claim." Under those rules, FCSC decisions are dispositive of the validity of a plaintiff's "claim." *See also* 22 U.S.C. § 6082(a) (recognizing the FCSC's role in certifying claims and specifying other methods for determining ownership of a claim). Congress has long required that in making determinations about such claims, the FCSC "shall apply . . . *[t]he applicable principles of international law*, justice and equity*" any time it "exercis[es] authority" under the ISCA "*or any other Act*." 22 U.S.C. §§ 1623(a)(2)(B), 1623(k) (emphasis added).[10] Similarly, the congressional findings in Helms-Burton indicate that the Act was meant to respect, not override, international law. *See* 22 U.S.C. § 6081(9) ("International law recognizes that a nation has the ability to provide for rules of law with respect to conduct outside its territory that has or is intended to have substantial effect within its territory."). For this reason, Helms-Burton must be construed to apply an international law test to assess the validity of the "claim."[11]

---

[10] The FCSC applies the three components of this standard in hierarchical order, considering "justice and equity" if, and only if, the claim comports with international law. *See, e.g.*, *Re Estate of Clippard, et al.*, Decision No. LIB III-045, at 12 (F.C.S.C. Jan. 16, 2018) ("Under the Commission's authorizing statute, the applicable legal principles are, in order, the applicable principles of international law, justice and equity. Here, the applicable principles of international law conclusively determine the resolution of these claims") (internal quotation marks omitted); *Re [Redacted]*, Decision No. LIB III-044, at 25 (F.C.S.C. Jan. 16, 2018) ("[T]he Commission must turn to the applicable principles of international law, justice and equity. We turn first to international law and conclude that international law suffices to decide this case.") (internal quotation marks omitted); *Re Perle, et al.*, Decision No. 1025, at 4 (F.C.S.C. Oct. 20, 1954) ("justice and equity require the allowance of a claim, *if otherwise judicially valid*") (emphasis added).

[11] In *Garcia-Bengochea v. Carnival Corp.*, the court accepted that the "Act does not define the term 'claim'," and further concluded that in such circumstances, the court should look beyond the Helms-Burton Act to evaluate the meaning of "claim." 2019 WL 4015576, at *5-6 (S.D. Fla. Aug. 26, 2019) (King, J.). There, the court looked to the dictionary definition of "claim," but the court was not asked to address, nor did it address, whether it would be appropriate to define "claim" with reference to international law. The same is true of Order, *Havana Docks Corp. v. Carnival Corp.*, No. 1:19-cv-21724, (S.D. Fla. Aug. 28, 2019) (Bloom, J.). The issue here thus remains one

What is more, the statute authorizing the FCSC to certify Cuba-related confiscation claims expressly excluded domestic takings, because it permitted only certification of claims if "the property on which the claim was based was owned wholly or partially, directly or indirectly by a national of the United States on the date of the loss." 22 U.S.C. § 1643c(a). Based on this, the FCSC routinely denied claims of claimants who were Cuban nationals at the time of confiscation, even if they later became U.S. citizens. *See*, *e.g.*, *In Re Armando Sosa.*, Decision No. CU-831, at 1-3 (F.C.S.C. Dec. 14, 1967) ("Claimant has been a national of the United States since his naturalization on January 6, 1964," but "the property claimed was taken on November 12, 1963," accordingly "the claim is therefore denied."). Under Helms-Burton, such claimants are not eligible to seek Title III relief. 22 U.S.C. § 6082(a)(5)(B) (FCSC denials conclusive as to Helm-Burton claims).

To allow Plaintiff a different treatment (*i.e.*, to allow Plaintiff to premise its Title III action on a predicate "claim" that is not cognizable under international law), this Court would have to treat the word "claim"—as used in Section 6082 of the Act, and repeated in Section 6083(a)—as having one meaning for Helms-Burton plaintiffs that did not invoke the FCSC procedure, and another for claimants who submitted their claims to the FCSC and were denied because their claim did not comply with international law standards (including because the claimants had been Cuban nationals at the time of confiscation). But that approach cannot be right: Congress did not intend the word "claim" to have different meanings in two closely interrelated statutes and to cause different outcomes for such similarly situated groups of plaintiffs. *Cf. Sullivan v. Stroop*, 496 U.S. 478, 484-85 (1990) ("[I]dentical words used in different parts of the same act are intended to have

---

of first impression. And, as shown above, the answer is clear: the "claim" must be valid under international law.

the same meaning."); *see also Lamb*, 2010 WL 376858, at *7 ("The spirit, if not the letter, of the LIBERTAD Act would not be honored by the provision of more benefits to nonclaimants than to claimants."). As such, a domestic takings case cannot serve as a predicate claim under Helms-Burton.

>    ii.    *A domestic taking does not give rise to an international law claim.*

Because only takings actionable under international law give rise to a Title III claim, Plaintiff's case should be dismissed. The AC alleges that, at the time the shares in (and other assets of) Banco Nuñez were seized in 1960, the Founders were Cuban citizens. AC ¶¶ 45, 47, 50. But "'[a]s a rule, when a foreign nation confiscates the property of its own nationals, it does not implicate principles of international law.'" *Comparelli v. Republica Bolivariana De Venezuela*, 891 F.3d 1311, 1320 (11th Cir. 2018) (quoting *FOGADE v. ENB Revocable Tr.*, 263 F.3d 1274, 1294 (11th Cir. 2001)). Instead, claims stemming from such acts are governed solely by the internal law of sovereign nations. *Id.*; *Beg v. Islamic Rep. of Pakistan*, 353 F.3d 1323, 1328 n.3 (11th Cir. 2003) (same); *Mezerhane*, 785 F.3d at 549 (applying the "long-standing rule that closes the doors of American courts to international-law claims based on a foreign country's domestic taking of property"); *Santivanez v. Estado Plurinacional De Bolivia*, 512 F. App'x 887, 888-89 (11th Cir. 2013) ("Even if the taking complained of in this case violated local Bolivian law, it did not violate international law."); Restatement (Fourth) on Foreign Relations Law § 455 (Am. Law Inst. 2018) (same). Plaintiff thus has failed to plead a valid claim to confiscated property under international law, warranting dismissal for failure to satisfy this statutory prerequisite to a Helms-Burton action.

## CONCLUSION

For the reasons set forth herein, the AC should be dismissed under Rule 12(b)(1), 12(b)(2) and 12(b)(6).

**REQUEST FOR HEARING**

Pursuant to Local Rule 7.1(b), SG requests a hearing on its Motion to Dismiss the Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1), (2) and (6).  Although the written arguments should be sufficient for the Court to grant this Motion, oral presentation of the issues may assist the Court in making its determination, especially as they relate to the Court's lack of personal and subject-matter jurisdiction, and the legal deficiencies in Plaintiff's claims in this case of first impression.  SG estimates that a hearing would last approximately 1.5 hours.

Dated: October 29, 2019                   Respectfully submitted,

                                          **REED SMITH LLP**


                                          By:  _/s/ Sujey S. Herrera_____
                                              Edward M. Mullins
                                              José I. Astigarraga
                                              Sujey S. Herrera
                                              Reed Smith LLP
                                              1001 Brickell Bay Drive Suite 900
                                              Miami, Florida 33131
                                              Main: (786) 747-0200
                                              Email: EMullins@reedsmith.com
                                              Email: jia@reedsmith.com
                                              Email: sherrera@reedsmith.com

                                          **MAYER BROWN LLP**

                                              *Of counsel*

                                              Steven Wolowitz
                                              Mayer Brown LLP
                                              1221 Avenue of the Americas
                                              New York, NY 10020
                                              Main: (212) 506-2500
                                              Fax: (212) 262-1910
                                              Email: swolowitz@mayerbrown.com

                                              Alex Lakatos
                                              Mayer Brown LLP
                                              1999 K. Street, N.W.
                                              Washington, DC 20006-1101
                                              Main: (202) 263-3000
                                              Fax: (202) 263-3300
                                              Email: alakatos@mayerbrown.com

                                              *Attorneys for Defendant Société Générale, S.A.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 29, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I further certify that the foregoing is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By:     */s/ Sujey Herrera*_____
        Sujey Herrera

43