# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO.: 19-CV-22842-DPG

SUCESORES DE DON CARLOS
NUÑEZ Y DOÑA PURA GALVEZ,
INC., d/b/a BANCO NUÑEZ,

       Plaintiff,

vs.

SOCIÉTÉ GÉNÉRALE, S.A., d/b/a
SG AMERICAS, INC.; THE BANK OF
NOVA SCOTIA, d/b/a SCOTIA
HOLDINGS (US) INC., a/k/a THE BANK
OF NOVA SCOTIA, MIAMI AGENCY;
THE NATIONAL BANK OF CANADA,
d/b/a NATIONAL BANK OF CANADA
FINANCIAL GROUP, INC.; and BANCO
BILBAO VIZCAYA ARGENTARIA, S.A.,
d/b/a BBVA, USA.,

       Defendants.

_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT
## SOCIÉTÉ GÉNÉRALE, S.A.'S MOTION TO DISMISS THE AMENDED COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 1

    I.     The Nuñez Family and Banco Nuñez ......................................................... 1

    II.    The Helms-Burton Act ............................................................................ 2

    III.   The Plaintiff's Claims .............................................................................. 4

    IV.   SocGen Traffics in the Nuñezes' Confiscated Property .................................... 4

LEGAL ARGUMENT ...................................................................................................... 6

    I.     PLAINTIFF PLEADS A PLAUSIBLE CLAIM THAT SOCGEN TRAFFICS IN PLAINTIFF'S CONFISCATED PROPERTY IN VIOLATION OF HELMS-BURTON ......... 7

    II.    PLAINTIFF HAS ALLEGED ITS ARTICLE III STANDING. .................................. 10

    III.   THE COURT HAS PERSONAL JURISDICTION OVER SOCGEN. ........................ 13

    IV.   PLAINTIFF MAY BRING THIS HELMS-BURTON CLAIM ON BEHALF OF THE NUÑEZ HEIRS. ..................................................................................... 16

    V.    THE DOMESTIC TAKINGS RULE IS NO BAR TO HELMS-BURTON CLAIMS. 21

CONCLUSION ............................................................................................................... 24

REQUEST FOR A HEARING ......................................................................................... 25

# TABLE OF AUTHORITIES

*Cases*

*Attias v. Carefirst, Inc.*,
   865 F.3d 620 (D.C. Cir. 2017) ........................................................................ 10, 13

*Bennet v. Spear*,
   520 U.S. 154 (1977) ............................................................................................ 10

*Certain Underwriters at Lloyd's, London v. Kirkland*,
   69 So. 3d 98 (Ala. 2011) ..................................................................................... 17

*Cibran Enters., Inc. v. BP Prods. N. Am., Inc.*,
   365 F. Supp. 2d 1241 (S.D. Fla. 2005) ............................................................... 17

*Comparelli v. Republica Bolivariana De Venezuela*,
   891 F.3d 1311 (11th Cir. 2018) ........................................................................... 21

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ........................................................................................ 11

*Ela v. Destafano*,
   869 F.3d 1198 (11th Cir. 2017) ........................................................................... 21

*Fin. Sec. Assur., Inc. v. Stephens, Inc.*,
   500 F.3d 1276 (11th Cir. 2007) ............................................................................. 9

*Fraser v. Smith*,
   594 F.3d 842 (11th Cir. 2010) ............................................................................. 14

*Garcia-Bengochea v. Carnival Corp.*,
   — F. Supp. 3d —, —, 2019 WL 4015576 (S.D. Fla. Aug. 26, 2019) ....................... 9

*In re Energy Transfer Equity, L.P. Unitholder Litigation*,
   No. CV 12197, 2018 WL 2254706 (Del. Ch. May 27, 2019) ............................ 5, 8, 9

*In re Sealed Case*,
   932 F.3d 915 (D.C. Cir. 2019) ............................................................................ 14

*Kawa Orthodontics, LLC v. Sec'y, U.S. Dep't of the Treasury*,
   773 F.3d 243 (11th Cir. 2014) ............................................................................. 10

*Lamb v. ITT Corp.*,
   No. 09-CV-95, 2010 WL 376858 (D. Neb. Jan. 26, 2010) .................................. 12

*Lexmark Int'l., Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ............................................................................................ 11

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013) ................................................................................. 15

*Mezerhane v. Venezuela*,
   785 F.3d 545 (11th Cir. 2015) ............................................................ 21, 22, 23, 24

*Miller v. Arab Bank, PLC*,
   372 F. Supp. 3d 33 (E.D.N.Y. 2019) ................................................................... 15

*MSPA Claims 1, LLC v. Tenet Fla., Inc.*,
   918 F.3d 1312 (11th Cir. 2019) ............................................................................ 17

*Oldfield v. Pueblo De Bahia Lora, S.A.*,
   558 F.3d 1210 (11th Cir. 2009) ............................................................... 14, 15, 16

*Orangeburg, S.C. v. Fed. Energy Regulatory Comm'n*,
   862 F.3d 1071 (D.C. Cir. 2017) ..................................................................... 11, 13

*Peyton v. Rowe*,
   391 U.S. 54 (1968) ......................................................................................... 18, 23

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013) ................................................................................... 11

*SEC v. Carrillo*,
   115 F.3d 1540 (11th Cir. 1997) ..................................................................... 14, 15

*Sierra Club v. U.S. Dep't of Interior*,
   899 F.3d 260 (4th Cir. 2018) ......................................................................... 10, 13

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ......................................................................................... 10

*Sprint Commn'cs Co., L.P. v. APCC Servs., Inc.*,
   554 U.S. 269 (2008) ............................................................................................. 17

*Strauss v. Crédit Lyonnais, S.A.*,
   175 F. Supp. 3d 3 (E.D.N.Y. 2016) ..................................................................... 16

*The Emily & the Caroline Broadfoot*,
   22 U.S. 381 (1824) ......................................................................................... 19, 20

*United States v. Morrison*,
   529 U.S. 598 (2000) ............................................................................................. 11

*Wollard v. Lloyd's and Companies of Lloyd's*,
   439 So. 2d 217 (Fla. 1983) .................................................................................. 20

*Statutes*

12 U.S.C. § 3105(d)(1) ................................................................................................ 15

22 U.S.C. § 1623(k) .................................................................................................... 23

22 U.S.C. § 1634b(a) .................................................................................................. 23

22 U.S.C. § 1634h ...................................................................................................... 23

22 U.S.C. § 6021 ........................................................................................................ 14

22 U.S.C. § 6082 .................................................................................................. 21, 24

22 U.S.C. § 6082(6) .................................................................................................... 22

22 U.S.C. § 6082(a)(1)(A) .......................................................................................... 22

22 U.S.C. § 6082(a)(4)(B) ............................................................................... 16, 18, 19

22 U.S.C. § 6085(b)(1) ................................................................................................. 4

22 U.S.C. § 1623(a) .................................................................................................... 23

22 U.S.C. § 1643*l* ...................................................................................................... 24

22 U.S.C. § 6023(12)(A) ............................................................................................... 8

22 U.S.C. § 6023(13)(A)(ii) .......................................................................................... 7

22 U.S.C. § 6023(13)(a)(iii) .......................................................................................... 9

22 U.S.C. § 6082(1)(A) ................................................................................................. 3

22 U.S.C. § 6082(a)(5)(A) ........................................................................................... 24

22 U.S.C. §§ 1622a, 1622b, 1623 ............................................................................... 23

22 U.S.C. §§ 6081 – 6085 .................................................................................. 2, 13, 21

22 U.S.C. §§ 6081(6), (10), (11) .................................................................................. 2

22 U.S.C. §§ 6082(a)(3)(A), (C)(ii) ............................................................................ 24

22 U.S.C. §§ 1623(a)(2)(B), 1623(k) .......................................................................... 23

22 U.S.C. §§ 6023(13)(A) ........................................................................................... 12

22 U.S.C. §§ 6023(13)(A)(i)-(iii) ................................................................................ 11

22 U.S.C. §§ 6081(3)(A)(ii), (iii) ............................................................................................ 22

28 U.S.C. § 1605(a)(3) ................................................................................................... 12, 21

50 U.S.C. § 4305(b)(1) ........................................................................................................ 5

§ 627.428, Fla. Stat. (1983) ................................................................................................ 20

§ 1623 ............................................................................................................................... 23

§§ 1623(a) or (k) ............................................................................................................... 23

*Regulations*

Summary of the Provisions of Title III of the Cuban Liberty and Democratic Solidarity
   (LIBERTAD) Act of 1996,
   61 Fed. Reg. 24955-01 ................................................................................................. 3

*Other Authorities*

H.R. Rep. No. 104-202 ............................................................................................ 13, 18, 23

## INTRODUCTION

The heirs of Carlos Nuñez and Pura Galvez Nuñez waited 60 years to seek compensation related to the confiscation of their property by the Cuban government.  Through Helms-Burton, Congress created a cause of action for them and other U.S. nationals against companies that profit from the use of confiscated property without the consent of the true owners.  This Court should deny the motion to dismiss their Helms-Burton claim.

For one, Helms-Burton creates liability for direct and indirect traffickers in confiscated property, such as defendant Société Générale, S.A. ("SocGen").  Helms-Burton claimants also do not lack standing to demand compensation from a trafficker that is profiting from their confiscated property without their consent.  Further, personal jurisdiction is no bar to suit here: SocGen admitted to criminal allegations related to its $15 billion in U.S. financial transactions associated with its Cuban trafficking.  In addition, the Nuñez heirs acquired their trafficking claims before March 12, 1996; nothing in Helms-Burton evidences that Congress intended to deny them a right of action simply because they assigned their claim to a U.S. entity for estate planning purposes.  Congress also did not predicate Helms-Burton claims on the domestic takings rule; Congress did the opposite—explicitly nullifying that rule under Helms-Burton.

## FACTUAL BACKGROUND

### I.  The Nuñez Family and Banco Nuñez

In 1961, Carlos Nuñez and his wife Pura Galvez Nuñez escaped Cuba following the communist revolution.  Their escape was precipitated by unlawful killings, unprecedented imprisonments, and the unmatched barbarism of Fidel Castro's regime.  Am. Compl., ¶ 1.

The Nuñezes had built a successful life in Cuba for their family.  They were sole owners of the second largest Cuban-owned bank on the island, which bore their name:  Banco Nuñez.

Banco Nuñez had twenty-two branches across the island with a physical presence in all but one of Cuba's six provinces.  The Nuñezes owned the land on which the branches were located through another entity, Inmobiliaria Norka, S.A.  *Id.* ¶¶ 2-3

In 1960, Castro's communist regime confiscated without compensation Carlos and Pura Galvez Nuñezes' companies.  The Cuban government seized and absorbed all Cuban-owned banks, including Banco Nuñez and Inmobiliaria Norka, S.A., into a single financial institution: Banco Nacional de Cuba.  BNC has since been in control of all the island's banking, borrowing, and lending.  By conservative estimates, more than 10% of BNC is comprised the financial institution stolen from Carlos and Pura Galvez Nuñez.  No compensation has ever been paid for the initial taking or current use of the Nuñezes' banking institution by BNC or others acting in concert with BNC.  *Id.* ¶¶ 4-5, 7-8, 25.

Carlos and Pura Galvez Nuñez fled to the United States, as did many Cubans after the communist revolution. Pura Galvez Nuñez died after they came to the United States, as did Carlos Nuñez in 1979, but not before he became a United States citizen.  The children of Carlos and Pura Galvez Nuñez, including those from Carlos' second marriage, inherited the interests of their parents, including Carlos and Pura Galvez Nuñez's rights associated with Banco Nuñez and Inmobiliaria Norka, S.A.  *Id.* ¶¶ 18, 40.

## II.  The Helms-Burton Act

In 1996, the United States adopted Helms-Burton.  22 U.S.C. §§ 6081 – 6085.  Congress enacted Helms-Burton to further the U.S. policy of regime change in Cuba and to provide legal remedies to U.S. nationals.  22 U.S.C. §§ 6081(6), (10), (11).  Congressional findings include the following: "To deter trafficking in wrongfully confiscated property, United States nationals who were the victims of these confiscations should be endowed with a judicial remedy in the courts of

the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." *Id.* § 6081(11).  The Department of Justice recognized the same, explaining after its passage:  "Title III of the Act discourages foreign investment in properties that were expropriated by the Cuban Government on or after January 1, 1959, without compensation, from persons who **are now Untied States nationals**."[1]

Helms-Burton created a private right of action against any party who traffics in property seized by the Cuban government after 1959, defining "traffics" broadly.  *See* 22 U.S.C. § 6082(1)(A); *id.* § 6023(13).  For instance, "traffics" means to (1) "knowingly and intentionally . . . manage[] . . . confiscated property, or . . . receive[], possess[], obtain[] control of . . . an interest in confiscated property" as well as (2) "engage[] in a commercial activity using or **otherwise benefitting from confiscated property**."  *Id.* §§ 6023(13)(A)(i)-(ii) (emphasis added).  A "person" who may be liable as a trafficker includes any entity, "including any agency or instrumentality of a foreign state."  *See id.* § 6023(11).  Cuba's national bank, BNC, thus constitutes a trafficker under Helms-Burton.

The Act establishes liability for direct traffickers in confiscated property, such as BNC, as well as third-parties who participate in or profit from the trafficking without consent of the owners of the confiscated property.  *Id.* § 6023(13)(A)(iii).  The Act's definition of trafficking includes entities who "participate[] in, **or profit[] from**, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engage[] in trafficking (as described in clause (i) or (ii)) through another person."  *Id.* (emphasis added).

---

[1] Att'y Gen. Order No. 2029-96, Dep't of Justice, Summary of the Provisions of Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, 61 Fed. Reg. 24955-01, 1996 WL 260180 (May 17. 1996) (emphasis added).

Almost immediately after the Act became effective, however, President Bill Clinton suspended all private rights of action under the Act, as Congress authorized presidents to do.  *See* 22 U.S.C. § 6085(b)(1); President Statement on Helms-Burton Waiver Exercise 07/16/1996, 1996 WL 396122, at *1 (July 16, 1996).  More than two decades after President Clinton's suspension of Helms-Burton, the ability to pursue private rights of action under Helms-Burton was triggered in April 2019, when President Donald Trump did not renew the Act's suspensions, allowing plaintiffs to file suit under Title III beginning May 2, 2019.

### III. The Plaintiff's Claims

The Nuñez heirs—thirteen individuals, Am. Comp. ¶ 18—were United States nationals when Helms-Burton became effective, except in possibly one instance.  Carlos Nuñez became a United States national and left his interests in Banco Nuñez to his children before Helms-Burton became effective.  In August 1996, several weeks after President Clinton suspended Title III, *see* President Statement, 1996 WL 396122, at *1, and unsure of when they would ultimately be able to bring their Helms-Burton claims (or who would be *alive* to do so), the Nuñez heirs assigned their claims to a single corporate entity, a Florida corporation:  Sucesores de Don Carlos Nuñez y Doña Pura Galvez, Inc., the corporate Plaintiff in this matter.  Shortly after the suspension of private rights of action under Helms-Burton was lifted in May 2019, Plaintiff filed the present action against Société Générale, S.A. ("SocGen") and others for trafficking in the Nuñezes' confiscated property.

### IV. SocGen Traffics in the Nuñezes' Confiscated Property

In 1995, a year before Helms-Burton was effective, BNC—the entity which had confiscated and absorbed Banco Nuñez and Inmobiliaria Norka, S.A.—granted SocGen a license to conduct banking in Cuba for profit.  By 2000, SocGen had created a series of credit facilities

to do business with BNC, i.e., Cuban Credit Facilities, while at the same time circumventing the U.S. embargo of Cuba.   SocGen earned profits from its more than $15 billion worth of transactions related to its activities with BNC.  *See* Am. Compl., ¶ 13.

In 2018, SocGen entered into a deferred prosecution agreement with the U.S. Department of Justice in which SocGen admitted to its banking ties with Cuba.   SocGen admitted to engaging in more than 2,500 financial transactions that violated U.S. sanctions on Cuba.   These activities violated the Trading With the Enemy Act, 50 U.S.C. § 4305(b)(1), *et seq*., as well as the Cuban Asset Control Regulations promulgated thereunder.   SocGen intentionally and knowingly omitted information to hide the true source of the banking transactions:  Cuba.  ECF No. 16-4 at pp. 2, 37, ¶¶ 6, 12, 13.

The illicit SocGen-Cuba transactions had a value of more than $15 billion.  SocGen used U.S. financial institutions located in New York for each of those transactions, including SocGen's New York branch.  SocGen is headquartered in Paris, France.   *Id.* at pp. 37, 44, ¶¶ 12-13, 25, 26; Am. Compl., ¶ 27.

On behalf of the heirs of Carlos and Pura Galvez Nuñez, the Plaintiff alleges that SocGen traffics in the confiscated property of the Nuñez family by profiting from a banking relationship with BNC, the direct trafficker of Plaintiff's property.  Having received no compensation for the confiscation of their banking facilities in 1960, the Nuñez heirs thereafter became entitled to an equity interest in the entity that absorbed their banking facilities:  BNC.  C*f. In re Energy Transfer Equity, L.P. Unitholder Litig.*, No. CV 12197, 2018 WL 2254706, at *4 (Del. Ch. May 27, 2019) (explaining that companies may transfer equity rather than cash as merger consideration).  The amount of the equity equals the relative value of the confiscated property

from the Nuñezes within the BNC enterprise, or 10%.  BNC has not compensated the Nuñez heirs for that equity interest.  Am. Compl., ¶¶ 6-9, 12, 81-82.

SocGen now moves to dismiss the Amended Complaint.  SocGen contends, erroneously, that (I) SocGen has not trafficked in the Plaintiff's confiscated property in violation of Helms-Burton; (II) Article III standing does not exist for Plaintiff's claim; (III) this Court lacks personal jurisdiction over SocGen; (IV) Plaintiff's claim is statutorily barred; and (V) and this Court should deny relief because the Cuban confiscations that SocGen is profiting from did not violate international law.

## **LEGAL ARGUMENT**

This Court should deny SocGen's Motion.  The reasons to do so are as follows:

- First, Plaintiff's claim is an appropriate action under Helms-Burton.  Cuba's BNC engages in trafficking under Helms-Burton by managing, possessing, and engaging in commercial activity using the Plaintiff's equity interests in BNC that resulted from the 1960 uncompensated confiscation of Banco Nuñez and Inmobiliaria Norka, S.A.  Helms-Burton liability extends to all entities who participate in or profit from BNC's trafficking or its related commercial activities, including SocGen.

- Second, Plaintiff has standing to bring its claim.  The injury for which Plaintiff seeks redress—uncompensated trafficking in the Nuñezes' property—is traceable to SocGen, which is profiting from the illicit trafficking without Plaintiff's consent.

- Third, this Court has personal jurisdiction over SocGen under the federal long-arm statute.  That statute is applicable because the Helms-Burton claim arises under federal law and SocGen is not subject to general jurisdiction in the United States.  Federal due process permits assertion of specific jurisdiction in this instance because SocGen engaged in $15 billion or more of transactions in the United States involving BNC, and those transactions are related to Plaintiff's cause of action.

- Fourth, U.S. nationals held a claim for trafficking in confiscated property as of March 1996.  Their claims are not defeated simply because they were assigned to a Florida corporation a month after President Clinton suspended all private rights of action under Helms-Burton.

- Fifth, the domestic takings rule is not a bar to Plaintiff's Helms-Burton claim.  That rule states that expropriations of a foreign national's property by the foreign national's government do not violate international law.  Congress did not limit Helms-Burton liability to confiscations in violation of international law, as Congress had done vis-à-vis the Foreign

Sovereign Immunities Act.  Rather, Congress allows relief related to all confiscations by the Cuban Government, including for Cuban nationals who fled communist Cuba and became United States citizens thereafter.

## I.   PLAINTIFF PLEADS A PLAUSIBLE CLAIM THAT SOCGEN TRAFFICS IN PLAINTIFF'S CONFISCATED PROPERTY IN VIOLATION OF HELMS-BURTON.

SocGen urges this Court to dismiss this Helms-Burton claim because, it argues, Congress created no liability for entities "merely doing business with Cuban instrumentalities that received confiscated assets."  Mot. at 30, 27-34.  The plain language of Helms-Burton contradicts that notion.  For one, Congress defined traffickers to include government instrumentalities that "engage[] in a commercial activity using or otherwise benefitting from confiscated assets."  22 U.S.C. § 6023(13)(A)(ii); *see also id.* § 6023(11) (defining "person" to include "any agency or instrumentality of a foreign state").  Congress also provided that an entity engages in trafficking if it knowingly and intentionally "participates in, *or profits from*, trafficking (as described in clause (i) or (ii)) *by another person*"—i.e., profiting from transactions with a Cuban instrumentality that receives, manages, obtains control of, dispenses, *or otherwise acquires* or holds an interest in confiscated property.  *Id.* § 6023(13)(A)(iii) (emphases added).  SocGen engages in trafficking under that provision.

SocGen does not dispute that BNC is a trafficker; that's because it is.   BNC confiscated and absorbed Banco Nuñez, Cuba's second-largest Cuban-owned bank in 1960.  At the time, Banco Nuñez controlled $105.1 million in assets, had twenty-two branches in Cuba, and had a physical presence in all but one of Cuba's six provinces.   BNC confiscated, without any compensation, not only the Nuñez family banking enterprise, but also the entity that owned the property on which Banco Nuñez's branches were located, Inmobiliaria Norka, S.A.  Of the $74 million in confiscated banking institutions nationwide, the Nuñez family's enterprise comprised more than 10% of the interests consolidated into BNC.  The Nuñez family has thus asserted its

entitlement to at least a 10% equity interest in BNC.  Am. Compl., ¶¶ 2, 5-7; *cf. In re Energy Transfer Equity*, 2018 WL 2254706, at *4 (explaining that companies may transfer equity rather than cash as merger consideration).

SocGen asserts that the Nuñez family's banking interests simply disappeared once they were confiscated by BNC.  *See* Mot. at 33 (contending that the Plaintiff cannot assert a claim unless its particular property seized in 1960 was among those SocGen illegally transferred through New York financial institutions).  SocGen is wrong.  Congress defined "property" under Helms-Burton to include "any present, future, or contingent right . . . or interest therein."  22 U.S.C. § 6023(12)(A).  Plaintiff has pled a ***right*** to more than a 10% share in BNC based on Cuba's confiscation of the Nuñez family banking interests.

In essence, SocGen asserts that the seizure of any banking institution is a non-compensable taking under Helms-Burton because a bank's dollars seized in 1960 must have been spent by now.  *See* Mot. at 33.  But the property interests of a financial institution are more than simply its cash on hand at the time of theft.  BNC took not only the Banco Nuñez's cash but the entire banking enterprise—continuing to use it to this day with no compensation to its owners.

The United States has also rejected the notion that confiscation of banking interests are not compensable.  The United States has certified banking claims related to Cuban confiscations years after their initial taking.  The U.S. Foreign Claims Settlement Commission, for instance, calculated the interests of two U.S. nationals whose minority interests in a nationalized Cuban bank were seized in 1960.  The Commission determined the shareholders were entitled to the pro-rata share of the bank's net worth that existed on the date of confiscation plus 6% annual interest for each year thereafter.  ECF No. 16-6, pp. 6-7.  Plaintiff here analogously pleads a

claim that the Nuñez heirs are entitled to a portion of BNC's equity equivalent to Carlos and Pura Galvez Nuñez's share of all confiscated banking enterprises BNC seized in 1960.

SocGen traffics in the Nuñez heirs' property because SocGen knowingly and intentionally profits from the trafficking of BNC, an entity that is engaging in commercial banking activities that use or benefit from the uncompensated taking of Banco Nuñez and Inmobiliaria Norka, S.A.  *See* Am. Compl. ¶¶ 13, 56, 82 (discussing BNC's license to SocGen to "conduct 'for-profit activities related to banking in Cuba'"); 22 U.S.C. § 6023(13)(a)(iii).[2]

Plaintiff's allegations set forth a claim under Helms-Burton, and that is all that is required in this District.  *See, e.g.*, Order at 7, *Havana Docks Corp. v. Carnival Corp.*, No. 19-cv-21724-BLOOM (S.D. Fla. Aug. 28, 2019), ECF No. 47, attached here as **Ex. 1**.  Relying on Eleventh Circuit precedent, *Havana Docks* held that the plaintiff stated a claim for relief under Helms-Burton where its pleading tracked the language of that statute:  "To plausibly plead a claim, a complaint must 'contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'"  *Id.* (quoting *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282–83 (11th Cir. 2007)).

Plaintiff pled all the material elements to state a claim against SocGen under Helms-Burton.  Helms-Burton belies SocGen's contention that SocGen cannot be held liable for doing business with a trafficker.  It can.  The Nuñez heirs have a claim to at least a 10% interest in BNC.  *Cf. Garcia-Bengochea v. Carnival Corp.*, — F. Supp. 3d —, —, 2019 WL 4015576, at *1 (S.D. Fla. Aug. 26, 2019) (King, J.) ("[A] 'claim' under Helms-Burton need not be based on direct property ownership as Carnival contends, but instead embraces *indirect* ownership as well.

---

[2]  Plaintiff's allegations relating to SocGen's knowing and intentional participation in and profiting from BNC's trafficking in confiscated banking enterprises are what distinguish SocGen from SocGen's straw man "small-business owner" who provides HVAC services to BNC unrelated any banking activities.  Mot. at 32.

And here, Plaintiff plausibly alleges indirect ownership based on his claim to stock in La Maritima, the company that owned the docks before it was nationalized by the Cuban Government in October 1960.").  The Court should deny this asserted basis to dismiss.

## II.    PLAINTIFF HAS ALLEGED ITS ARTICLE III STANDING.

SocGen erroneously contends that Plaintiff's injuries are not fairly traceable to SocGen's conduct and, thus, Plaintiff lacks standing to bring its claim.  Mot. at 23.  To establish standing for bringing a Helms-Burton claim, like any other federal statute, the plaintiff must show that (i) it suffered an injury in fact, (ii) that is fairly traceable to the challenged conduct of the defendant, and (iii) that is likely to be redressed by a favorable judicial decision.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

The pleading requirements are not onerous to establish standing.  A plaintiff need only "state a *plausible* claim" that each of the standing elements are present.  *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017).  The Court must also "presume the plaintiff's 'general allegations embrace those specific facts that are necessary to support the claim.'"  *Kawa Orthodontics, LLC v. Sec'y, U.S. Dep't of the Treasury*, 773 F.3d 243, 245 (11th Cir. 2014).

As to traceability, Article III standing "does not require the challenged action to be the sole or even immediate cause of the injury."  *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 284 (4th Cir. 2018) (citing *Bennet v. Spear*, 520 U.S. 154, 168-69 (1977)).  Proximate causation must neither be pled nor proved as to standing.  *See Attias*, 865 F.3d at 629 (recognizing the defendant need not be "the most immediate cause, or even a proximate cause," of plaintiffs' injuries and determining plaintiffs had standing to bring claims against a health insurer related to a data breach, even though an unknown thief was the most immediate cause of the plaintiffs' injuries).  The absence of certain actors from the proceedings does not defeat a plaintiff's

standing.  *See Orangeburg, S.C. v. Fed. Energy Regulatory Comm'n*, 862 F.3d 1071, 1080 (D.C. Cir. 2017) (finding that plaintiff's harm could be traced to defendant even though "a key player in the causal story" was not a party to the action).

Article III "'requires no more than *de facto* causality.'"  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).  "The traceability requirement for Article III standing means that the plaintiff must 'demonstrate a causal nexus between the defendant's conduct and the injury.'"  *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013).  Particularly when addressing a statutory cause of action, "[p]roximate cause analysis is controlled by the nature of the statutory cause of action.  The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits."  *Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014).

SocGen fallaciously contends that the only injury that the Nuñez heirs suffered was the original taking of their property in 1960.  *See* Mot. at 22-23.  SocGen presumably argues that there are no injuries by present-day corporations knowingly and intentionally exploiting confiscated assets without compensation.  Congress disagreed.  Helms-Burton defines prohibited trafficking to include not only the transferring of confiscated assets but also the use or benefitting from those assets through commercial activities without the consent of the property's owner.  *See* 22 U.S.C. §§ 6023(13)(A)(i)-(iii); *see supra* Part I.  If SocGen were correct, Congress adopted a statute that was largely unconstitutional.  *See United States v. Morrison*, 529 U.S. 598, 607 (2000) ("Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds.").  And Congress would have acted unconstitutionally more than once.

*See* Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(3) (removing sovereign immunity for foreign instrumentalities that merely ***operate*** expropriated assets, as opposed to taking them).

Here, the injury that Plaintiff alleges is the continued, unconsented, and uncompensated use of its property interests—i.e., its 10% equity in BNC. Aware of Cuba's confiscation and consolidation of all banking institutions on the island in 1960, SocGen has intentionally participated in and profited from BNC's commercial banking activities without seeking the consent of the U.S. nationals who hold those interests.

Plaintiff's injuries are traceable to SocGen in at least two respects. First, SocGen itself has not compensated the Plaintiff and yet proceeded to exploit its banking interests, engaging in $15 billion worth of transactions in the process. Helms-Burton permits SocGen to profit from trafficking in confiscated assets only if it receives the consent of their owner. 22 U.S.C. § 6023(13)(A). SocGen did not do that. Plaintiff's injury is thus due, in part, to SocGen's own failure to secure Plaintiff's consent to utilize its pro rata share of the Cuban banking industry operated by BNC.

Precedent already exists for companies to acquire the consent from the owners of trafficked property under Helms-Burton. *See, e.g.*, *Lamb v. ITT Corp.*, No. 09-CV-95, 2010 WL 376858, at *1-2 (D. Neb. Jan. 26, 2010). Even before rescission of the suspension for private rights of action under Helms-Burton, an Italian company secured a $22 million agreement with the majority owners of a telephone company nationalized by the Cuban government. *Id.* The Italian company became the part owner in that telephone company and entered the agreement to, among other things, limit its financial exposure under Helms-Burton. *Id.* at *2. Unlike that Italian company, SocGen has simply trafficked in Plaintiff's property without even attempting to acquire its consent by way of any remuneration.

Plaintiff's injuries are traceable to SocGen in another way.  SocGen's willingness to do business with Cuba and BNC has allowed BNC to continue exploiting confiscated assets without compensation or consent.  SocGen facilitated $15 billion-worth of illegal Cuban banking transactions through New York financial institutions alone in violation of laws designed to end the communist regime.  *See* 22 U.S.C. § 6081.  SocGen is thus thwarting U.S. policy aimed at securing compensation for its U.S. nationals by creating banking channels for the Cuban regime to access international funding.  Rather than isolating Cuba, SocGen is allowing uncompensated exploitation to prosper.[3]

The fact that the Cuban government was a "key player" in the initial and later injurious conduct does not absolve SocGen from liability, nor does it preclude the Plaintiff from having standing.  *Sierra Club*, 899 F.3d at 284; *Attias*, 865 F.3d at 629.  BNC's absence as a defendant is not fatal either.  *See Orangeburg*, 862 F.3d at 1080.  Because Plaintiff's injuries may be remedied by a judgment compensating it for its Helms-Burton claim, Plaintiff has standing.

### III.    THE COURT HAS PERSONAL JURISDICTION OVER SOCGEN.

This Court should deny SocGen's motion to dismiss based on lack of personal jurisdiction because jurisdiction exists pursuant to Federal Rule of Civil Procedure 4(k)(2), the federal long-arm statute.  The Eleventh Circuit held:

> Where, as here, a defendant is not subject to the jurisdiction of the courts of general jurisdiction of any one state, Rule 4(k)(2) permits a court to aggregate a foreign defendant's nationwide contacts to allow for service of process provided that two conditions are met: (1) plaintiff's claims must "arise under federal law," and (2) the exercise of jurisdiction must be "consistent with the Constitution and laws of the United States."

---

[3] *See also* H.R. 104-968 at 58 (1996) ("The purpose of this civil remedy is, in part, to discourage persons and companies from engaging in commercial transactions involving confiscated property, and in so doing to deny the Cuban regime of Fidel Castro the capital generated by such ventures and to deter the exploitation of property confiscated from U.S. nationals.").

*Fraser v. Smith*, 594 F.3d 842, 848-89 (11th Cir. 2010).

The prerequisites to apply Rule 4(k)(2) are met here.  First, the Helms-Burton action is a claim arising under federal law.  22 U.S.C. § 6021, *et seq*.  Second, SocGen unequivocally asserts that it is not subject to general jurisdiction anywhere in the United States.  Mot. at 10 (SocGen "is based in France and . . . it conducts its U.S. operations from New York—[which] demonstrate[s] a lack of general jurisdiction in the United States.").  The only issue then is whether exerting jurisdiction against SocGen is consistent with the due process clause.

To comport with due process requirements of Rule 4(k)(2) and "permit the exercise of specific jurisdiction, there must first exist 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws.'" *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220 (11th Cir. 2009).  This Court can look to SocGen's minimum contacts with the United States as whole in conducting this inquiry.  *See SEC v. Carrillo*, 115 F.3d 1540, 1543-44 (11th Cir. 1997).  Second, "the defendant's contacts with the forum must relate to the plaintiff's cause of action or have given rise to it."  *Oldfield*, 558 F.3d at 1220.  "These dual requirements are the constitutional benchmarks of the minimum contacts analysis and ensure that [the] defendant is only burdened with litigation in a forum where his 'conduct and connection with the forum . . . are such that he should reasonably anticipate being haled into court there.'"  *Id*. at 1220-21.

SocGen has purposely availed itself of doing business in the United States by engaging in financial banking activities in New York, including through its own New York branch.  Am. Compl. ¶ 64; ECF No. 16-4 at pp. 32-33, ¶¶ 2, 4; *Oldfield*, 558 F.3d at 1220.  When SocGen opened its U.S. branch, it agreed to comply with U.S. law.  *See, e.g.*, *In re Sealed Case*, 932 F.3d 915, 922 (D.C. Cir. 2019) ("Congress requires any 'foreign bank' to acquire 'prior approval of

the' Federal Reserve before it 'may establish a branch or an agency' in the United States." (quoting 12 U.S.C. § 3105(d)(1))).

SocGen's banking contacts with the United States are also related to the present Helms-Burton claim. *Oldfield*, 558 F.3d at 1220. At a minimum, Plaintiff demands its damages that flow from the profits that SocGen acquired based on its trafficking in the United States through the banking relationship with BNC, an agency of Cuba's government directly trafficking in Plaintiff's property. As SocGen admitted, SocGen used New York banking institutions, including SocGen's New York branch, to engage in thousands of banking transactions, valued at more than $15 billion, with BNC and Cuba that violate U.S. law. ECF No. 16-4 at p. 44, ¶ 25. Those transactions constitute trafficking under Helms-Burton, and SocGen provided no compensation to Plaintiff related to this trafficking.

It is both "foreseeable" and "fundamentally fair" that SocGen would be haled into a U.S. court to compensate U.S. nationals' claims related to transactions processed in the United States in violation of U.S. law, including Helms-Burton. *See Carrillo*, 115 F.3d at 1548 (exercising jurisdiction under Rule 4(k)(2) when defendants admitted involvement in the alleged conduct, which transpired within the United States, and that conduct gave rise to the action). The Second Circuit, for instance, has held that "repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress, constitutes 'purposeful availment' . . . subjecting [a defendant] to specific jurisdiction within the Southern District of New York consistent with due process requirements." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013) (alternation omitted). Other authorities agree. *See, e.g.*, *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 43-44 (E.D.N.Y. 2019) (use of New York's banking system as an instrument for accomplishing the alleged wrongs is sufficient

to subject that bank to specific jurisdiction); *Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 28 (E.D.N.Y. 2016) ("New York transfers demonstrate [purposeful] availment *a fortiori* because they were executed through Defendant's own branch in New York.  As such, there is no question that Defendant . . . subject[ed] itself to suit in the United States with respect to any and all claims substantially related to such conduct.").[4]  This Court thus has personal jurisdiction over SocGen.

## IV.   PLAINTIFF MAY BRING THIS HELMS-BURTON CLAIM ON BEHALF OF THE NUÑEZ HEIRS.

SocGen contends that the Cuban government and third-parties with whom it does business, such as SocGen, may exploit at will confiscated property in the event that U.S. nationals die before they are able to adjudicate their claims under Helms-Burton.  *See* Mot. at 27-34.  That is because, under SocGen's reading, ***no heirs or legatees*** of those U.S. nationals—even if the latter are U.S. nationals as well—may inherit Helms-Burton claims if they had not done so before March 12, 1996.  *See id.* (citing 22 U.S.C. § 6082(a)(4)(B)).

SocGen's position is untenable for three reasons.  First, precedent establishes that assignees are entitled to assert the same rights as their assignors.  Second, Helms-Burton must be

---

[4] The exercise of personal jurisdiction here as to SocGen also comports with "traditional notions of 'fair play and substantial justice.'"  *See Oldfield*, 558 F.3d at 1221.   The Eleventh Circuit described those relevant factors as including:

> [T]he forum State's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief, at least when that interest is not adequately protected by the plaintiff's power to choose the forum; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.

*Id.* Those factors weigh heavily in favor of this Court adjudicating this violation of U.S. law in favor of the U.S. claimant, especially because France and other European Union jurisdictions do not recognize and will not enforce Helms-Burton claims.  *See generally* Huber, Jürgen, *The Helms-Burton Blocking Statute of the European Union*, 20 Fordham Int'l L.J. 699, 702–03 (1997) (discussing EU rules prohibiting application of Helms-Burton).

liberally construed to effectuate its purpose:  to allow compensation to U.S. nationals.  Third, rules of statutory construction belie SocGen's interpretation of Helms-Burton.

The Eleventh Circuit recognizes a bedrock principle of U.S. law:  "'[T]he assignee of a claim has standing to assert the injury in fact suffered by the assignor.'"  *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1317 (11th Cir. 2019)).  The Supreme Court holds similarly:

> The history and precedents that we have summarized make clear that courts have long found ways to allow assignees to bring suit; that where the assignment is at issue, courts—both before and after the founding—have always permitted the party with legal title alone to bring suit; and that there is a strong tradition specifically of suits by assignees for collection.

*Sprint Commn'cs Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 285 (2008) (holding that an assignee of a legal claim had standing to bring suit under the federal Communications Act); *accord Certain Underwriters at Lloyd's, London v. Kirkland*, 69 So. 3d 98, 102 (Ala. 2011) ("'[A] valid assignment gives the assignee the same rights, benefits, and remedies that the assignor possesses,' such that the assignee 'simply steps into the shoes of the assignor . . . .'").

Plaintiff, a U.S. entity, has the legal right to bring the same claim that its U.S. national assignors had as of the effective date of Helms-Burton.  *See* authorities cited *supra*.  Carlos Nuñez, as well as the heirs of Carlos and Pura Galvez Nuñez,  all had been U.S. nationals with confiscation claims before March 16, 1996, the date of Helms-Burton's enactment, with the possible exception of one heir.  The U.S. entity Plaintiff, by operation of law, has the right to stand in their shoes and unify as well as preserve their rights in Banco Nuñez and Inmobiliaria Norka, S.A. as the heirs waited for decades for any U.S. president to allow them to adjudicate their claim.  Should the Court have any doubt as to the proper party that may assert this claim, it should grant leave to add the thirteen Nuñez heirs (or their living descendants) as parties to this action, rather than dismiss.  *See Cibran Enters., Inc. v. BP Prods. N. Am., Inc.*, 365 F. Supp. 2d

1241, 1251-52 (S.D. Fla. 2005) (explaining that "substitution of plaintiffs should be liberally allowed" and permitting amendment to include an individual as plaintiff where the issue was raised as to the invalidity of an assignment of rights to a corporate entity).

In any event, this Court should not dismiss this action because Congress did not intend to prevent the transfer of Helms-Burton claims from one generation of U.S. nationals to another by enacting 22 U.S.C. § 6082(a)(4)(B).  The Supreme Court has long recognized "that remedial statutes should be liberally construed."  *Peyton v. Rowe*, 391 U.S. 54, 65 (1968).  Here, Congress created a right for U.S. nationals to vindicate their claims to previously confiscated property.

SocGen's narrow reading of Helms-Burton is contrary to Congressional intent. Congressional intent evidences that § 6082(a)(4)(B) was aimed at preventing foreigners from assigning their claims to U.S. nationals.  Congress did not intend to prevent U.S. nationals from preserving their claims on behalf of their U.S. national heirs and U.S. assignees.  SocGen selectively cites to the congressional record to support its reading of the Act.  *See, e.g.*, Mot. at 27 (citing H.R. Rep. No. 104-202, at 40 (1996) (stating the "intent[]" that Helms-Burton claims not be available to entities incorporated after March 16, 1996)).  SocGen did not disclose to the Court what the report said immediately before that passage:  "These provisions are intended, in part, to eliminate any incentive that might otherwise exist to transfer claims to confiscated property to U.S. nationals *in order to take advantage of the remedy created by this section*." H.R. Rep. No. 104-202, at 40 (emphasis added).  SocGen also selectively quotes from the March 1, 1996 House report.  Mot. at 28.  SocGen excluded portions of that report reiterating Congress's intent to bar the assignment of claims to provide a Helms-Burton remedy that would otherwise be lacking due to the nationality of the assignor.  *See* H.R. No. 104-468 at 59 (1996) ("It is not the committee's intent that the right of action be available to persons or entities that

would relocate to the United States for the purpose of using this remedy.").  With one possible exception, the Nuñez heirs were U.S. nationals and already had a right of action prior to assignment, so their assignment to Plaintiff was not the target of § 6082(a)(4)(B).[5]

Moreover, Congress's intent was not to bar claims simply because U.S. nationals died and did not outlive the Castro regime or the suspension of Helms-Burton.  Dismissing Plaintiff's case based on those grounds would be a precedent-setting ruling, extinguishing possibly thousands of Helms-Burton cases where U.S. nationals simply did not survive the 23 years between the Act's enactment in 1996 and lifting of the suspension of Helms-Burton's private right of action in 2019.

Lastly, SocGen's interpretation, that Helms-Burton does not permit the acquisition of claims in any circumstance (post March 1996), including by inheritance, is contrary to widely accepted canons of statutory construction, including the presumption against ineffectiveness as well as the substance over form doctrine.  The Supreme Court has long held that in construing a statute, courts "must look to the object in view, and never adopt an interpretation that will defeat its own purpose, if it will admit of any other reasonable construction."  *See The Emily & The Caroline Broadfoot*, 22 U.S. 381, 388 (1824).  In that case, the Supreme Court rejected a narrow interpretation of the Slave Trade Act of 1794.  That act barred, among other things, preparing a ship for the purpose of carrying on the slave trade.  *Id.*  The claimant whose ships had been seized pursuant to the statute contended that a ship could not be deemed "prepare[d]" for "the purpose of carrying on" the slave trade until it was sufficiently complete to reveal its slave-trade-related purpose.  *Id.* at 389.  The Supreme Court rejected that contention:  "To apply the

---

[5] If one individual was not a U.S. national on March 12, 1996, the Court can consider at trial how, if at all, Plaintiff's claim may be reduced based on that individual's proportionate inherited interest.

construction contended for on the part of the claimant . . . would be rendering the law in a great measure nugatory, and ***enable offenders to elude its provisions in the most easy manner***." *Id.* (emphasis added) ("We can discover no sound reason for delaying the seizure until the vessels were on the point of sailing . . . the delay would be useless, and evasion of the law rendered almost certain.").

Likewise, SocGen's interpretation here is designed solely to allow traffickers to elude liability under Helms-Burton. That interpretation largely renders Helms-Burton ineffective for U.S. nationals who succeed to confiscation claims timely acquired by another U.S. national, whether by devise or assignment. This Court should apply Plaintiff's reasonable interpretation to Helms-Burton, not the interpretation that renders the Act largely ineffective.

The substance over form doctrine also precludes SocGen's narrow construction. *See, e.g.*, *Wollard v. Lloyd's & Companies of Lloyd's*, 439 So. 2d 217, 218-19 (Fla. 1983). In *Wollard*, a statute provided that insureds would be entitled to attorney's fees "[u]pon rendition of a judgment or decree" against the insurer. *Id.* at 218 n.1 (quoting § 627.428, Fla. Stat. (1983)). Courts had held that even where the insurer paid the sued upon amounts on the eve of trial, ending the litigation in favor of the insured, the insured had no entitlement to attorney's fees because there had been no "rendition of a judgment or decree." *Id.* at 218. The Florida Supreme Court rejected that notion:

> This literal requirement of the statute exalts form over substance to the detriment of public policy, and such a result is clearly absurd. It is a basic tenet of statutory construction that statutes will not be interpreted so as to yield an absurd result.

*Id.* at 218-19. Equally absurd is SocGen's arguments here. The Nuñez heirs acquired their claims before March 12, 1996. Their claims were not defeated simply because they parked their claims in a U.S. company for estate planning purposes during the decades-long suspension of Helms-Burton. The Court should also reject this ground for dismissal.

## V.  THE DOMESTIC TAKINGS RULE IS NO BAR TO HELMS-BURTON CLAIMS.

Helms-Burton has no requirement that a U.S. national seeking compensation for the present-day exploitation of its property must have been a U.S. national when the Cuban government initially confiscated its property.  *Compare* 22 U.S.C. §§ 6081 – 6085 *with* Mot. at 35-40 (arguing otherwise).  SocGen is improperly attempting to graft the domestic takings rule onto Helms-Burton, advancing an argument that is contradicted by the statute's plain language.

The domestic takings rule provides that "'when a foreign nation confiscates the property of its own nationals, it does not implicate principles of international law.'"  *Comparelli v. Republica Bolivariana De Venezuela*, 891 F.3d 1311, 1320 (11th Cir. 2018).  The Eleventh Circuit has disallowed claims under the Foreign Sovereign Immunities Act based on the domestic takings rule.  *See, e.g.*, *Mezerhane v. Venezuela*, 785 F.3d 545, 551-52 (11th Cir. 2015) (holding that the Venezuelan plaintiff stated no expropriation claim against Venezuela because the domestic taking did not violate international law).  A plaintiff asserting an expropriation claim under the Foreign Sovereign Immunities Act must always establish that the taking was in violation of international law.  *Id.* (citing 28 U.S.C. § 1605(a)(3)).

Unlike the Foreign Sovereign Immunities Act, Helms-Burton contains no prerequisites that confiscations be in violation of international law.  *See* 22 U.S.C. § 6082.  Congress's express adoption of that restriction in one statute and its exclusion in a similar statute was intentional and must be given effect.  *See Ela v. Destafano*, 869 F.3d 1198, 1202 (11th Cir. 2017) ("Where Congress knows how to say something but chooses not to, its silence is controlling.").

Other statutory language supports that Congress had no intent to limit Helms-Burton to U.S. citizens naturalized before 1960.  Helms-Burton allows "any United States national" to pursue a trafficking claim—not simply those who were nationals at the time of the taking.  *See*

22 U.S.C. § 6082(a)(1)(A) (". . . any person that . . . traffics in property which was confiscated by the Cuban government, on or after January 1, 1959, shall be liable to **any United States national** who owns the claim to such property . . . ." (emphasis added)).  Helms-Burton's stated purpose is to remedy the confiscation of property of both "thousands of United States nationals" **and** "thousands **more** Cubans who claimed asylum in the United States as refugees because of persecution and **later became naturalized citizens of the United States**." 22 U.S.C. §§ 6081(3)(A)(ii), (iii) (emphases added).

Congress also explicitly disallowed courts from applying the act of state doctrine to prohibit Helms-Burton claims, a definitive indication that the domestic takings rule is inapplicable to Helm-Burton actions.  22 U.S.C. § 6082(6) ("Inapplicability of Act of State Doctrine").  Often applied to expropriation claims, the act of state doctrine "is a judicially-created rule of decision that 'precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory.'" *Mezerhane*, 785 F.3d at 551–52.  The exclusion of the act of state doctrine from Helms-Burton is significant because Congress had already—decades earlier—abrogated the act of state doctrine **except in instances where there were violations of international law**.  *See Mezerhane*, 785 F.3d at 552 (discussing the Second Hickenlooper Amendment).  For expropriation claims, then, the act of state doctrine could still bar claims subject to the domestic takings rule because the Cuban government's confiscation of Cuban citizens' property would not violate international law.  *Id.* Congress, however, precluded the act of state doctrine from defeating Helms-Burton claims; and therefore, domestic takings cases are subject to adjudication under Helms-Burton.

The statutory history of Helms-Burton also belies SocGen's contentions.  The 1995 House Committee Report described persons eligible to file a Helms-Burton claim:

> A "United States national" is defined in section 4, in part, as "any United States citizen," ***meaning that this right of action is extended to persons who were naturalized after the subject property was confiscated*** . . . .

H.R. Rep. No. 104-202, at 40 (1995).  The dissenting view expressed in the report is in accord:

> This bill invites anyone who has had property confiscated in Cuba over the past 35 years—whether a U.S. citizen or not—to . . . file a lawsuit in U.S. federal courts.

*Id*. at 55.  The Department of Justice recognized the same.  *See supra* note 1 and corresponding text (noting that Helms-Burton applied to "persons who ***are now Untied States nationals***").

Congress's statutory framework associated with the Foreign Claims Settlement Commission (the "Commission") is not a persuasive indicator that international law principles covertly restrict Helms-Burton claims, as SocGen posits.  *See* Mot. at 39-40.  The Commission is a Department of Justice agency that adjudicates or evaluates certain claims of U.S. nationals against foreign governments.  *See* 22 U.S.C. §§ 1622a, 1622b, 1623.

SocGen asserts that international law governs the Commission's adjudication of Cuban confiscation claims as a matter of statutory prescription.  SocGen initially cites to statutory provisions requiring the Commission to consider international law.  *See* Mot. at 39 (citing 22 U.S.C. §§ 1623(a)(2)(B), 1623(k) under subchapter I).  Congress, however, excluded those provisions—22 U.S.C. § 1623(a) and 22 U.S.C. § 1623(k)—from subchapter V that governs Cuba-related claims submitted to the Commission.  *See* 22 U.S.C. § 1634h (incorporating certain provisions from subchapter I, including those under § 1623, but not §§ 1623(a) or (k)).  Thus the "applicable principles" of international law that SocGen asserts governs adjudication of Cuban claims actually are not applicable at all.  *Compare id. with* Mot. at 39 & n.10.

In any event, the statutes governing claims submitted to the Commission were adopted more than 30 years before Helms-Burton.  *See* 22 U.S.C. § 1634b(a) (requiring all Cuba-related

claims to be submitted within sixty days of October 16, 1964).[6]  That statutory regime governing

the Commission did not restrict Congress in expanding the class of claimants who could assert

rights under Helms-Burton in 1996, thirty years after millions of Cuban exiles had become

domiciled in the United States.  Helms-Burton, in fact, evidences that Congress intended to do

just that.  For instance, in adopting Helms-Burton, Congress amended subchapter V, governing

the Commission's review of Cuba-related claims, by explicitly allowing consideration of claims

by U.S. nationals who were not naturalized American citizens at the time of Cuban confiscations.

*See* 22 U.S.C. § 1643*l*.  That provision provides:

> Notwithstanding any other provision of this chapter and only for purposes of section 6082 of this title [i.e., Helms-Burton's liability provision], a United States district court, for fact-finding purposes, may refer to the Commission . . . questions of the amount and ownership of a claim by a United States national . . . ***whether or not the United States national qualified as a national of the United States*** . . . ***at the time of the action by the Government of Cuba***."

*Id.* (emphases added)).[7]  The domestic takings rule does not bar this action.

## CONCLUSION

For the reasons set forth above, this Court should deny SocGen's Motion to Dismiss

Plaintiff's Amended Complaint.

---

[6] *See In re Joseph Abrams*, Claim No. CU-8816 (Foreign Claims Settlement Comm'n June 3, 1972), *available at* https://www.justice.gov/fcsc/cuba/documents/7501-end/8816.pdf (explaining that the deadline to file claims had been May 1, 1967).

[7] Finally, there is nothing irregular about courts treating differently a certified claim by the Commission and an uncertified claim under Helms-Burton—that is precisely what Congress envisioned, contrary to SocGen's assertions.  *See* Mot. at 40.  Certified claims under Helms-Burton are entitled to treble damages without sending thirty-day demand letters, unlike uncertified claims.  22 U.S.C. §§ 6082(a)(3)(A), (C)(ii).  Congress also prohibited certain Commission-eligible claims from being asserted under Helms-Burton.  *See* 22 U.S.C. § 6082(a)(5)(A) (disallowing claims by U.S. nationals who could have submitted claims to the Commission before 1972, but did not do so).

## REQUEST FOR A HEARING

Pursuant to Local Rule 7.1(b), Plaintiff requests a hearing on SocGen's Motion to Dismiss the Amended Complaint.  Oral argument will facilitate the Court's resolution of of this matter in light of the novel issues surround the interpretation of Helms-Burton.

Dated: December 13, 2019.

Respectfully submitted,

**KOZYAK TROPIN & THROCKMORTON, LLP**
*Counsel for Plaintiff*
2525 Ponce de Leon Blvd., 9th Floor
Miami, Florida 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

By: */s/ Javier A. Lopez*
      Javier A. Lopez, Esq.
      Florida Bar No. 16727
      jal@kttlaw.com
      Dwayne A. Robinson, Esq.
      Florida Bar No. 99976
      drobinson@kttlaw.com
      Stephanie M. Gomez, Esq.
      Florida Bar No. 112095
      sgomez@kttlaw.com
      Evan J. Stroman, Esq., CPA
      Florida Bar No. 118929
      estroman@kttlaw.com

**LAW OFFICES OF PAUL A. SACK, P.A.**
*Counsel for Plaintiff*
1210 Washington Ave., Ste. 245
Miami Beach, Florida 33139
Tel: (305) 397-8077
Fax: (305) 763-8057

By: */s/ Paul A. Sack*
      Paul A. Sack, Esq.
      Florida Bar No. 363103
      paul@paulsacklaw.com
      ps1619@bellsouth.net
      Brandon R. Deegan, Esq.
      Florida Bar No. 117368
      deegan@paulsacklaw.com