# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO.: 20-CV-00851-LTS-KNF

SUCESORES DE DON CARLOS
NUÑEZ Y DOÑA PURA GALVEZ,
INC.; MYRIAM E. NUÑEZ, as Personal
Representative and Executor of the ESTATE
OF NESTOR FRANCISCO NUÑEZ
GALVEZ; EILEEN DOMINGUEZ, as Personal
Representative and Executor of the ESTATE
OF BLANCA NUÑEZ; GLORIA TORRALBAS
NUÑEZ; GLORIA PILAR MOLINA, as Personal
Representative and Administrator of the ESTATE
OF THOMAS TORRALBAS NUÑEZ; PURA
AMERICA OCHOA NUÑEZ; NORKA
CABANAS NUÑEZ; CARLOS CABANAS
NUÑEZ; SILVIA NUÑEZ TARAFA; CARLOS
NUÑEZ TARAFA; LOURDES NUÑEZ, as Personal
Representative and Administrator of the
ESTATE OF ALEJANDRO NUÑEZ TARAFA;
CARLOS ARSENIO NUÑEZ RIVERO, as
Personal Representative and Executor of the
ESTATE OF CARIDAD MARIA RIVERO
CABALLERO; and CARLOS ARSENIO NUÑEZ
RIVERO,

     Plaintiffs,

                                                **JURY DEMAND**

vs.

SOCIÉTÉ GÉNÉRALE, S.A.,
and BNP PARIBAS, S.A.,

     Defendants.

_____

## SECOND AMENDED COMPLAINT

Plaintiffs Sucesores de Don Carlos Nuñez y Doña Pura Galvez, Inc. ("Sucesores");

Myriam E. Nuñez, as Personal Representative and Executor of the Estate of Nestor Francisco

Nuñez Galvez; Eileen Dominguez, as Personal Representative and Executor of the Estate of
Blanca Nuñez; Gloria Torralbas Nuñez; Gloria Pilar Molina, as Personal Representative and
Administrator of the Estate of Thomas Torralbas Nuñez; Pura America Ochoa Nuñez; Norka
Cabanas Nuñez; Carlos Cabanas Nuñez; Silvia Nuñez Tarafa; Carlos Nuñez Tarafa; Lourdes
Nuñez, as Personal Representative and Administrator of the Estate of Alejandro Nuñez Tarafa;
Carlos Arsenio Nuñez Rivero, as Personal Representative and Executor of the Estate of Caridad
Maria Rivero Caballero; and Carlos Arsenio Nuñez Rivero (collectively, "Plaintiffs"), for their
complaint against Société Générale, S.A. ("SocGen") and BNP Paribas, S.A. ("Paribas")
(collectively, "Defendants"), for violations of the Cuban Liberty and Democratic Solidarity Act,
22 U.S.C. § 6021, *et seq.* ("Helms-Burton"), state:

## **INTRODUCTION**

1.      This is an action for damages arising from the confiscation of property by the
Cuban Government against two banks that trafficked in that property in violation of the Cuban
Liberty and Democratic Solidarity (LIBERTAD) Act, Pub. L. 104-114, 110 Stat. 785, 22 U.S.C.
§§ 6021-6091, commonly known as the Helms-Burton Act.

2.      Before Fidel Castro came to power, Banco Nuñez was a flourishing enterprise
owned by Carlos and Pura Nuñez (the "Founders").  Founded in 1921, Banco Nuñez grew to
become the second largest Cuban-owned bank on the island in terms of assets and equity.[1]  The
Cuban Government confiscated Banco Nuñez on October 14, 1960, and consolidated it into the
state-controlled Banco Nacional de Cuba ("BNC").  About 10% of BNC's equity was derived

---

[1] *See* December 31, 1958, *Esta Era la Banca de Cuba a la Llegada del Comunismo*, attached
hereto as **Exhibit 1**.  From 1948 to 1958, the Cuban peso traded at par with the United States
dollar.  *See* Armando M. Lago & José Alonso, *A First Approximation Model of Money, Prices
and Exchange Rates in Revolutionary Cuba*, Association for the Study of the Cuban Economy
(Nov. 30, 1995), https://www.ascecuba.org/asce_proceedings/a-first-approximation-model-of-
money-prices-and-exchange-rates-in-revolutionary-cuba/.

from property confiscated from Banco Nuñez.  Before confiscation, Banco Nuñez controlled $105.1 million in assets, including $51.5 million in loans.  It had a book value in excess of $7.8 million and a significantly higher fair market value.  Despite confiscating their bank, the Cuban Government never compensated the Founders.

3.      In 1961, shortly after their bank was confiscated, the Founders fled Cuba for the United States to escape the extrajudicial killings, unjustified imprisonment, and cruelty that would come to embody Castro's reign.  Pura Nuñez died in 1969, leaving her entire interest in Banco Nuñez to her heirs.  Carlos became a United States citizen before his death in 1979. Twelve of Carlos' heirs likewise became citizens by birth or by naturalization.  For the sole purpose of consolidating and asserting interests in Banco Nuñez, the Founders' heirs formed and transferred interests in Banco Nuñez to Sucesores, a Florida corporation.

4.      In 1996, Congress observed that the Cuban Government was seeking to raise "hard currency" by "offering foreign investors" opportunities to enter into ventures that benefited from the use of property confiscated by the Cuban Government.  It passed the Helms-Burton Act to deter such "'trafficking' in confiscated property" by creating a private right of action.  That statute allows United States nationals to bring an action against anyone who intentionally traffics in property confiscated by the Cuban Government.  Starting in 2000 at the latest—four years after the adoption of Helms-Burton—SocGen and Paribas began trafficking in property known to be confiscated by the Cuban Government.  That property included the Nuñez heirs' share of the new conglomerated BNC.  SocGen and Paribas together earned more than $1 billion in profit from that trafficking, conducting the transactions through their New York branches in this District.

5.      On June 10, 2019, and February 19, 2020, Plaintiffs sent notices to SocGen and Paribas, respectively, demanding that they immediately cease trafficking in Plaintiffs' property. Plaintiffs now seek damages and attorneys' fees as provided under Helms-Burton based on Defendants' violations of the Act.

## PARTIES AND RELEVANT NONPARTIES

6.      Plaintiff Sucesores de Don Carlos Nuñez y Doña Pura Galvez, Inc. is a Florida corporation that holds interests in Banco Nuñez confiscated by the Cuban Government. Sucesores was created in 1996 to consolidate the heirs' interests in Banco Nuñez and create a single vehicle for asserting the heirs' claims under Helms-Burton.  That is Sucesores' sole purpose; it conducts no other business.

7.      Plaintiff Myriam E. Nuñez is the Personal Representative and Executor of the Estate of Nestor Francisco Nuñez Galvez.  Nestor Francisco Nuñez Galvez is the deceased son of the Founders.  He inherited an interest in Banco Nuñez from his parents before, and held that interest on, March 12, 1996.  He had been a United States citizen at least since March 12, 1996.

8.      Plaintiff Eileen Dominguez is the Personal Representative and Executor of the Estate of Blanca Nuñez.  Blanca Nuñez is the deceased daughter of the Founders.  She inherited an interest in Banco Nuñez from her parents before, and held that interest on, March 12, 1996.  She had been a United States citizen at least since March 12, 1996.

9.      Plaintiff Gloria Torralbas Nuñez is the granddaughter of the Founders.  She inherited an interest in Banco Nuñez from her grandparents before, and held that interest on, March 12, 1996.  She has been a United States citizen at least since March 12, 1996.

10.      Plaintiff Gloria Pilar Molina is the Personal Representative and Administrator of the Estate of Thomas Torralbas Nuñez.  Thomas Torralbas Nuñez is the deceased grandson of

the Founders. He inherited an interest in Banco Nuñez from his grandparents before, and held that interest on, March 12, 1996. He had been a United States citizen at least since March 12, 1996.

11.     Plaintiff Pura America Ochoa Nuñez is the granddaughter of the Founders. She inherited an interest in Banco Nuñez from her grandparents before, and held that interest on, March 12, 1996. She has been a United States citizen at least since March 12, 1996.

12.     Plaintiff Norka Cabanas Nuñez is the granddaughter of the Founders. She inherited an interest in Banco Nuñez from her grandparents before, and held that interest on, March 12, 1996. She has been a United States citizen at least since March 12, 1996.

13.     Plaintiff Carlos Cabanas Nuñez is the grandson of the Founders. He inherited an interest in Banco Nuñez from his grandparents before, and held that interest on, March 12, 1996. He has been a United States citizen at least since March 12, 1996.

14.     Plaintiff Silvia Nuñez Tarafa is the granddaughter of the Founders. She inherited an interest in Banco Nuñez from her grandparents before, and held that interest on, March 12, 1996. She has been a United States citizen at least since March 12, 1996.

15.     Plaintiff Carlos Nuñez Tarafa is the grandson of the Founders. He inherited an interest in Banco Nuñez from his grandparents before, and held that interest on, March 12, 1996. He has been a United States citizen at least since March 12, 1996.

16.     Lourdes Nuñez is the Personal Representative and Administrator of the Estate of Alejandro Nuñez Tarafa. Alejandro Nuñez Tarafa is the deceased grandson of the Founders. He inherited an interest in Banco Nuñez from his grandparents before, and held that interest on, March 12, 1996. He had been a United States citizen at least since March 12, 1996.

17.     Carlos Arsenio Nuñez Rivero is the Personal Representative and Executor of the Estate of Caridad Maria Rivero Caballero.  Caridad Maria Rivero Caballero is the deceased second wife of Founder Carlos Nuñez.  She inherited an interest in Banco Nuñez from her husband before, and held that interest on, March 12, 1996.  She had been a United States citizen at least since March 12, 1996.

18.     Plaintiff Carlos Arsenio Nuñez Rivero is the son of Founder Carlos Nuñez.  He inherited an interest in Banco Nuñez from his father before, and held that interest on, March 12, 1996.  He had been a United States citizen at least since March 12, 1996.

19.     Myriam E. Nuñez, as Personal Representative and Executor of the Estate of Nestor Francisco Nuñez Galvez; Eileen Dominguez, as Personal Representative and Executor of the Estate of Blanca Nuñez; Gloria Torralbas Nuñez; Gloria Pilar Molina, as Personal Representative and Administrator of the Estate of Thomas Torralbas Nuñez; Pura America Ochoa Nuñez; Norka Cabanas Nuñez; Carlos Cabanas Nuñez; Silvia Nuñez Tarafa; Carlos Nuñez Tarafa; Lourdes Nuñez, as Personal Representative and Administrator of the Estate of Alejandro Nuñez Tarafa; Carlos Arsenio Nuñez Rivero, as Personal Representative and Executor of the Estate of Caridad Maria Rivero Caballero; and Carlos Arsenio Nuñez Rivero are collectively referred to as the "Individual Heirs."  Through a Stockholders Agreement, the Individual Heirs assigned all interests bequeathed to them in Carlos' will to Sucesores for the sole purpose of consolidating their interests in Banco Nuñez.

20.     Defendant Société Générale, S.A., is a French multinational bank and financial services company headquartered in Paris, France, with substantial business operations in New York, New York.

21.     Defendant BNP Paribas, S.A., is a French multinational bank and financial services company headquartered in Paris, France, with substantial business operations in New York, New York.

22.     The Republic of Cuba, a nonparty to this case, is a sovereign state composed of the island of Cuba, as well as Isla de la Juventud and several minor archipelagos.

23.     Non-party Banco Nacional de Cuba ("BNC") is part of the Cuban Government. After nationalization of Cuba's banking system in 1960, BNC operated as the island's sole banking institution and regulator of all foreign payments.  Today, BNC continues to function "as a commercial bank."  It also serves as regulator of "external debt" that the Cuban State and BNC "have contracted with foreign creditors" and that is backed by "the guarantee of the [Cuban] State."

## JURISDICTION AND VENUE

24.     Sucesores is a Florida corporation and a United States national located at 9700 NW 79th Avenue, Hialeah Gardens, Florida 33016.

25.     Defendant Société Générale, S.A., is a multinational bank headquartered at 29 Blvd. Haussman, 9th Arrondissement, Paris, France.  SocGen conducts banking business in New York through its branch located at 245 Park Avenue, New York, New York 10029, through which it has maintained credit facilities that have cleared a substantial number of payments on behalf of BNC.[2]  Plaintiffs' claim arises out of those transactions.  For purposes of these proceedings, SocGen has consented to specific personal jurisdiction in the Southern District of New York.[3]  Defendant BNP Paribas, S.A., is a multinational bank headquartered at 16 Blvd. des Italiens, Paris, France.  Paribas purposefully availed itself of the privilege of doing business in

---

[2] *See* ECF No. 29-2.
[3] *See* ECF No. 41, p. 8; ECF No. 42, ¶¶ 2-3.

this forum by maintaining a branch in this District at 787 7th Avenue, New York, New York 10019. Paribas has maintained credit facilities and routed wire transfers for BNC's benefit through its New York branch. Plaintiffs' claim arises out of those transactions involving Paribas' New York branch.[4] Paribas has been present in the United States since the late 1800s, and continues to maintain a substantial presence, employing more than 16,000 people in North America. This Court has subject-matter jurisdiction over this matter under 28 U.S.C. § 1331. Plaintiffs bring a civil action that arises under federal law, 22 U.S.C. § 6082.

26.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)(1) because Defendants reside or are deemed to reside in the Southern District of New York under 28 U.S.C. §§ 1391(c) and (d). Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, including each Defendant's use of its respective New York branch to maintain credit facilities or process wires for the benefit of BNC. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(3) because Defendants are subject to personal jurisdiction in this District with respect to this action.

## FACTUAL ALLEGATIONS

### I.     Cuba Nationalizes Banco Nuñez and Other Banks

27.     Carlos and Pura Nuñez founded Banco Nuñez in 1921. The Founders, the sole owners of Banco Nuñez, grew the bank into a twenty-two branch banking operation with a physical presence in five of Cuba's six provinces. On December 31, 1958, the day before Fidel Castro seized power, Banco Nuñez was the second largest Cuban-owned bank on the island.

---

[4] *See* Paribas Guilty Plea, Statement of Facts ¶ 53, attached hereto **Exhibit 2** (hereafter "Paribas Guilty Plea").

Banco Nuñez controlled $105.1 million in assets, including $51.5 million in loans, and had equity of $7.8 million.[5]

28.     After Castro seized power, the Cuban Government began nationalizing every bank on the island – including foreign banking institutions – and absorbing those banks into the state-controlled entity Banco Nacional de Cuba ("BNC").   On October 14, 1960, Cuba confiscated and nationalized all remaining Cuban-owned banks, including Banco Nuñez.   Using that confiscated property, BNC began operating as Cuba's sole financial institution with responsibility for conducting or overseeing all monetary policy, commercial banking, borrowing, and lending in Cuba.

29.     Cuba's confiscation of the banking industry was well known to the international banking community.   The Castro Government passed multiple laws in 1960, including Cuban Law Nos. 851 and 891, declaring banking a public function in Cuba and ordering BNC to confiscate all national and international banks in Cuba.   The foreign banks whose branches, businesses, and assets were handed over to BNC included household names like Chase and Citibank.   As part of a broad response to the Cuban Government's actions, Congress authorized the Foreign Claims Settlement Commission of the United States – a quasi-judicial, independent agency within the Department of Justice which adjudicates claims against foreign governments – to consider claims relating to Cuba's confiscation of property.   In public decisions, the Commission has granted relief for claims arising from the Cuban Government's nationalization and confiscation of banks.

30.     At the time BNC absorbed Banco Nuñez, Banco Nuñez had a book value in excess of $7.8 million and a significantly higher fair market value.   Banco Nuñez also had $9.9

---

[5] *See* n.1, *supra*.

9

million on deposit with BNC that was also confiscated.  About 10% of BNC's equity was derived from property seized from Banco Nuñez.

31.     The Founders received no compensation for the banking enterprise that the Cuban Government confiscated and merged into BNC.  Nor did the Founders, any of their heirs, or Plaintiffs receive any compensation for BNC's use of Banco Nuñez and its assets over the next 60 years, to the present day.  Plaintiffs' lawsuit seeks recovery for Defendants' trafficking in this confiscated property, without Plaintiffs' consent, as authorized under Helms-Burton.

## II.     The Founders Relocate to the United States

32.     The Founders fled to the United States.  Pura Nuñez died in 1969, and left her entire interest in Banco Nuñez to her children.  Carlos remarried after Pura's death and became a naturalized United States citizen.  Carlos died on October 31, 1979, leaving his entire interest in Banco Nuñez to his heirs.

33.     Pura and Carlos had 12 living heirs who were United States citizens on March 12, 1996, and held an interest in Banco Nuñez: three children, Nestor Francisco Nuñez Galvez, Blanca Nuñez, and Carlos Arsenio Nuñez Rivero; eight grandchildren, Gloria Torralbas Nuñez, Thomas Torralbas Nuñez, Pura America Ochoa Nuñez, Norka Cabanas Nuñez, Carlos Cabanas Nuñez, Silvia Nuñez Tarafa, Carlos Nuñez Tarafa, and Alejandro Nuñez Tarafa; and Carlos' second wife, Caridad Maria Rivero Caballero.

34.     In 1996, heirs of Pura and Carlos created Sucesores to consolidate their interests in Banco Nuñez and create a single vehicle for asserting claims under Helms-Burton.  Through a Stockholders Agreement, dated May 24, 1997, and an Assignment of Interest, dated September 20, 2019, the heirs assigned all of the interests they inherited through Carlos' will to Sucesores. Each heir received a percentage of shares in Sucesores.  Sucesores did not acquire its Helms-

Burton claim in a secondary market for claims.

35.     Some shares in Sucesores were later transferred or bequeathed within the Nuñez family.  No shares have ever been controlled by anyone other than an heir of Carlos and Pura Nuñez.  Several of the heirs who created Sucesores continue to hold their original shares and have never transferred those shares to anyone else.

## III.   Congress Enacts the Economic Embargo of Cuba and Helms-Burton

36.     After Castro's rise to power, the United States imposed almost a complete commercial, economic, and financial embargo against Cuba.  The embargo prevented (among other things) financial institutions subject to the jurisdiction of the United States from conducting business with Cuban parties or property.  The embargo significantly limited Cuba's ability to access international markets.  In 1996, Congress sought to strengthen its embargo by adopting the Helms-Burton Act.  At the time, Cuba was seeking to circumvent the embargo by using "confiscated" property to raise "badly needed" finances and expertise from "foreign investors."

37.     "To deter" this "trafficking in wrongfully confiscated property," Helms-Burton provides United States nationals who were the victims of these confiscations "a judicial remedy in the courts of the United States" that "den[ies] traffickers any profits from economically exploiting Castro's wrongful seizures."

38.     Title III of Helms-Burton provides that any person who traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable for monetary damages to the United States national who owns a claim to that property. "United States national" means any United States citizen or any other legal entity organized under the laws of the United States, or of any State.  "Traffick[ing]" is defined broadly.  It includes possessing, controlling, managing, using or holding an interest in confiscated property without

the owner's consent. It also includes "engag[ing]" in "commercial activity using or otherwise benefiting from confiscated property" without the owner's consent. Persons who "cause[ ]," "direct[ ]," "participate[ ] in," or "profit[ ] from" trafficking by another party without the owner's consent engage in trafficking as well.

## IV. Defendants' Trafficking in Confiscated Property in Violation of Helms Burton

39.     Both SocGen and Paribas violated Helms Burton through extensive, secret financial transactions with and through BNC. Their conduct came to light through government investigations and criminal proceedings brought by the United States Department of Justice. Paribas pleaded guilty to conspiracy to violate the International Economic Powers Act and the Trading with the Enemy Act. SocGen entered into a Deferred Prosecution Agreement ("DPA") after being charged with violating the Trading with the Enemy Act. Both the Paribas plea agreement and the SocGen DPA include extensive stipulated statements of facts in which Defendants admit to conduct that constitutes trafficking in violation of Helms Burton and indicates the existence of additional conduct that constitutes trafficking in violation of Helms Burton. That conduct includes engaging in commercial activity with BNC, which has included and benefitted from the wrongfully confiscated assets of Banco Nuñez since 1960.

### A.  SocGen's Trafficking

40.     The U.S. economic embargo of Cuba restricts access to U.S. dollars important for transacting business in international markets. U.S. law restricts, for example, BNC's ability to use the U.S. financial system to conduct business in dollars—either to promote its own interests or to serve clients—by limiting U.S. banks' ability to process transactions involving BNC. For that reason, most "[f]inancial institutions in the United States that process U.S. dollar transactions from other countries utilize sophisticated filters designed to identify and block or

reject any transactions involving entities that have been sanctioned by [Office of Foreign Asset Control]," including BNC.[6]  To evade those restrictions and avoid having critical transactions blocked, BNC obtained assistance from SocGen.  As SocGen admitted in a deferred prosecution agreement, it unlawfully provided "a Cuban government bank" (*i.e.*, BNC) and other Cuban entities access to U.S. dollars and the U.S. financial system.

41.     After obtaining a license to conduct "for-profit [banking] activities" in Cuba,[7] SocGen opened more than twenty credit facilities for or involving Cuban entities in U.S. dollars.  Six of those facilities involved loans directly to BNC or "loans to a New Jersey-incorporated entity for subsequent transfer to" BNC.[8]  Other facilities involved loans to finance a Cuban corporation's purchase of oil, to support the state-owned company that operates Cuba's airlines, and to finance the production and export of Cuban commodities.[9]  For example, SocGen, working with another French bank, provided a $40 million revolving line of credit to finance the importation of crude oil from the Netherlands by Union CubaPetróleo (a Cuban government-owned corporation).[10]  Those credit facilities allowed Cuban entities subject to sanctions to access U.S. dollars and transact business with foreign corporations that they otherwise would have been unable to do.  On information and belief, BNC was involved in the SocGen credit facilities.

42.     As part of maintaining the credit facilities, SocGen processed at least 2,500 transactions – valued at $13 billion – through New York financial institutions between 2004 and

---

[6] SocGen Deferred Prosecution Agreement, Statement of Facts ¶11, attached hereto as **Exhibit 3** (hereafter "SocGen DPA").

[7] *See* Gaceta Oficial, December 11, 1995, Resolution Number 329 of 1995, attached hereto as **Exhibit 4**.

[8] SocGen DPA, Statement of Facts ¶23.

[9] *Id.* ¶¶21-23.

[10] *Id.* ¶¶22-23.

2010.[11]   SocGen, however, concealed those transactions from U.S. regulators.  For example, in January 2006, SocGen directed another bank to route payments for a Cuban credit facility through SocGen's New York branch " 'without including any mention or reference to Cuba, any Cuban entity or to the Caribbean, either in the correspondence (electronic, paper or fax), the SWIFT messages or the fund transfer SWIFTS.' "[12]  Similarly, in July 2002, SocGen described the measures it would take to conceal that the credit facilities were for Cuban entities:

> We are going to receive transfer orders in USD in favor of certain suppliers in non-Cuban banks.  In this case, the USD transfer must not in any case mention the name of the [the joint venture] or its country of origin, Cuba.  The clearing will indeed be carried out in NY.  I have explicitly asked [the joint venture] to write on its transfer request the instructions to be included.[13]

43.   SocGen earned significant profits from operating the credit facilities.   In a forfeiture proceeding, SocGen agreed to pay over $880 million in forfeited profits based on its illegal dealings with Cuban entities like BNC.[14]

44.   SocGen's conduct constitutes trafficking in confiscated property under Helms-Burton.  In violation of Helms-Burton, SocGen knowingly and intentionally "participate[d] in" and "profit[ed] from" BNC's trafficking in confiscated property.   BNC knowingly and intentionally trafficked in confiscated property by "manag[ing], "possess[ing]," "obtain[ing] control of" or "otherwise acquir[ing] or hold[ing] an interest in" the banking enterprise confiscated from the Founders and "us[ing]" Banco Nuñez's property (including its banking infrastructure and equity) in its own banking operations.   BNC also engaged in commercial banking that "use[d] or otherwise benefit[ed] from" that confiscated property.   That BNC engaged in conduct constituting trafficking in confiscated property was well known to the

---

[11] *Id.* ¶ 12.
[12] *Id.* ¶ 36 (emphasis omitted).
[13] *Id.* ¶ 15 (emphasis omitted) (alterations original).
[14] *Id.* ¶ 3.

international banking community.   SocGen nonetheless assisted BNC's banking activities. Acting as an intermediary, SocGen provided U.S. dollar credit facilities to BNC and other Cuban entities that BNC by itself could not provide or access.

45.     SocGen also knowingly and intentionally "engage[d] in," "participate[d] in," and "profit[ed] from" "commercial activit[ies]" that "use[d] or otherwise benefit[ed]" from the confiscated property.   SocGen extended multiple credit facilities to BNC.   Those commercial activities "use[d]" property confiscated from Banco Nuñez.   Those activities and SocGen also "benefit[ed] from" the confiscated property and BNC's trafficking in the confiscated property. About 10% of BNC's equity was derived from property confiscated from Banco Nuñez.   That confiscated property made BNC a more stable, less risky, and more desirable counterparty than it otherwise would have been, potentially allowing for more substantial loans, more favorable terms, or greater profitability.

46.     Neither the Founders nor any of their heirs nor Plaintiffs ever consented to BNC's and SocGen's trafficking in the confiscated property.

**B.  Paribas' Trafficking**

47.     Paribas trafficked in the confiscated property as well.   Like SocGen, Paribas "conspired with numerous Cuban banks" to evade U.S. economic sanctions that restrict BNC's (and other sanctioned entities') access to U.S. dollars important to transacting in international markets.[15]

48.     As admitted in its plea agreement, from at least 2000 to 2010, Paribas offered U.S. dollar financing to Cuban entities.   Most of the financing was provided through eight credit

---

[15] *See* Paribas Guilty Plea, Statement of Facts ¶¶ 14, 49.

facilities operated with the involvement of Cuban banks.[16]  Through those facilities, Paribas processed more than $1.747 billion in U.S. dollar-denominated transactions.[17]  Paribas also opened U.S. dollar accounts with Cuban banks to permit them access to U.S. dollars.[18]  On information and belief, one of the Cuban banks or Specially Designated Nationals sanctioned entities that Paribas assisted was BNC.

49.    On information and belief, Paribas also participated with SocGen in operating at least one of the credit facilities described above.  Paribas, like SocGen, participated in a credit facility to finance a Cuban entity's purchase of oil in U.S. dollars from the Netherlands.[19]  As part of a "highly complicated" scheme to conceal that the transactions involved a Cuban entity, Paribas would make a number of bank-to-bank transfers.[20]  One of the transfers was between a Paribas account set up at SocGen[21] and Paribas' own internal accounts.[22]  "[T]ypically," the payments would be transferred through Paribas' New York branch.[23]

50.    Paribas, too, went to great lengths to conceal its illicit activities with Cuba.  For example, in an April 2000 credit application, Paribas acknowledged the "'risk linked to the American embargo' and explained that the risk had been 'resolved' through the use of a 'fronting' structure that layered the U.S. dollar transactions using accounts at a different French

---

[16] *See id.* ¶ 52.

[17] *See id.* ¶ 49.

[18] *See id.* ¶ 65.

[19] *See id.* ¶¶ 52-53.

[20] *See id.* ¶ 53.

[21] SocGen is referred to as "French Bank 1" in the Paribas plea agreement.  *See id.*  Paribas, by contrast, appears to be "French Bank 1" in the SocGen DPA, *compare* SocGen DPA, Statement of Facts ¶ 22 (SocGen worked with "French Bank 1" on a credit facility to "finance" a "Dutch [c]ompany" in "import[ing] . . . crude oil into Cuba to be refined and sold" there) *with* Paribas Guilty Plea, Statement of Facts ¶ 52 (Paribas participated in a credit facility involving "loans to a Dutch company to finance the purchase of crude oil products to be refined in and sold to Cuba").

[22] *See* Paribas Guilty Plea, Statement of Facts ¶ 53.

[23] *See id.*

bank . . . and concealed the involvement of Cuban entities."[24]   Similarly, in January 2006, a Paribas employee wrote: "'I think we need to point out to [French Bank 1] that they should not mention CUBA in their transfer order.'"[25]   Another employee responded that French Bank 1 "'knows very well that Cuba or any other Cuban theme must not be mentioned in the transfer orders and I reminded them about this over the phone this morning.'"[26]

51.     Paribas earned significant profits from its conduct, so much so that high-level managers dismissed "explicit concerns from compliance personnel" in pursuit of the profits.[27]

52.     Paribas' conduct constitutes trafficking in confiscated property under Helms-Burton.  In violation of Helms-Burton, Paribas knowingly and intentionally "participate[d] in" and "profit[ed] from" BNC's trafficking in confiscated property.   BNC knowingly and intentionally trafficked in confiscated property by "manag[ing], "possess[ing]," "obtain[ing] control of" or "otherwise acquir[ing] or hold[ing] an interest in" the banking enterprise confiscated from the Founders and "us[ing]" Banco Nuñez's property (including its banking infrastructure and equity) in its own banking operations.  BNC also engaged in commercial banking that "use[d] or otherwise benefit[ed] from" that confiscated property.   That BNC engaged in conduct that constitutes trafficking in confiscated property was well known to the international banking community.   Paribas nonetheless assisted BNC's banking activities. Acting as an intermediary, Paribas provided U.S. dollar credit facilities to BNC and other Cuban entities that BNC by itself could not provide or access.

53.     Paribas also knowingly and intentionally "engage[d] in," "participate[d] in," and "profit[ed] from" "commercial activit[ies]" that "use[d] or otherwise benefit[ed]" from the

---

[24] *See id.* ¶¶ 53-54.
[25] *See id.* ¶ 54 (alteration in original).
[26] *Id.*
[27] *Id.* ¶ 51.

confiscated property.  Paribas extended multiple credit facilities to BNC.  Those commercial activities "use[d]" property confiscated from Banco Nuñez.  Those activities and Paribas also "benefit[ed] from" the confiscated property and BNC's trafficking in the confiscated property. About 10% of BNC's equity was derived from property confiscated from Banco Nuñez.  That confiscated property made BNC a more stable, less risky, and more desirable counterparty than it otherwise would have been, potentially allowing for more substantial loans, more favorable terms, or greater profitability.

54.     Neither the Founders nor their heirs nor Plaintiffs ever consented to BNC's and Paribas' trafficking in the confiscated property.

## ALLEGATIONS AS TO DAMAGES

55.     Helms-Burton provides statutory measures of compensatory and treble damages that Plaintiffs demand in these proceedings, along with attorneys' fees and costs.

56.     Plaintiffs are entitled to compensatory damages equaling the fair market value of Plaintiffs' property.  That valuation is either the current value of the property or the value of the property when confiscated in 1960, plus interest, whichever is greater.

57.     Treble damages are also warranted.  Pursuant to 22 U.S.C. § 6082(a)(3)(D), Sucesores, a non-certified claimholder – on behalf of the holders of interests in Banco Nuñez – notified SocGen and Paribas by certified mail that they were trafficking in confiscated property and demanded that they cease.  Sucesores also stated its intent to commence an action under Title III of Helms-Burton or, in the case of Paribas, that it intended to join Paribas as a Defendant to this action.  The correspondence contained the statutory summary statement required by 22 U.S.C. § 6082(a)(3)(D)(iii)(III).

58.     SocGen received the demand letter on June 10, 2019.   Paribas received the demand letter on February 19, 2020.   Neither Defendant responded to deny that they are continuing to traffic in Plaintiffs' property or otherwise maintaining the credit facilities.

59.     SocGen and Paribas continue to traffic in Plaintiffs' property in substantially the same manner as described above.   Both Defendants continue to operate similar credit facilities to the ones described above, except those facilities exclude U.S.-dollar transactions to avoid U.S. law.   In the 2000s, SocGen and Paribas began to transition a number of the credit facilities described above from using U.S. dollars to using other currencies.[28]   Neither Defendant represented that it would cease operating those facilities or trafficking in confiscated property in response to the demand letters.

60.     Treble damages against the Defendants are warranted.

## TOLLING OR NON-ACCRUAL OF STATUTE OF LIMITATIONS

61.     Each President of the United States suspended the right to sue under Helms-Burton from when it would have taken effect on August 1, 1996, through May 2, 2019, when the current administration lifted that suspension.   To the extent that Plaintiffs' claim accrued against SocGen and Paribas during that suspension period, the Defendants' liability "can't be extinguished subsequently."[29]   The President lifted the "suspension period" on May 2, 2019, and Sucesores promptly brought suit and the Individual Heirs joined thereafter.

62.     For years, SocGen and Paribas knowingly and intentionally profited by trafficking in Plaintiff's confiscated property, actively concealing their actions to prevent discovery by U.S. regulators.

---

[28] *See* SocGen DPA, Statement of Facts ¶ 33; Paribas Guilty Plea, Statement of Facts ¶ 66.

[28] *See* Office of the Press Secretary, Briefing on Helms-Burton Title III Suspension 7/16/96, 1996 WL 396125, at *5 (July 16, 1996).

63.     Finally, Defendants' trafficking is ongoing.  Defendants continue to operate credit facilities as described above, using currencies other than the U.S. dollar.

## COUNT I
### Liability to Sucesores for Trafficking Pursuant to Helms-Burton
### (Against Both Defendants)

Plaintiff re-alleges and incorporates paragraphs 1-63, above as if fully set forth herein.

64.     Sucesores holds interests in Banco Nuñez.  Accordingly, Sucesores respectfully requests that the Court: (1) enter a judgment against the Defendants for monetary damages in accordance with § 6082(a), including (a) the greater of the current value of the property or the fair market value of the property when confiscated plus interest, and (b) treble damages; (2) award attorneys' fees and costs in accordance with § 6082(a)(1)(A)(ii); and (3) for any further relief deemed appropriate by this Court.

## COUNT II
### Liability to Individual Heirs for Trafficking Pursuant to Helms-Burton
### (Against Both Defendants)

Individual Heirs re-allege and incorporate paragraphs 1-63, above as if fully set forth herein.

65.     To the extent that Sucesores cannot bring the Individual Heirs' Helms-Burton claims, Sucesores' purpose is frustrated and the Stockholders Agreement is void *ab initio*.  All parties to the Stockholders Agreement assigned interests to Sucesores on the mutual, essential, and reasonable understanding that Sucesores would be legally permitted to vindicate those interests – and they would not have entered into the agreement otherwise.  To the extent that Sucesores does not hold all interests in Banco Nuñez, the Individual Heirs hold those interests.

66.     Accordingly, the Individual Heirs respectfully request that the Court: (1) enter a judgment against the Defendants for monetary damages in accordance with § 6082(a), including

(a) the greater of the current value of the property or the fair market value of the property when confiscated plus interest, and (b) treble damages; (2) award attorneys' fees and costs in accordance with § 6082(a)(1)(A)(ii); and (3) for any further relief deemed appropriate by this Court.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Dated: July 16, 2020.                      Respectfully submitted,

New York, New York

Javier A. Lopez, Esq.
Benjamin J. Widlanski, Esq.              /s/ Steven F. Molo
Dwayne A. Robinson, Esq.                 Steven F. Molo
Evan J. Stroman, Esq., CPA               Sara E. Margolis
**KOZYAK TROPIN &**                      **MOLOLAMKEN LLP**
**THROCKMORTON, LLP**                    430 Park Ave.
2525 Ponce de Leon Blvd., 9th Floor      New York, New York  10022
Miami, Florida  33134                    Tel.:  (212) 607-8170
Tel.: (305) 372-1800                     Fax:  (212) 607-8161
Fax: (305) 372-3508                      smolo@mololamken.com
jal@kttlaw.com                           smargolis@mololamken.com
bwidlanski@kttlaw.com
drobinson@kttlaw.com
estroman@kttlaw.com

Paul A. Sack
**LAW OFFICES OF**
**PAUL A. SACK, P.A.**
1210 Washington Ave., Ste. 245
Miami Beach, FL
Tel.: (305) 397-8077
Fax: (305) 763-8057
paul@paulsacklaw.com