UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

SUCESORES DE DON CARLOS NUÑEZ Y
DOÑA PURA GALVEZ, INC.; MYRIAM E.
NUÑEZ, as Personal Representative and
Executor of the ESTATE OF NESTOR
FRANCISCO NUÑEZ GALVEZ; EILEEN
DOMINGUEZ, as Personal Representative and
Executor of the ESTATE OF BLANCA
NUÑEZ; GLORIA TORRALBAS NUÑEZ;
GLORIA PILAR MOLINA, as Personal
Representative and Administrator of the
ESTATE OF THOMAS TORRALBAS
NUÑEZ; PURA AMERICA OCHOA NUÑEZ;
NORKA CABANAS NUÑEZ; CARLOS
CABANAS NUÑEZ; SILVIA NUÑEZ
TARAFA; CARLOS NUÑEZ TARAFA;
LOURDES NUÑEZ, as Personal
Representative and Administrator of the
ESTATE OF ALEJANDRO NUÑEZ
TARAFA; CARLOS ARSENIO NUÑEZ
RIVERO, as Personal Representative and
Executor of the ESTATE OF CARIDAD
MARIA RIVERO CABALLERO; and
CARLOS ARSENIO NUÑEZ RIVERO,

                          Plaintiffs,

              -against-

SOCIÉTÉ GÉNÉRALE, S.A., and
BNP PARIBAS, S.A.,

                          Defendants.

--------------------------------------------------------X

|  |
|--|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED:   12/22/2021   |

20-CV-851 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

        Plaintiffs, a corporation created to assert claims to the confiscated assets and banking

infrastructure of former Cuban bank Banco Nuñez and twelve heirs or descendants of the

founders of the bank, bring this suit against Defendants Société Générale, S.A. ("SocGen") and

BNP Paribas, S.A. ("Paribas").  They allege that by extending credit facilities to the Cuban bank

that now holds the assets expropriated from the Banco Nuñez founders, Defendants trafficked in that confiscated property within the meaning of the Helms-Burton Act.  Under the civil remedy provision of that Act, Plaintiffs assert a claim against Defendants for money damages of three times the value of Banco Nuñez at the time it was seized, plus interest for the ensuing sixty-one years.

Defendants move jointly to dismiss Plaintiffs' claims under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  Defendants raise a range of arguments in support of their motion, including contentions that Plaintiffs fail to allege continued ownership of claims to confiscated property that are not time-barred, that international law forecloses Plaintiffs' claims, that the alleged injury in this case cannot support Article III standing, and that Plaintiffs have not adequately alleged that Defendants acted knowingly and intentionally.[1]  For the reasons set forth below, Defendants' motion to dismiss is GRANTED.

## BACKGROUND[2]

Plaintiff Sucesores de Don Carlos Nuñez y Doña Pura Galvez, Inc. ("Sucesores") is a Florida corporation formed by heirs of the founders of Banco Nuñez, Carlos and Pura Nuñez, "[f]or the sole purpose of consolidating and asserting interests in Banco Nuñez."  (Second Am. Compl. ("SAC") ¶ 3, ECF No. 82.)  The twelve individual plaintiffs include ten children and grandchildren of Carlos and Pura Nuñez, Carlos's second wife, and his son from that second marriage, all of whom inherited interests in Banco Nuñez.  (*Id.* ¶¶ 7–18.)  Defendants are two

---

[1] Defendants also argue that the alleged conduct in this case does not meet the Helms-Burton Act's definition of "trafficking."  Because Defendants' other arguments justify dismissing the complaint, the Court does not reach this question.

[2] This recounting of the facts of this case is based upon Plaintiffs' pleadings, which are accepted as true for purposes of resolving Defendants' motion to dismiss.

large French financial institutions, SocGen and Paribas, that have extended credit facilities to numerous Cuban enterprises.  (*Id.* ¶¶ 20–21, 41, 48.)

Carlos and Pura Nuñez founded Banco Nunez in 1921.  By 1958, it had become the second largest bank in Cuba, and it grew to $105.1 million in assets and $7.8 million in equity by 1960.  (*Id.* ¶ 27.)[3]  After Fidel Castro came to power, the Cuban government seized Banco Nuñez and its assets on October 14, 1960, as part of a final step of nationalizing all banking entities in Cuba.  (*Id.* ¶ 28.)  After the seizure, the bank's assets were incorporated into Banco Nacional de Cuba ("BNC") and accounted for approximately ten percent of BNC's equity.  (*Id.* ¶ 30.)  BNC operated initially as the sole financial institution in Cuba.  (*Id.* ¶ 23.)  Alarmed by the rise of a nearby Communist country, the United States imposed a punishing embargo of a wide range of economic entities in Cuba, including those in its financial sector.  (*See id.* ¶ 36.)  Nevertheless, BNC continues on as a commercial bank today.  (*Id.* ¶ 23.)

Upon the deaths of Pura Nuñez in 1969 and Carlos Nuñez in 1979, their interests in the confiscated Banco Nuñez assets passed to their heirs and descendants.  (*Id.* ¶¶ 3, 32.)  These interests became potentially much more valuable in 1996, with the passage of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, also known as the Helms-Burton Act (the "Act").  Pub. L. No. 104-114, 110 Stat. 815 (1996).  Around this time, many in Congress had grown concerned that "the Cuban Government [wa]s offering foreign investors the opportunity to purchase an equity interest in, manage, or enter into joint ventures using property and assets . . . confiscated from United States nationals" and that these foreign investments "provide[d] badly needed financial benefit, including hard currency, oil, and productive

---

[3] Dollar figures are unadjusted for inflation.

investment and expertise" that helped the Cuban government remain in power.  *See* 22 U.S.C. §

6081(5)–(6).  After Cuban military jets downed unarmed American civilian aircraft in what

Congress labeled an "act of terrorism"—leaving four American members of a humanitarian

organization dead—Congress and the President responded and enacted the Helms-Burton Act

just seventeen days later.  *See id.* § 6046.  The Act was intended to compel the Cuban

government to adopt democratic elections by toughening existing sanctions and establishing a

civil remedy for U.S. nationals who own a claim to property wrongfully confiscated by the

Cuban government.  *See id.* § 6022(2), (4), (6).  This remedy allowed these U.S. nationals to

recover up to three times the fair market value of confiscated property from any party that

"traffics" in that property, creating a potent deterrent to foreign investment.  *Id.* § 6082(a)(1), (3).

An international uproar followed, due to anger at the United States for imposing enormous

potential liability on nationals of other countries.  The United States' reaction was to suspend

operation of the Act's civil remedy provision every six months; this series of suspensions lasted

until May 2, 2019.  (SAC ¶ 61.)

Following passage of the Helms-Burton Act, SocGen and Paribas engaged in significant

financial dealings with BNC and other Cuban entities.  From 2000 to 2010, Paribas provided

Cuban entities access to U.S. dollars via eight credit facilities and through accounts with BNC

and other Cuban banks, all in violation of the U.S. embargo.  (*Id.* ¶ 48.)  Paribas also "extended

multiple credit facilities to BNC."  (*Id.* ¶ 53.)  On June 28, 2014, Paribas entered a guilty plea in

which it admitted to much of that conduct and under which it forfeited more than $8.8 billion.

(SAC, Ex. 2 ("Paribas Guilty Plea") at 2.)  Between 2000 and 2010, SocGen also operated at

least twenty-one U.S.-dollar credit facilities involving Cuban entities, six of which directly or

indirectly extended credit to BNC.  (SAC ¶ 41; SAC, Ex. 3 ("SocGen DPA") at 42–44 ¶¶ 21–23,

25.)  In 2018, SocGen entered into a deferred prosecution agreement with the U.S. Attorney for

the Southern District of New York admitting to this conduct and forfeiting $880 million.  (SAC ¶

43; SocGen DPA at 2.)

Heirs of Carlos and Pura Nuñez formed Sucesores in 1996 to assert claims under the

Helms-Burton Act.  Through a May 24, 1997 Stockholders Agreement ("Agreement") and a

September 20, 2019 Assignment of Interest, those heirs transferred to Sucesores all interests in

Banco Nuñez that had been inherited via Carlos Nuñez's will.  (SAC ¶ 34.)  In return, those heirs

received shares in Sucesores.  (*Id.*)  Shortly before initiating this litigation, Sucesores sent a letter

to SocGen demanding that it stop trafficking in property seized from Banco Nuñez, which

SocGen received on June 10, 2019.  (*Id.* ¶¶ 57–58.)  Paribas received a similar demand letter on

February 19, 2020.  (*Id.*)  Neither firm responded.


## LEGAL STANDARDS

A district court must dismiss an action under Rule 12(b)(1) for lack of subject matter

jurisdiction if it determines that the plaintiff lacks constitutional standing to bring the action.

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015).

"The party asserting subject matter jurisdiction carries the burden of establishing, by a

preponderance of the evidence, that jurisdiction exists."  *Landau v. Eisenberg*, 922 F.3d 495, 497

(2d Cir. 2019).  The plaintiff thus must allege facts that establish the three elements of Article III

standing: that the plaintiff has "(1) suffered an injury in fact, (2) that is fairly traceable to the

challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  A court reviewing a 12(b)(1)

motion will accept as true the allegations of the complaint but may also look at evidence from beyond the pleadings.  *Cortlandt St. Recovery*, 790 F.3d at 417.

To overcome a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In assessing the plausibility of a plaintiff's claim to relief, a court must "construe [the complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor," but "disregard[ing] conclusory allegations such as 'formulaic recitation[s] of the elements of a cause of action.'"  *Sacerdote v. New York Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021) (quoting *Twombly*, 550 U.S. at 555).  "[The] complaint is also deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint."  *Sierra Club v. Con-Strux, LLC*, 911 F.3d 85, 88 (2d Cir. 2018) (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)).

## DISCUSSION

### I.      Ownership of Actionable Claims

Defendants assert that that no plaintiff is plausibly alleged to own a claim to confiscated Banco Nuñez assets that can support liability pursuant to the Act.  They are correct as to Sucesores—the corporation is ineligible to bring suit under the Act because it acquired its claims to confiscated property after March 12, 1996.  Also lacking statutory standing are the two individual plaintiffs who had only held interests in Banco Nuñez that were passed down from Carlos Nuñez.  Plaintiffs fail to allege the facts necessary to support their proffered theories for

considering the individual plaintiffs' assignments of interests to Sucesores to be void.  However, the remaining ten individual plaintiffs have plausibly alleged their ownership of claims to confiscated property that were passed down from Pura Nuñez.

### A.  Sucesores's Claims

Defendants contend that Sucesores lacks statutory standing because it acquired its claims to Banco Nuñez after March 12, 1996.  The plain text of the Act supports this assertion.  The Act provides that "[i]n the case of property confiscated before March 12, 1996, a United States national may not bring an action under this section on a claim to the confiscated property unless such national acquires ownership of the claim before March 12, 1996."  22 U.S.C. § 6082(a)(4)(B).  The Second Amended Complaint alleges that heirs of Pura and Carlos Nuñez transferred to Sucesores the interests in Banco Nuñez that they inherited from Carlos via the Agreement, dated May 24, 1997, and the Assignment of Interest, dated September 20, 2019, in exchange for shares in the corporation.  (SAC ¶ 34.)  Because Sucesores acquired ownership of its claims to Banco Nuñez after March 12, 1996, its Helms-Burton Act claims must be dismissed.

Despite the text of the statute, Plaintiffs assert that the Court should consider Sucesores to be a "holding vehicle" through which the individual heirs bring claims.  This theory supposes that the corporation holds only formal, legal title to the claims to Banco Nuñez assets, and that it is sufficient that "beneficial ownership" remains with individuals who acquired their claims before March 12, 1996.  Plaintiffs' briefing directs the Court's attention to a Supreme Court decision holding that "assignees for collection only" may bring suit in an Article III court despite having only legal title to claims.  *See Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 285 (2008) ("*Sprint Communications*").  Yet, unlike in the decisions grounding the Supreme Court's analysis in *Sprint Communications*—and contrary to the suggestion in Plaintiff's briefing

7

(*see* Opp'n at 18, ECF No. 100)—Plaintiffs have not alleged that Sucesores promised to convey

to the assignors any proceeds of litigation, *cf. Sprint Communications*, 554 U.S. at 280.  Any

implication that such a promise should be inferred is belied by the later transfers of stock in

Sucesores to new stockholders who are not alleged to have ever held interests in Banco Nuñez.

(*See* SAC ¶ 35.)  Thus, Plaintiffs have not alleged the facts necessary to support their chosen line

of argument.

Even if paired with sufficient facts, though, Plaintiffs' "holding vehicle" argument is

foreclosed by the text of the statute.  Plaintiffs provide no reason to think that when the United

States national that "bring[s] an action under this section" is a purported holding vehicle, it

should escape the Act's mandate that "*such national* acquire[d] ownership of the claim before

March 12, 1996."  22 U.S.C. § 6082(a)(4)(B) (emphasis added).  Even the decision on which

Plaintiffs base their "holding vehicle" theory acknowledges that a party litigating a claim to

which it holds only legal title still is the entity that has cause of action.  *See Sprint*

*Communications*, 554 U.S. at 285 (noting that "courts—both before and after the founding [of

the United States]—have always permitted the party with legal title alone to bring suit").  It is

therefore immaterial whether the U.S. nationals from whom Sucesores acquired its claims came

into ownership of the claims prior to the statutory cutoff date.

Other courts have similarly recognized that the Helms-Burton Act requires the person

bringing suit to be the same person that acquired a claim to confiscated property before March

12, 1996.  *See Gonzalez v. Amazon.com, Inc.*, 835 F. App'x 1011, 1012 (11th Cir. 2021) (per

curiam) ("A U.S. national whose property was confiscated before March 12, 1996, cannot

recover damages for another person's unlawful trafficking of that property unless 'such

national'—i.e., the specific person bringing suit—acquired the claim to the property before

March 12, 1996."); *see also de Fernandez v. Seaboard Marine, Ltd.*, No. 20-cv-25176, 2021 WL 3173213, at *8 (S.D. Fla. July 27, 2021) ("[T]he Court disagrees that the [plaintiffs] 'stepped into the shoes' of the decedents and maintained the original acquisition date of the Confiscated Property.") (internal quotation marks and original brackets omitted); *id.* at *8 n.7 (collecting cases).

This interpretation is consistent with Congress's purpose in enacting the statute. Plaintiffs claim that Congress's only intention in setting the March 12, 1996 deadline was to prevent the creation of a secondary market in claims to confiscated property. (Opp'n at 19.) Plaintiffs' interpretation does not give effect to choices Congress made in crafting the statute. As a Delaware court held: "If Congress had solely intended to eliminate the incentive for claim transactions, it could have drafted § 6082(a)(4)(B) the same way as § 6082(a)(4)(C), which explicitly bars actions brought by those who 'acquire[d] ownership of a claim to the property by assignment for value.'" *Glen v. Trip Advisor LLC*, 529 F. Supp. 3d 316, 329 (D. Del. 2021) (quoting 18 U.S.C. § 6082(a)(4)(C)). Instead, the portion of the Act at issue in this case, 18 U.S.C. § 6082(a)(4)(B), "makes no distinctions with respect to the method of acquiring the claim." *Herederos de Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, No. 20-21630-CIV, 2021 WL 1648222, at *5 (S.D. Fla. Apr. 27, 2021). The Act's legislative history also supports the conclusion that the March 12, 1996 deadline was motivated only in part by a desire to foreclose a secondary market in claims. *See Trip Advisor*, 529 F. Supp. 3d at 330 (recognizing other potential congressional concerns, including judicial economy, adequacy of evidence, limitation of total liability, and attenuation of claims rooted in long-past confiscations). Because the claims to Banco Nuñez owned by Sucesores do not meet the requirements of the statute, Count One must be dismissed for failure to state a claim upon which relief can be granted.

9

### B.  Individual Plaintiffs—Claims from Carlos Nuñez

Plaintiffs propose that, if the claims held by Sucesores are barred because they were acquired after March 12, 1996, the assignments of claims to Sucesores should be deemed void pursuant to any one of three contract principles.[4]  Each argument is unconvincing.  Because all interests in Banco Nuñez that descended from Carlos Nuñez were assigned to Sucesores, the two individual plaintiffs who acquired interests in Banco Nuñez exclusively from Carlos Nuñez must have their claims dismissed.

#### 1.  Frustration of Purpose

Plaintiffs cannot successfully invoke "frustration of purpose" because the difficulties presented by the text of the Helms-Burton Act were entirely foreseeable.  Under applicable Florida law, the contract doctrine of frustration of purpose applies when "one of the parties finds that the purposes for which he bargained, and which purposes were known to the other party, have been frustrated because of the failure of consideration, or impossibility of performance by the other party."  *Crown Ice Mach. Leasing Co. v. Sam Senter Farms, Inc.*, 174 So. 2d 614, 617 (Fla. Dist. Ct. App. 1965).  Florida courts have emphasized the importance of foreseeability in considering whether a purpose was frustrated.  *See Ferguson v. Ferguson*, 54 So. 3d 553, 556 (Fla. Dist. Ct. App. 2011); *see also Genuinely Loving Childcare, LLC v. Bre Mariner Conway Crossings, LLC*, 209 So. 3d 622, 625 (Fla. Dist. Ct. App. 2017) ("If a risk was foreseeable at the inception of the [contract], then there exists an inference that the risk was either allocated by the contract or was assumed by the party [seeking to void the contract].").

---

[4] Defendants highlight that the Second Amended Complaint did not explicitly assert that the 2019 Assignment of Interest is void if Sucesores is unable to bring suit under the Helms-Burton Act.  (Mem. at 15 n.5, ECF No. 90; *cf.* SAC ¶ 65.)  This concern is unwarranted.  A plaintiff must assert adequate facts in a complaint to support her later legal arguments but need not include every legal assertion in her complaint.  In any event, the facts alleged do not support rescission of either agreement transferring interests to Sucesores.

Plaintiffs maintain that the parties to the Agreement entered it "on the mutual, essential, and reasonable understanding that Sucesores would be legally permitted to vindicate those interests," and thus that the Agreement should be deemed void *ab initio* if Sucesores cannot bring suit.  (SAC ¶ 65.)  Plaintiffs assert, without explanation, that it was reasonable to believe that Sucesores could bring suit on claims acquired after March 12, 1996.  The text of the statute lends no support for such an interpretation, and the Second Amended Complaint contains no allegation indicating why the assignors might have believed in 1997 or 2019 that Sucesores would nevertheless be able to bring suit under the Helms-Burton Act.  *Cf. Home Design Ctr.—Jt. Venture v. Cnty. Appliances of Naples, Inc.*, 563 So. 2d 767, 770 (Fla. Dist. Ct. App. 1990) (rejecting a commercial frustration theory when the party "did not present substantial competent evidence to establish that such basic business risks were matters which it could not have foreseen at the time it negotiated the terms of this lease").

### 2.  Mutual Mistake

Plaintiffs' contention that the Agreement and Assignment of Interest should be voided because of the parties' purported mutual mistake is similarly unavailing.  Under Florida law, to consider a contract void due to the parties' mutual mistake requires that the parties allege at least (1) "a mistake of material fact," (2) "facts which show that such mistake did not result solely from the want of such care and diligence on his part as are exercised by persons of reasonable prudence under like circumstances," and (3) "facts which show that upon discovery of the mistake he, with reasonable promptness, denied the contract as binding upon him."  *Rood Co. v. Bd. of Pub. Instruction*, 102 So. 2d 139, 141 (Fla. 1958).  Plaintiffs also assert a fourth requirement, that the party seeking relief did not bear the risk of mistake.  (Opp'n at 21.)  Plaintiffs fail on prong two of *Rood*.  They have not alleged any source of their mistaken belief

11

other than want of care and diligence.  Nor have they alleged that they exercised *any* diligence before assigning their interests to Sucesores.  Plaintiffs also fail on prong three.  To satisfy this requirement, "plaintiffs must affirmatively allege in their complaint that they rejected the contract in a 'reasonably prompt fashion' after discovering a mistake."  *Barber v. Am.'s Wholesale Lender*, 542 F. App'x 832, 836 (11th Cir. 2013) (per curiam).  The complaint does not allege any such rejection, even a conditional one.

### 3.  Mutual Consent

Finally, Plaintiffs argue that paragraph 65 of the Second Amended Complaint constitutes "conditional consent to have the assignments rescinded."  (Opp'n at 21.)  That paragraph asserts that frustration of purpose principles would make the Agreement void as a matter of law if Sucesores is unable to bring suit, but it lacks the factual allegations necessary to support Plaintiffs' mutual consent argument.  (*See* SAC ¶ 65.)  "It is well established that the parties to a contract can discharge or modify the contract, however made or evidenced, through *a subsequent agreement*."  *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004) (emphasis added).  In the case at bar, however, Plaintiffs have not alleged the existence of a subsequent agreement to nullify the Agreement or the Assignment of Interest.

Because there is no legal basis for voiding the Agreement or the Assignment of Interest, the Court dismisses the claims made by the two individual plaintiffs alleged to have held claims derived only from Carlos Nuñez: his deceased second wife, Caridad Maria Rivero Caballero, and their son, Carlos Arsenio Nuñez Rivero.

### C.  Individual Plaintiffs—Claims from Pura Nuñez

The other ten individual plaintiffs (the "Pura Group") allege that they received an interest in Banco Nuñez from Pura Nuñez, which allows them to state a claim sufficient to avoid dismissal under Rule 12(b)(6).  Defendants urge a contrary conclusion by pointing to inconsistencies between the Original Complaint and the Second Amended Complaint. (Sucesores's Original Complaint alleged that it was "the holder of one-hundred percent of the equity of Banco Nuñez" and that "[a]ll of the family members who had inherited claims to Banco Nuñez from both Founders assigned their claims to Plaintiff to unify and hold the claim associated with Banco Nuñez.")  (Compl. ¶¶ 27, 64, ECF No. 1.)

Any conflicts between the superseded pleadings and allegations made in the operative complaint need not be addressed at this stage of litigation.  An amended complaint, including its factual allegations, "ordinarily supersedes the original and renders it of no legal effect."  *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977); *see Medidata Sols., Inc. v. Veeva Sys. Inc.*, 748 F. App'x 363, 365 (2d Cir. 2018) (summary order).  When an amended complaint's factual allegations conflict with allegations made in an earlier complaint, courts in this circuit commonly accept the allegations of the amended complaint as true for the purposes of a motion to dismiss, and allow earlier pleadings to be considered at summary judgment or at trial (as controvertible, rather than conclusive, admissions).  *Palm Beach Strategic Income, LP v. Salzman*, No. 10-CV-261 (JS)(AKT), 2011 WL 1655575, at *5 (E.D.N.Y. May 2, 2011), *aff'd*, 457 F. App'x 40 (2d Cir. 2012) (comparing approaches).[5]  The Second Amended Complaint

---

[5] Courts retain some discretion in how to treat superseded pleadings: "Where a plaintiff blatantly changes his statement of the facts in order to respond to the defendant's motion to dismiss . . . and directly contradicts the facts set forth in his original complaint, a court is authorized to accept the facts described in the original complaint as true."  *Colliton v. Cravath, Swaine & Moore LLP*, No. 08 Civ 0400 (NRB), 2008 WL 4386764, at *6 (S.D.N.Y.

alleges that the ten plaintiffs in the Pura Group acquired interests in Banco Nuñez stemming

from Pura Nuñez[6] before March 12, 1996 and states only that all interests descending from

Carlos Nuñez were assigned to Sucesores.  (SAC ¶¶ 7–16, 32, 34.)  The operative complaint thus

permits the inference that the members of the Pura Group continue to hold viable claims to

confiscated Banco Nuñez assets, making dismissal on this ground unwarranted.[7]

### D.  Inapplicability of International Law

Defendants contend that a foreign state's expropriation of property owned by its own

citizens is legitimized by the "domestic takings rule," thereby erasing all claims that the previous

owners had held to the property.  (Mem. at 33.)  The domestic takings rule demarcates a class of

acts that are outside of the purview of international law.  The rule provides merely that domestic

takings do not constitute a violation of international law, because international law "customarily

concerns relations among sovereign states" rather than relations between states and individuals.

*Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703, 709–10 (2021).  Because the domestic

takings rule is rooted in the jurisdictional principle of sovereign immunity, *see Bolivarian*

*Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1321 (2017),

---

Sept. 24, 2008) (Buchwald, J.), *aff'd*, 356 F. App'x 535 (2d Cir. 2009) (internal quotation marks, brackets, and citation omitted).

[6] The Second Amended Complaint is not entirely clear on the mechanics of the inheritance.  It variously states that when Pura Nuñez died she "le[ft] her entire interest in Banco Nuñez to *her heirs*," she "left her entire interest in Banco Nuñez to *her children*," and that several of her grandchildren had "inherited an interest in Banco Nuñez *from [their] grandparents*," Pura and Carlos, before March 12, 1996.  (SAC ¶¶ 3, 9–16, 32 (emphases added).)  The Court infers that Pura left her interests in Banco Nuñez to her children upon her death and that some of these interests later descended to her grandchildren that are plaintiffs in this suit.

[7] The text of the complaint suggests that some individual plaintiffs represent the estates of individuals who died after March 12, 1996.  (*See, e.g.*, SAC ¶ 10.)  At least one court has held that when a claim to confiscated property is transferred from a decedent to his or her estate, this constitutes an "acquisition" that must have occurred before March 12, 1996.  *See de Fernandez*, 2021 WL 3173213, at *9.  Because the point was not briefed by either party, this opinion does not consider whether the estates of those who died after March 12, 1996 should be dismissed from this action.

the rule does not determine the substantive rights of those subject to a domestic taking, *see* Restatement (Fourth) of Foreign Relations Law § 451 cmt. f (2018) ("[U]nder international law, the law of sovereign immunity from adjudication does not establish causes of action or create or destroy legal obligations[.]").  Defendants' contention that international law affirmatively legitimates domestic takings thus has no basis in law.

## II.   Article III Standing

### A.  Injury in Fact

Defendants contend that Plaintiffs' asserted injury in this case is not sufficiently concrete to confer standing upon them.  The "first and foremost" element of Article III standing is injury in fact.  *Spokeo*, 578 U.S. at 338 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)).  To satisfy this requirement, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).[8]  A "bare procedural violation" of a statute is insufficient absent a concrete injury, *id.* at 341, because "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021).

Tangible harms such as physical or monetary injury are the most straightforward instances of concrete harms, but intangible harms can also be concrete.  *Id.* at 2204.  The

---

[8] Defendants do not argue that Plaintiffs' alleged injury is not actual, imminent, or particularized.  One could interpret Defendants' assertion that the Cuban government's confiscation "extinguishe[d] all preexisting property rights" in Banco Nuñez as a contention that Plaintiffs lacked a "legally protected interest" to be invaded.  (*See* Reply at 4.)  Whether analyzed in the context of Article III standing or statutory standing, this argument lacks merit, as is explained above in section I.D.

Supreme Court has recognized that "Congress is well positioned to identify intangible harms that meet minimum Article III requirements" and thus "may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *Spokeo*, 578 U.S. at 341 (quoting *Lujan*, 504 U.S. at 578). Both "history and the judgment of Congress" are significant in the analysis of whether an intangible harm is a concrete injury. *Id.* It is sufficient for a plaintiff to demonstrate "a harm [1] directly identified by Congress and [2] of the same character as harms remediable by traditional causes of action." *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 93 (2d Cir. 2019) (brackets added). Both factors are established in this case.

First, in enacting the Helms-Burton Act, "Congress recognized that U.S. nationals with claims to trafficked confiscated property have suffered an injury." *Exxon Mobil Corp. v. Corporación CIMEX S.A.*, 534 F. Supp. 3d 1, 31 (D.D.C. 2021). In the statute, Congress identified an injury produced by later exploitation of confiscated property, which it expressly distinguished from the harm of the initial confiscation: "unjust enrichment from the use of wrongfully confiscated property by governments and private entities at the expense of the rightful owners of the property" or from other "subsequent exploitation of this property at the expense of the rightful owner." 22 U.S.C. § 6081(2), (8). Plaintiffs allege precisely this type of injury.

Second, the injury identified in the Helms-Burton Act strongly resembles the harm addressed by the common-law unjust enrichment cause of action. The Act defines actionable exploitation of confiscated property to involve conduct with confiscated property that is beneficial to the trafficker and comes at the expense of the property's rightful owner, something Congress deemed inequitable. *See id.* § 6023(13)(A); *Havana Docks Corp. v. Norwegian Cruise*

16

*Line Holdings, Ltd.*, 484 F. Supp. 3d 1215, 1228 (S.D. Fla. 2020) ("Havana Docks' injury is 'real' because it is not receiving the benefit of its interest in the Subject Property.").  This definition contains a close analogue to each dimension of an unjust enrichment claim, which requires a plaintiff to "show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered[.]"  *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (internal quotation marks and original brackets omitted)).  Other courts have joined in the conclusion that this similarity is meaningful.  *See, e.g.*, *Glen v. Am. Airlines, Inc.*, 7 F.4th 331, 334 (5th Cir. 2021) ("The harm allegedly caused by American's trafficking bears a close relationship to unjust enrichment, which has indisputable common-law roots."); *Moreira v. Société Générale, S.A.*, No. 20-CV-9380 (JMF), 2021 WL 5524484, at *4 (S.D.N.Y. Nov. 24, 2021) (Furman, J.) (similar).

Defendants fault Plaintiffs for assertedly failing to satisfy an element recognized in one formulation of common-law unjust enrichment.  (Reply at 3.)  But *Spokeo* considers whether a statutory injury has "a *close relationship to* a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts"—it does not require that a statutory claim have *identical elements to* claims rooted in such a traditional harm.  *Spokeo*, 578 U.S. at 341 (emphasis added); *see also TransUnion*, 141 S. Ct. at 2209 ("In looking to whether a plaintiff's asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts, we do not require an exact duplicate.").

It is not necessary that Defendants benefit from trafficking in ways that correspond to an equal and opposite detriment to Plaintiffs.  The Fifth Circuit in *Glen v. American Airlines* held a Helms-Burton Act injury to be concrete in a case analogous to this one.  In *American Airlines*,

17

the owner of a claim to confiscated beachfront land alleged that the airline trafficked in confiscated property by operating a website through which travelers booked twelve reservations at hotels built on the confiscated beachfront land.  *American Airlines*, 7 F.4th at 334.  The Fifth Circuit held the plaintiff's injury to be concrete even though he would not have been entitled to the booking fees from those reservations if he did own and control the beachfront property.  *See id.*; *see also Trip Advisor*, 529 F. Supp. 3d at 327 (similar).  The Court is persuaded that a plaintiff is injured concretely when she is shut out wrongfully from the gains produced by exploiting property that is rightfully hers.  Under the relevant precedents, then, Plaintiffs have alleged a sufficient injury in fact for Article III standing.

### B.  Causation

Despite Defendants' contrary contentions, the injury alleged by Plaintiffs is also fairly traceable to Defendants' conduct.  The causation element of Article III standing requires that there "be a causal connection between the injury and the conduct complained of" such that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Lujan*, 504 U.S. at 560 (ellipses, brackets, quotation marks, and internal citation omitted).  A court addressing the causation element should recognize that "Congress has the power to . . . articulate chains of causation that will give rise to a case or controversy where none existed before."  *Spokeo*, 578 U.S. at 341 (quoting *Lujan*, 504 U.S. at 580 (Kennedy, J., concurring)).  Additionally, the burden of alleging an injury that is fairly traceable to the defendant's conduct is "relatively modest" at the motion-to-dismiss stage of litigation.  *Bennett v. Spear*, 520 U.S. 154, 171 (1997).

As explained above, Congress identified a distinct injury created by the subsequent exploitation of confiscated property.  This injury is framed as the trafficker's inequitable

enjoyment of benefits derived from the confiscated property at the expense of its rightful owner. It is clear that the trafficker's conduct exploiting the confiscated property is what causes that injury. *See Exxon Mobil*, 534 F. Supp. 3d at 31 ("Congress has defined Exxon's injury in terms of the effects of trafficking in the confiscated property, and that injury is plainly fairly traceable to Defendants' alleged trafficking[.]" (internal quotation marks omitted)). Plaintiffs therefore satisfy the causation requirement for Article III standing.

### C. Redressability

Defendants do not dispute that Plaintiffs' alleged injury is redressable by a favorable decision by this Court. Money damages would plainly redress the injury Plaintiffs allegedly suffered from the subsequent exploitation of confiscated Banco Nuñez assets without authorization or compensation.

## III.    Scienter: "Knowingly and Intentionally"

The Act's scienter requirement is the subject of substantial disagreement between the parties and in various judicial decisions. The Court will briefly overview the parties' positions, but this dispute need not be resolved at this juncture. The complaint's allegations are insufficient to satisfy either parties' proposed scienter requirements. For this reason, the Court must dismiss the claims of the remaining ten individual plaintiffs.

The parties dispute the elements for which scienter must be established. The statute provides that "a person 'traffics' in confiscated property if that person knowingly and intentionally" engages in one of three courses of conduct with respect to confiscated property "without the authorization of any United States national who holds a claim to the property." 22 U.S.C. § 6023(13)(A). Plaintiffs contend that a Helms-Burton Act claimant must plausibly allege that a defendant knew or should have known (1) that the property in question was

confiscated by the Cuban government and (2) that its course of conduct dealt with such property, e.g., that its commercial activities "benefit[ed] from" confiscated property. *Id.* § 6023(13)(A)(ii). Defendants seem to advance a variation of the first element, which would require that a defendant knew from whom the Cuban government confiscated the property. They also contend two additional elements require scienter, i.e., that Defendants knew (3) that the owners of the claim to confiscated property were not compensated and (4) that the claim to confiscated property is held by U.S. nationals.

The parties disagree, as well, on whether actual knowledge must be established. Each one's contention has some basis. Plaintiffs point to the statute's definition of "knowingly" as "with knowledge or having reason to know," *id.* § 6023(9), whereas Defendants assert that the statute's use of the word "intentionally" incorporates a common-law requirement of actual knowledge, *cf. Gonzalez v. Amazon.com, Inc.*, No. 19-23988-Civ-Scola, 2020 WL 1169125, at *2 (S.D. Fla. Mar. 11, 2020) (faulting plaintiffs for failing to allege scienter, in that they did not "demonstrate that the Defendants *knew* the property was confiscated by the Cuban government nor that it was owned by a United States citizen" (emphasis added)).

### A.  Reason to Know that BNC Held Confiscated Property

The aforementioned questions are not necessary to resolve in adjudicating this motion to dismiss. The Court need not decide which other elements the Act's scienter requirement may or may not encompass, because a defendant must at least have had reason to know that the property in which it allegedly trafficked was confiscated by the Cuban government. *See Trip Advisor,*

529 F. Supp. 3d at 331 (rejecting contrary argument).[9]  Neither party contests this point.  Yet, that necessary condition is lacking in this case.

Plaintiffs make three non-conclusory allegations from which they ask the Court to infer that, between 2000 and 2010, Defendants knew or had reason to know that BNC held confiscated property.  Those allegations are (1) that the "Castro Government passed multiple laws in 1960, including Cuban Law Nos. 851 and 891, declaring banking a public function in Cuba and ordering BNC to confiscate all national and international banks in Cuba," (2) that the banks that had their assets seized in 1960 included "household names" such as Chase and Citibank, and (3) that the Foreign Claims Settlement Commission of the United States at some indeterminate date issued unspecified public decisions in which it "granted relief for claims arising from the Cuban Government's nationalization and confiscation of banks."  (SAC ¶ 29.)[10]  None of these facts are alleged to have been known by Defendants or their directors, officers, or employees.

Plaintiffs' reference to specific public laws by which the Cuban government confiscated all banks in Cuba comes closest to permitting an inference of scienter.  Still, a comparison to an analogous civil liability context illustrates why this allegation is insufficient.  The Federal Trade Commission Act provides for civil penalties when one violates a Federal Trade Commission ("FTC") regulation "with actual knowledge or knowledge fairly implied on the basis of objective

---

[9] There is only one contrary decision applying the Helms-Burton Act.  It holds that a "[p]laintiff need not allege specific facts showing [a defendant's] state of mind when it allegedly 'trafficked' in the confiscated property" to withstand a motion to dismiss.  *Garcia-Bengochea v. Norwegian Cruise Line Holdings Ltd.*, No. 1:19-cv-23593-JLK, 2020 WL 5028209, at *2 (S.D. Fla. Aug. 25, 2020).  This conclusion rests on an interpretation of Rule 9(b) of the Federal Rules of Civil Procedure that is foreclosed by the law of this circuit.  *See Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 323 (2d Cir. 2021).

[10] Plaintiffs' conclusory allegation that "the international banking community" had knowledge of the confiscation of Cuba's banking industry (SAC ¶ 29) is not entitled to the presumption of truth with which a court will treat non-conclusory allegations, *see Iqbal*, 556 U.S. at 679.  Thus, it is unavailing for Plaintiffs to invite the Court to infer—based on this asserted "industry knowledge"—that Defendants had reason to know that BNC held confiscated property.

circumstances that [an] act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. §

45(m)(1)(A). Despite the ordinary rule that ignorance of the law does not excuse misconduct,

courts applying this statute inquire whether a plaintiff has made sufficient allegations to fairly

imply a company's knowledge of an FTC rule—even when it is a domestic regulation that

actively governs the conduct of the company and its industry. *See United States v. Dish Network

L.L.C.*, 954 F.3d 970, 978 (7th Cir. 2020). It would be anomalous, then, to institute in the instant

case a presumption that a company has reason to know the consequences of a *foreign* law from

*forty years earlier* that was relevant to its industry but *never applicable to the company itself*.

The Court cannot reasonably infer that Defendants had reason to know in 2000 that the Cuban

government had seized the assets and infrastructure of Banco Nuñez forty years earlier and

transferred them to BNC. This alone is fatal to a conclusion that Plaintiffs have adequately pled

scienter with respect to the period from 2000 to 2010. The Court thus need not articulate the

precise scope and stringency of the Act's scienter requirement.

### B.  Continued Trafficking After Receiving Demand Letters

Recent case law illuminates an alternative path to establishing scienter, but Plaintiffs'

allegations are again insufficient. Several judicial decisions have held that the Act's scienter

requirement is satisfied when a defendant receives a demand letter putting it on notice of its

alleged Helms-Burton Act violation but nevertheless continues its course of conduct after the end

of a thirty-day notice period. *See Trip Advisor*, 529 F. Supp. 3d at 332–33; *de Fernandez*, 2021

WL 3173213, at *8. In this case, Plaintiffs allege that such demand letters were received by

SocGen on June 10, 2019 and Paribas on February 19, 2020. (SAC ¶¶ 57–58.)

Plaintiffs fail to satisfy the scienter requirement in this way, however, due to the

complaint's conclusory or impermissibly vague allegations that Defendants' trafficking

22

continues.  The allegations that "Defendants' trafficking is ongoing" and "SocGen and Paribas continue to traffic in Plaintiffs' property in substantially the same manner as described above" (*see* SAC ¶¶ 59, 63) are the type of conclusory allegations that the Court disregards as mere "legal conclusions couched as factual allegations," *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).[11]  Plaintiffs' remaining, non-conclusory allegations are sparse and, ultimately, too vague to state a claim.  There is no crisply defined, general standard for the degree of specificity with which factual allegations must be made to withstand a motion to dismiss.  Instead, "to 'nudge their claims across the line from conceivable to plausible,' [plaintiffs] must 'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'"  *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (alteration omitted) (quoting *Twombly*, 550 U.S. at 570).  Determining whether Plaintiffs' allegations are impermissibly vague is thus "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  In doing so, the Court weighs considerations such as "the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs*, 647 F.3d at 430.

---

[11] To be sure, one other court applying the Helms-Burton Act has held that scienter was sufficiently alleged based on a bare assertion that defendants continued their trafficking more than thirty days after receiving a demand letter. *See* Second Amended Complaint ¶ 148, *Glen v. Trip Advisor, LLC*, 529 F. Supp. 3d 316 (D. Del. 2021) (No. 19-cv-1809-LPS).  In that case, though, the plaintiff alleged specific facts that occurred as late as July 2019—just two months before the case was filed—and strongly suggested that trafficking was ongoing at the time. *See id.* ¶ 94. This case is far different, with nine- and ten-year gaps between the most recent specific instance of alleged trafficking and the delivery of demand letters. *See Moreira*, 2021 WL 5524484, at *5 (disregarding conclusory allegations that trafficking was ongoing ten years after the last specific instance of trafficking alleged in the complaint).

Plaintiffs' allegations relating to ongoing trafficking consist fundamentally of three points: (1) "In the 2000s, SocGen and Paribas began to transition a number of the credit facilities described [throughout the complaint] from using U.S. dollars to using other currencies"; (2) "Defendants continue to operate similar credit facilities to the ones described [throughout the complaint], except those facilities exclude U.S.-dollar transactions to avoid U.S. law"; and (3) after being sent demand letters by Sucesores, "[n]either Defendant responded to deny that they are continuing to traffic in Plaintiffs' property or otherwise maintaining the credit facilities." (SAC ¶¶ 58–59.)

In the circumstances of this case, these threadbare allegations are too vague to support an inference that either Defendant continued to extend credit to BNC more than thirty days after receiving a demand letter. Most critically, the complaint does not allege that a single credit facility was renewed with BNC,[12] specifically, rather than with other Cuban entities that are irrelevant to liability in this case. *Cf., e.g.*, *Bank v. Alarm.com Holdings, Inc.*, 828 F. App'x 5, 8 (2d Cir. 2020) (summary order) ("Specifically, Bank failed to allege that either [defendant] initiated the phone calls of which he complains, which is fatal to each of his claims."). Nor does it specify any date or period after 2010 in which one or more credit facilities was renewed or newly established. *Cf. Wang v. Palmisano*, 51 F. Supp. 3d 521, 541 (S.D.N.Y. 2014) (Karas, J.) ("[Plaintiff] has not alleged the dates on which Defendants rejected his applications, or even the dates on which he submitted his applications . . . . The Complaint's vague allegations therefore fail to give rise to a plausible inference that Defendants rejected him in retaliation for filing his FLSA claims."). The nature of the credit facilities that Defendants assertedly continue to operate

---

[12] The only conduct that Plaintiffs argue constitutes trafficking involves extension of credit facilities *to BNC*. (*See* Opp'n at 26).

is also entirely unspecified other than being "similar" to those operated from 2000 to 2010. Finally, a defendant's failure to deny allegations does not make those allegations plausible, at least at this stage of litigation. *See Moreira*, 2021 WL 5524484, at *6. Plaintiffs' vague or inadequate allegations do not permit the Court to make a reasonable inference that SocGen or Paribas continued to extend credit to BNC after 2019 or 2020.[13] Thus, Plaintiffs cannot rely on Defendant's receipt of demand letters to establish scienter.

Because Plaintiffs have not sufficiently alleged scienter, the individual plaintiffs alleged to own interests in Banco Nuñez descended from Pura Nunez must also have their claims dismissed.[14]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. The Court dismisses the claims of Sucesores, Carlos Arsenio Nuñez Rivero as personal representative of the estate of Caridad Maria Rivero Caballero, and Carlos Arsenio Nuñez Rivero in his personal capacity for failure to allege ownership of actionable claims to confiscated property. The Court also dismisses the claims of the remaining ten individual plaintiffs for failure to plead plausibly that Defendants trafficked in confiscated property with the requisite scienter. If Plaintiffs wish to amend their complaint in response to this Opinion and Order, they have leave to do so no later

---

[13] This conclusion is bolstered by several exhibits attached to the complaint, which contain facts that cut against the plausibility of Defendants continuing to extend credit to BNC. Specifically, they state that SocGen "renewed [its credit] facilities in Euros *or did not renew them at the end of their term*" (SocGen DPA at 47 ¶ 33 (emphasis added)) and that Paribas in 2008 "implemented a policy that prohibited all new business with Cuba" (Paribas Guilty Plea ¶ 67). Both facts make the already tenuous chain of inferences suggested by Plaintiffs even less tenable.

[14] A recent decision in this district employed analogous reasoning to hold that a Helms-Burton Act claim was time-barred by the Act's requirement that actions be brought no more than two years after the trafficking in question ceases. *See Moreira*, 2021 WL 5524484, at *5. Because Defendants did not raise that argument in this case, the Court does not consider it.

than January 21, 2022.  The Clerk of Court is respectfully directed to terminate the motion at

ECF No. 89.

      SO ORDERED.

Dated: New York, New York
      December 22, 2021                  *        /s/ Kimba M. Wood*     
                                                       KIMBA M. WOOD
                                         United States District Judge