**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SUCESORES DE DON CARLOS NUÑEZ Y DOÑA PURA GALVEZ, INC.; MYRIAM E. NUÑEZ, as Personal Representative and Executor of the ESTATE OF NESTOR FRANCISCO NUÑEZ GALVEZ; EILEEN DOMINGUEZ, as Personal Representative and Executor of the ESTATE OF BLANCA NUÑEZ; GLORIA TORRALBAS NUÑEZ; GLORIA PILAR MOLINA, as Personal Representative and Administrator of the ESTATE OF THOMAS TORRALBAS NUÑEZ; PURA AMERICA OCHOA NUÑEZ; NORKA CABANAS NUÑEZ; CARLOS CABANAS NUÑEZ; SILVIA NUÑEZ TARAFA; CARLOS NUÑEZ TARAFA; LOURDES NUÑEZ, as Personal Representative and Administrator of the ESTATE OF ALEJANDRO NUÑEZ TARAFA; CARLOS ARSENIO NUÑEZ RIVERO, as Personal Representative and Executor of the ESTATE OF CARIDAD MARIA RIVERO CABALLERO; and CARLOS ARSENIO NUÑEZ RIVERO, <br><br>               Plaintiffs, <br><br>    v. <br><br>SOCIÉTÉ GÉNÉRALE, S.A. and BNP PARIBAS, S.A., <br><br>               Defendants. | Civil Action No. 1:20-cv-00851-KMW <br><br> ORAL ARGUMENT REQUESTED |

**JOINT REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**
**PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(2) AND 12(b)(6)**

**TABLE OF CONTENTS**

**Page**

I.  PLAINTIFFS FAIL TO ADEQUATELY PLEAD SCIENTER ....................................... 1

   A.  The "New" Allegations of Post-Notice Trafficking Against SG Fail To Establish Scienter. .................................................................................... 1

   B.  The Allegations of Post-Notice Trafficking Against BNPP Likewise Fail. .......... 5

   C.  Even If Plaintiffs' Allegations of Post-Notice Trafficking Were Plausible, The TAC Would Still Be Subject To Dismissal For Failure to Plead Scienter. ..................................................................................................... 7

II. PLAINTIFFS' CLAIMS ARE BARRED BY THE ACT'S STATUTE OF REPOSE......................................................................................................... 8

III. THE COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS FOR THE ALLEGED CONDUCT WITHIN THE REPOSE PERIOD. .......................... 9

   A.  SG Is Not Barred From Contesting Personal Jurisdiction. ..................... 9

   B.  Plaintiffs' "Single Claim" Argument Is Unavailing. ........................... 11

IV. PLAINTIFFS FAIL TO ALLEGE THAT DEFENDANTS ENGAGED IN ANY "TRAFFICKING" AT ANY TIME................................................................. 12

V.  PLAINTIFFS FAIL TO SHOW THAT THE "CARLOS NUÑEZ" PLAINTIFFS OR THE FIVE ESTATE PLAINTIFFS TIMELY ACQUIRED THEIR PURPORTED "CLAIMS" TO BANCO NUÑEZ....................................................... 15

   A.  Plaintiffs Fail to Show That the Individual Plaintiffs Who Acquired Their Interests From Founder Carlos Nuñez Can Bring Title III Claims..................... 15

   B.  The Five Estate Plaintiffs Are Barred By the March 12, 1996 Cutoff. ............... 18

CONCLUSION.................................................................................................... 20

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abelesz v. Magyar Nemzeti Bank*,
   692 F.3d 661 (7th Cir. 2012) ................................................................14

*Altman Stage Lighting, Inc. v. Smith*,
   No. 20 CV 2575 (NSR), 2022 WL 374590 (S.D.N.Y. Feb. 8, 2022) .......................5

*Artis v. Receivables Performance Mgmt., LLC*,
   No. CV PJM 18-2575, 2020 WL 978810 (D. Md. Feb. 27, 2020) ...................10, 11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .........................................................................14

*Bank v. Alarm.com Holdings, Inc.*,
   828 F. App'x 5 (2d Cir. 2020) ...............................................................6

*Brown v. Lockheed Martin Corp.*,
   814 F.3d 619 (2d Cir. 2016).................................................................10

*Bruce Lee Enters., LLC v. A.V.E.L.A., Inc.*
   No. 10-cv-2333-LTS, 2011 WL 1327137 (S.D.N.Y. Mar. 31, 2011) ....................10

*Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*,
   137 S. Ct. 2042 (2017).......................................................................9

*Constr. Tech., Inc. v. Lockformer Co.*,
   704 F. Supp. 1212 (S.D.N.Y. 1989).........................................................4

*CTS Corp. v. Waldburger*,
   573 U.S. 1 (2014)............................................................................9

*de Fernandez v. Seaboard Marine*,
   No. 20-cv-25176-BLOOM/Otazo-Reyes, 2021 WL 3173213 (S.D. Fla. Jul.
   27, 2021) ..................................................................................15

*Doe v. Bausch & Lomb, Inc.*,
   443 F. Supp. 3d 259 (D. Conn. 2020).......................................................10

*K.D. ex rel. Duncan v. White Plains Sch. Dist.*,
   921 F. Supp. 2d 197 (S.D.N.Y 2013)........................................................6

*Escalon v. Trafigura Trading LLC*,
   No. 4:21-cv-00659 (S.D. Tex. Mar. 15, 2022), ECF No. 49 ...........................19, 20

## TABLE OF AUTHORITIES
(Continued)

**Page(s)**

*In re Est. of Slater*,
  437 So. 2d 1110 (Fla. Dist. Ct. App. 1983) .............................................................19

*Freund v. Société Nationale des Chemins de
  fer Français*, 592 F. Supp. 2d 540, 559 (S.D.N.Y. 2008), *aff'd*, 391 F. App'x
  939 (2d Cir. 2010)................................................................................................14

*Ganaway v. Henderson*,
  103 So. 2d 693 (Fla. Dist. Ct. App. 1958) .............................................................17

*Garcia-Bengochea v. Carnival Corp.*,
  407 F. Supp. 3d 1281 (S.D. Fla. 2019) ..............................................................11, 12

*Garcia-Bengochea v. Royal Caribbean Cruises, Ltd.*,
  No. 1:19-cv-23592, 2020 WL 6081658 (S.D. Fla. Oct. 15, 2020) ...........................18

*In re Gardinier, Inc*,
  831 F.2d 974 (11th Cir. 1987) ..............................................................................16

*Glen v. Am. Airlines, Inc.*,
  7 F.4th 331 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 863 (2022)............................18

*Glen v. Trip Advisor LLC*,
  529 F. Supp. 3d 316 (D. Del. 2021) ......................................................................18

*Gogoleva v. Soffer*,
  187 So. 3d 268 (Fla. Dist. Ct. App. 2016) .............................................................17

*Gonzalez v. Amazon.com, Inc.*,
  835 F. App'x 1011 (11th Cir. Feb. 11, 2021) .....................................................18, 20

*Hammond Realty Co. v. Wheaton*,
  90 So. 2d 292 (Fla. 1956) (Drew, J., dissenting on unrelated grounds) ...................16

*Havana Docks Corp. v. Carnival Corp.*,
  No. 19-cv-27124, 2020 WL 5517590 (S.D. Fla. Sept. 14, 2020) ...................11, 12, 15

*Holzsager v. Valley Hosp.*,
  646 F.2d 792 (2d Cir. 1981).................................................................................10

*Lehigh Valley Indus., Inc. v. Birenabaum*,
  527 F.2d 87 (2d Cir. 1975)...................................................................................12

*In re Livent, Inc. Noteholders Sec. Litig.*,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001)......................................................................7

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
    332 F. Supp. 3d 885 (S.D.N.Y. 2018)..................................................................................3

*Moore v. State Farm Mut. Auto. Ins. Co.*,
    916 So. 2d 871 (Fla. Dist. Ct. App. 2005) .........................................................................16

*N.L.R.B. v. SW Gen., Inc.*,
    137 S. Ct. 929 (2017)..........................................................................................................15

*New Testament Baptist Church Inc. of Mia. v. State, Dep't of Transp.*,
    993 So. 2d 112 (Fla. Dist. Ct. App. 2008) .........................................................................17

*Phoenix Cos., Inc. v. Concentrix Ins. Admin. Sols. Corp.*,
    554 F. Supp. 3d 568 (S.D.N.Y. 2021)................................................................................4

*Pino v. Union Bankers Ins. Co.*,
    627 So. 2d 535 (Fla. Dist. Ct. App. 1993) .........................................................................17

*Ray v. Rotella*,
    425 So. 2d 94 (Fla. Dist. Ct. App. 1982) ...........................................................................19

*Rosenfeld v. Lenich*,
    370 F. Supp. 3d 335 (E.D.N.Y. 2019) ...............................................................................4

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)..................................................................................................14

*Simon v. Republic of Hung.*,
    812 F.3d 127 (D.C. Cir. 2016) ............................................................................................14

*Skidmore v. Led Zeppelin*,
    106 F. Supp. 3d 581 (E.D. Pa. 2015) ..................................................................................12

*Sorrels v. McNally*,
    89 Fla. 457 (1925)................................................................................................................19

*Steinberger v. Lefkowitz*,
    634 Fed. App'x. 10 (2d Cir. 2015).......................................................................................3

*Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*,
    812 F. Supp. 2d 357 (S.D.N.Y. 2011).................................................................................6

*Wang v. Palmisano*,
    51 F. Supp. 3d 521 (S.D.N.Y. 2014)...................................................................................6

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*Wilder v. News Corp.*,
    No. 11 Civ. 4947(PGG), 2015 WL 5853763 (S.D.N.Y. Oct. 7, 2015)....................................12

*Wolf, D. V.M. v. James G. Barrie, P.A.*,
    858 So.2d 1083 (Fla. Ct. App. 2003) ..............................................................................17, 18

**Statutes**

22 U.S.C. § 6021.................................................................................................................................14

22 U.S.C. § 6023.................................................................................................................................13

22 U.S.C. § 6082.................................................................................................................................13

Fla. Stat. § 732.101 (2021)...............................................................................................................19

Fla. Stat. § 732.514 (2021)...............................................................................................................19

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019).......................................................................................19

*Black's Law Dictionary* 24 (6th ed. 1990)....................................................................................19

*Black, Rescission and Cancellation* (2nd ed., 2019) ..................................................................16

Plaintiffs' Opposition Brief ("Opp.") fails to rebut any of the independent grounds for dismissal set forth in Defendants' Moving Brief ("Br."). As a result, the Third Amended Complaint ("TAC") should be dismissed in its entirety and with prejudice.

## I.     PLAINTIFFS FAIL TO ADEQUATELY PLEAD SCIENTER

Plaintiffs concede that their theory of scienter rests on whether the TAC contains plausible, factual, allegations of trafficking following SG's and BNPP's alleged receipt of Helms-Burton notice letters in June 2019 and February 2020. Understanding the deficiency of their allegations, Plaintiffs try to plug the gap by misstating the language of the TAC and drawing unsustainable inferences about Defendants' conduct. Opp. 8-12. The TAC's "post-notice" trafficking allegations, as in the SAC, remain "mere legal conclusions couched as factual allegations." MTD Opinion at *10 (citations omitted). Plaintiffs thus fail to establish the "necessary condition" that Defendants "at least have had reason to know that the property in which [they] allegedly trafficked was confiscated by the Cuban government." MTD Opinion at *9; Br. 9-10.

### A.     The "New" Allegations of Post-Notice Trafficking Against SG Fail To Establish Scienter.

In their Opposition, Plaintiffs mischaracterize their allegation against SG in arguing that a "whistleblower" said that SG "continues to profit from . . . *the very same conduct* [] SocGen was punished for" in its DPA. Opp. 9 (emphasis added). To the contrary, the TAC alleges only that the "whistleblower" asserted, in a conclusory way, that SG has done unspecified business with "Cuban entities" or "the Cuban Government." *See* TAC ¶ 46; Br. 11 (citing TAC ¶¶ 46, 48). Contrary to Plaintiffs' contention (Opp. 8-11), the "whistleblower" is not alleged to have supplied Plaintiffs with *any* information about *any* recent transactions with *any* Cuban bank, let alone *with BNC*— much less that SG engaged in the "same activities" that were the subject of SG's DPA. And, of course, there is no allegation involving the specific assets allegedly seized from Banco Nuñez. *See*

Br. 11. These are the very same omissions that doomed the SAC. MTD Opinion at *10-*11. Nor is there merit to Plaintiffs' request for an "inference" that this unspecified business somehow indirectly involves BNC. Opp. 9-11.

*First*, the Court already held, in dismissing the SAC, that deriving profits from business "in Cuba" is not the same as renewing credit facilities *with BNC* and cannot establish "ongoing trafficking." *See* MTD Opinion at *11 (rejecting allegations of continued trafficking where the SAC "[did] not allege that a single credit facility was renewed with BNC, specifically, rather than with other Cuban entities that are irrelevant to liability in this case."); *see also Pujol* Opinion at *6 ("there is no indication that either Defendant renewed facilities available *to BNC* as opposed to other Cuban entities") (emphasis in the original). Nor do the allegations that SG extended credit facilities to BNC during the period 2000-2010 support an inference that any credit facilities were extended to anyone (much less to BNC) in 2019 or 2020. Opp. 9-10; MTD Opinion at *11 (rejecting as speculative the unsupported allegation that Defendants in the post-notice period operated credit facilities "similar" to those operated from 2000-2010); *see also Pujol* Opinion at *6 (dismissing complaint on statute of repose grounds: The fact that Defendants previously engaged in conduct described in their settlements with the U.S. government "says nothing about whether they *continued* to do so" during the two-year period before filing the complaint). The TAC does not allege that the "whistleblower" offered any facts that would allow the Court to draw the inferences that it declined to draw previously—*i.e.*, that SG entered into credit facilities with BNC at any point after 2010, much less after receiving Plaintiffs' demand letters. *See* MTD Opinion at

*10 n.11 (emphasizing the "nine- and ten-year gaps between the most recent specific instance of alleged trafficking and the delivery of demand letters").[1]

**Second**, to bridge the gap in the TAC, the Court would have to make *two* separate inferences: (i) that SG's "commercial activities" involve a *Cuban* bank (which the "whistleblower" is not alleged to have said, *see* TAC ¶¶ 46, 48, 67); and (ii) that, if so, those activities "flowed through" or otherwise touched BNC. But Plaintiffs allege no facts supporting these inferences; "providing access" to "foreign currency" does not necessitate the support of any Cuban bank.

*A fortiori*, Plaintiffs' "new" allegation does not support a further inference that SG's supposed activities "flowed through" or otherwise touched BNC specifically. *See Steinberger v. Lefkowitz*, 634 Fed. App'x. 10, 12 (2d Cir. 2015) (finding that plaintiffs failed to satisfy the burden to allege that funds had flowed to a particular recipient because plaintiff's theory would require the court to make "multiple inferences" that were not "readily apparent"); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 922-23 (S.D.N.Y. 2018) (finding that plaintiffs alleged a "conceivable," but not "plausible," theory of damages because "[t]here are no facts alleged in the TAC that connect [some defendants'] episodic manipulation to prices of COMEX futures at all, let alone to Plaintiffs' alleged trades").

**Third**, Plaintiffs admit that the 'whistleblower' spoke to their counsel in August or early September 2019, *before* Plaintiffs filed their First Amended Complaint ("FAC"). Br. 8. Yet

---

[1] Plaintiffs' allegation that BNC is the primary "financial institution" with which foreign companies do business in or with Cuba does not nudge their claims into the realm of plausibility. Opp. 10 (citing TAC ¶¶ 23, 46). First, as noted above, Plaintiffs have alleged no factual basis to support their speculation that SG's asserted post-demand letter "commercial activities" (providing "Cuban entities" "access to foreign currency") involve *any Cuban financial institution at all*, much less BNC. *See* TAC ¶¶ 46, 48, 67; Br. 13 n.4). Second, Plaintiffs concede, as they must, that BNC is not the only Cuban financial institution capable of doing business with foreign companies. Opp. 10 n.5. In reality, Plaintiffs proffer their sheer speculation, not a plausible allegation, that the asserted provision of "access" to foreign currency for "Cuban entities" somehow involves BNC.

nowhere in that pleading (filed September 24, 2019) or in the SAC (filed September 11, 2020) did Plaintiffs allege that SG's supposed post-2010 activity involved BNC. MTD Opinion at *11. They made only the conclusory allegation that "Defendants' trafficking is ongoing," which the Court rejected. MTD Opinion at *10 (citing SAC ¶¶ 59, 63). This wholly undermines, and makes implausible, Plaintiffs' conjecture that their so-called "new" allegation in the TAC—that SG continues to derive profits from "commercial activities in Cuba" (TAC ¶¶ 46, 48, 67)—somehow involves BNC. And Plaintiffs' belated contention that, when drafting the FAC and the SAC, they chose not to cite the "whistleblower"—supposedly because they considered it sufficient to allege that "everyone knew" Cuban banks were expropriated (Opp. 9 n.4)—defies credulity. Had the so-called whistleblower actually supplied Plaintiffs with any facts showing conduct involving BNC that post-dated the demand letter (or, indeed, any conduct involving BNC post-2010), Plaintiffs surely would have supplied such facts in their earlier pleadings.

*Finally,* Plaintiffs' attempt to rehabilitate these defects by using the incantation "on information and belief" is unavailing. Allegations on information and belief may be appropriate where the facts are "*peculiarly* within the possession and control of the defendant," Opp. 9, but that is *not* the case here, where the Plaintiffs had access to a "whistleblower." *Phoenix Cos., Inc. v. Concentrix Ins. Admin. Sols. Corp.*, 554 F. Supp. 3d 568, 600 (S.D.N.Y. 2021) (rejecting allegations on information and belief where information at issue was known to defendant's former employees); *Rosenfeld v. Lenich*, 370 F. Supp. 3d 335, 349 (E.D.N.Y. 2019) (rejecting allegations pled on information and belief where "[plaintiff] ha[d] not identified any barrier that would prevent her from, at a minimum, asking" a third party for the information at issue); *Constr. Tech., Inc. v. Lockformer Co.*, 704 F. Supp. 1212, 1232 (S.D.N.Y. 1989) (rejecting allegations on information and belief where "others [various third parties] had at least some knowledge of these facts."). And

even where (unlike here) the information *is* uniquely within the defendant's possession, as the cases Plaintiffs cite show, the information and belief formulation is not "a license to make wholly conclusory assertions." *Altman Stage Lighting, Inc. v. Smith*, No. 20 CV 2575 (NSR), 2022 WL 374590, at *6 (S.D.N.Y. Feb. 8, 2022). Here, Plaintiffs' assertion that the post-notice "commercial activities" somehow "flowed through" BNC is just that—a wholly conclusory assumption.

In short, given that the TAC has simply recycled, as to SG, the SAC's deficient allegations of "ongoing trafficking" in the post-demand letter period, there is no basis for the Court to grant Plaintiffs the multiple inferences they now seek. Br. 10-14.

**B.    The Allegations of Post-Notice Trafficking Against BNPP Likewise Fail.**

As to BNPP, Plaintiffs similarly fail to state any post-notice trafficking, relying again on bare allegations of "continued trafficking" (Opp. x) and attenuated claims lacking any connection to BNC—let alone Banco Nuñez—that fall far short of any definition of "trafficking." None of the TAC allegations identify any transactions by BNPP with BNC involving confiscated property, much less supports a plausible inference that BNPP knew and intended that any of its transactions involved confiscated property.

***First,*** Plaintiffs acknowledge this Court's finding that their bare allegation of "continued" trafficking was insufficient (Opp. 12), but assert, with no citation to the TAC, that the TAC "expands on" that allegation. But the TAC simply parrots the same threadbare allegation as before, with no elaboration as to any transactions between BNC and BNPP that fit the definition of "trafficking." Indeed, Plaintiffs once again assert the claim—already rejected by this Court—that BNPP "did not abandon" the "credit facilities" referred to in BNPP's 2014 Plea Agreement. TAC ¶ 54. But BNPP's Plea Agreement does not refer to any credit facility or conduct by BNPP since 2010, and the TAC adds no facts to bridge the nearly ten-year gap between the conduct covered by the Plea Agreement and the alleged post-demand-notice conduct. Br. 9-14; 20-21. Similarly,

Plaintiffs claim in their Opposition that an alleged, unidentified former compliance officer (now labelled a "whistleblower" in their Opposition), "report[ed] that . . . Paribas continued trafficking in Banco Nuñez property thereafter."[2] Opp. x. However, this is a mischaracterization of their allegations in the TAC, which merely stated in vague terms that the officer "knows U.S. currency was provided to BNC in 2020 and has no reason to believe Paribas stopped." TAC ¶ 55.

**Second**, Plaintiffs tout as "the TAC's most damning revelation" (Opp. 12) their assertion—once again supposedly fed to Plaintiffs' counsel by an alleged "former Paribas compliance officer"—that BNPP "routinely provides to BNC in Switzerland parcels of U.S. currency." TAC ¶ 55. Plaintiffs have nothing further to say about this allegation (other than to falsely note that BNPP did not address it, *but see* Br. 2, 8, 11, 13-14), which is not surprising. Plaintiffs' allegation of parcels denominated in dollars is at odds with their assertion that credit facilities continued after 2010 exclusive of U.S. dollar transactions, TAC ¶ 67 (*see also* MTD Opinion at *11).[3] The TAC otherwise pleads no facts connecting the alleged "parcels of cash" to any BNC credit facility. *Cf. Wang v. Palmisano*, 51 F. Supp. 3d 521, 541 (S.D.N.Y. 2014) (dismissing case for failure to plead relevant dates underlying claim); *Bank v. Alarm.com Holdings, Inc.*, 828 F. App'x 5, 8 (2d Cir. 2020) (affirming dismissal for failure to plead facts required to make a key inference). Counsel cannot remedy that deficiency by speculating in the Opposition that the alleged "parcels of cash" could be "disbursements from a credit facility," Opp. 12, or "payments on behalf of" an

---

[2] Plaintiffs cannot amend their complaint by asserting new theories for the first time in their opposition to Defendants' motion to dismiss. *See, e.g.*, *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y 2013) (citing *Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 363 n.9 (S.D.N.Y. 2011).

[3] This Court "need not feel constrained to accept as truth conflicting pleadings that . . . would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001) (listing cases that support this proposition).

unidentified "Paribas client." *Id.* And Counsel would have the court *additionally* speculate (which the Opposition simply asserts in *ipse dixit* fashion) as to how any of this is connected to Plaintiffs' confiscated property. *See id; see also infra*, Part IV (explaining the Act's requirement that trafficking be tied to *Plaintiffs'* confiscated property). Plaintiffs also argue that "Paribas understood that these continued practices were no different from the conduct for which it was punished in 2014." Opp. 5. But this is utterly baseless; Plaintiffs' new (false) allegation on the delivery of parcels of cash to BNC in Switzerland is completely unrelated to the pre-2010 conduct. The 2014 Plea Agreement makes no reference to any cash deliveries by BNPP, whether in Switzerland (where BNPP does not even have a branch) or elsewhere.

**Finally,** Plaintiffs try to disguise the lack of substance behind their "continued trafficking" claim by attributing to this alleged "former Paribas compliance officer" a variety of allegations regarding supposed BNPP transactions not with BNC, but with various entities, which in turn, allegedly do business with or in Cuba. TAC ¶ 62. But these allegations are mere distractions; there are no facts linking the alleged transactions to assets seized from Banco Nuñez some 60 years ago. The alleged conduct—payments by German company to Cuban airline (TAC ¶ 62(i)); loan to French company that then made sales to Cuba (TAC ¶ 62(ii)); loans to Australian company (TAC ¶ 62(iii))—are unrelated to the extension of U.S.-dollar credit facilities to "Cuban entities," including (according to Plaintiffs) BNC. TAC ¶ 52.[4]

### C.   Even If Plaintiffs' Allegations of Post-Notice Trafficking Were Plausible, The TAC Would Still Be Subject To Dismissal For Failure to Plead Scienter.

In their Opposition, Plaintiffs fail to address the separate bases for dismissal on scienter grounds set forth in the Moving Brief. Br. at 15-17. As Defendants have shown, the TAC is also

---

[4] Plaintiffs' reference to an email informing employees not to divulge information outside the Bank, TAC ¶ 57, does not support an inference of "knowingly and intentionally" violating the Act.

deficient because it fails to allege, as required by the Act's scienter standard, that Defendants: (1) knew that particular property had been confiscated by the Cuban Government *and* intended to deal in that specific confiscated property (Br. 15); and (2) knew and intended that none of the owners of the claim to the confiscated property received compensation or a settlement (Br. 16-17). Plaintiffs fail to address, much less refute, these points. Rather, Plaintiffs weakly assert that the Court "need not reach" these aspects of scienter because their allegations of post-demand letter conduct are sufficient. Opp. 8 n.3. This is wrong. Plaintiffs fail to allege that their demand letters put Defendants on notice that the owners of the claims to Banco Nuñez were uncompensated; thus, allegations of post-demand letter conduct cannot satisfy the scienter requirement.

## II.    PLAINTIFFS' CLAIMS ARE BARRED BY THE ACT'S STATUTE OF REPOSE.

Plaintiffs concede that the timeliness of their claims depends on whether they have sufficiently alleged trafficking within the two-year period preceding the filing of their complaint. (July 10, 2019 for SG and September 11, 2020 for BNPP). Opp. 13. For the same reasons applicable to the scienter issue (*see* Part I, *supra*; Br. 20-21), Plaintiffs' allegations do not sufficiently allege trafficking by either Defendant within the two-year period prior to the filing of this action. The Court has already held that Plaintiffs have failed to plead trafficking/scienter, either prior to or after the demand letters of 2019 and 2020. MTD Opinion at *10. The same conclusions apply for purposes of evaluating whether Plaintiffs have sufficiently pled conduct within the Act's two-year statute of repose. *See id.* at *11 n.14 (noting that Judge Furman dismissed the nearly-identical Helms-Burton suit in *Banco Pujol* on statute of repose grounds).

Plaintiffs argue that their allegations of post-notice conduct make it "unnecessary to reach" the issue of whether Section 6084 is a statute of repose or a statute of limitations subject to equitable tolling. Opp. 13-15. Nevertheless, Plaintiffs argue "for purposes of preserving the issue" that Section 6084 is a statute of limitations that can be tolled. Opp. 13. This argument has no merit.

Br. 17-19. Section 6084 places an express and unambiguous two-year hard stop on when an action may be brought, which runs from the date of the last alleged wrongful conduct. Such a statute is one of repose because it "runs from the defendant's last culpable act" and "not from the accrual of the claim." *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2049 (2017); *see also* Br. 17-19 (citing cases). The decisions Plaintiffs cite in their Opposition embrace the same distinction. *See, e.g.*, Opp. 14 (citing *CTS Corp. v. Waldburger*, 573 U.S. 1, *7-*8 (2014) (statutes of limitations are "based on the date when the claim accrued," *i.e.*, "when the injury occurred or was discovered," whereas statutes of repose run "from the date of the last culpable act or omission of the defendant.")). Thus, in *Pujol*, Judge Furman concluded, based on an analysis of the plain language of the Act, relevant case law, and Congress's principal purpose in enacting Title III as expressed in Title III's findings, that "Section 6084 is more naturally read to be a statute of repose." *Pujol* Opinion at *5-9. That conclusion is plainly correct and should be adopted here. Br. 17-19.

## III.   THE COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS FOR THE ALLEGED CONDUCT WITHIN THE REPOSE PERIOD.

Assuming *arguendo* that Plaintiffs' allegations of conduct within the repose period could state a claim, none of the asserted conduct has a link to New York sufficient to support the exercise of personal jurisdiction over the Defendants in this Court. Br. 21-25.

### A.   SG Is Not Barred From Contesting Personal Jurisdiction.

Plaintiffs try to side-step the absence of personal jurisdiction, saying it was "settle[d]" in January 2020, when SG consented to the Southern District of Florida transferring this action here. Opp. 16. This argument ignores, however, that Plaintiffs' complaint at the time of transfer (the FAC, filed in September 2019) did not assert foreign transactions unconnected to the U.S.—on the contrary, the FAC solely focused on USD transactions cleared through New York (as specified in SG's DPA), and the same is true of the SAC (Br. 23-24). In dismissing the SAC, the Court held

that those allegations were insufficient to state a claim against SG. MTD Opinion at *9-*11. The TAC contains different (albeit deficient) allegations of trafficking in the period from 2018 to present—all in an effort by Plaintiff to try to prop up their scienter and repose contentions. *See* Opp. 8, 13; TAC ¶¶ 46, 48. Yet once the TAC is stripped of the time-barred allegations of trafficking between 2000 and 2010—and even were the TAC's newly-made allegations deemed plausible and sufficient—this newly pled "conduct" is not alleged to have had any connection with New York (or, indeed, the United States). Br. 23. Personal jurisdiction is thus lacking.

Plaintiffs' argument that SG is "estopped" from contesting personal jurisdiction (Opp. 16) is not supported by the cases they cite. First, *Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016), does not involve a party's consent to jurisdiction for purposes of a Section 1404(a) transfer. And none of the cases cited by Plaintiffs (*see* Opp. 16, citing *Doe v. Bausch & Lomb, Inc.,* 443 F. Supp. 3d 259 (D. Conn. 2020); *Bruce Lee Enters., LLC v. A.V.E.L.A., Inc.* No. 10-cv-2333-LTS, 2011 WL 1327137 (S.D.N.Y. Mar. 31, 2011)) involve the unique procedural posture here, *i.e.* where the entire jurisdictional premise of the case changed midstream.

Rather, those cases stand for the unremarkable proposition that a defendant may not challenge personal jurisdiction where doing so would be "clearly inconsistent" with the situation it faced at the time of transfer to this district. *See*, *e.g., Bruce Lee Enters.*, 2011 WL 1327137, at *3. Here, by contrast, SG is addressing amended pleadings, post-transfer, which materially alter the case. In such circumstances, personal jurisdiction may properly be challenged on a motion to dismiss the amended pleading. Br. 24-25; *Holzsager v. Valley Hosp.*, 646 F.2d 792, 796 (2d Cir. 1981) ("[A] party cannot be deemed to have waived objections or defenses which were not known to be available at the time they could first have been made, especially when it does raise the objections as soon as their cognizability is made apparent."); *Artis v. Receivables Performance*

*Mgmt., LLC*, No. CV PJM 18-2575, 2020 WL 978810, at *1 n.3 (D. Md. Feb. 27, 2020) (holding that defendant's personal jurisdiction defense was not waived because the amended complaint added new facts that made a previously unavailable defense available).

**B.      Plaintiffs' "Single Claim" Argument Is Unavailing.**

As to both Defendants, Plaintiffs concede that they have tried to plead a claim based on "trafficking activities *abroad*." Opp. 15 (emphasis added). And, given this Court's scienter ruling in the MTD Opinion and Plaintiffs' failure to sue within the repose period (*see*, *supra*, Part II), Plaintiffs have no viable claim as to any conduct involving New York. Personal jurisdiction is thus lacking. Br. 21-25. In an attempt to circumvent this failing, Plaintiffs argue that the pre-2010 activity with a connection to New York can serve as a jurisdictional "hook" for personal jurisdiction, contending that this pre-2010 conduct, and the asserted subsequent "conduct," comprise what they call a "single claim." Opp. 17-18. This argument fails on both law and fact.

*First*, as a factual matter, Plaintiffs' case does not purport to be based on a "single claim"; instead it purports to identify separate and distinct types of conduct, occurring decades and continents apart. Plaintiffs allege that between the early 2000s and 2010, the Defendants extended credit facilities to BNC and processed related transactions through New York. TAC ¶¶ 45, 48, 52. By contrast, in an attempt to allege conduct occurring between 2019 and the present, Plaintiffs assert a hodgepodge of ill-defined and unrelated matters (*e.g.*, loans to a French company, TAC ¶ 62(ii); delivery of cash to Switzerland, *id.* ¶ 55; providing unspecified "Cuban entities" access to "foreign currency," *id.* ¶ 46) but, crucially, do not allege that any of these unspecified matters had a connection with New York (or for that matter, anywhere else in the United States).

The cases Plaintiffs cite in support of their "single claim" theory (Opp. 17-18 (citing *Havana Docks Corp. v. Carnival Corp.*, No. 19-cv-27124, 2020 WL 5517590 (S.D. Fla. Sept. 14, 2020) and *Garcia-Bengochea v. Carnival Corp.,* 407 F. Supp. 3d 1281 (S.D. Fla. 2019))

undermine Plaintiffs' position. They involved a single location (a dock), a single course of conduct (embarking and disembarking passengers), and a single, uninterrupted time period ("regularly" from May 1, 2016 and continuing until May 28, 2019)—circumstances markedly absent here.[5]

*Second*, even had Plaintiffs alleged a "single claim," that still would not create personal jurisdiction. Plaintiffs do not cite any case resting personal jurisdiction purely on time-barred conduct in the forum, much less overcome the myriad decisions holding that time-barred conduct cannot support personal jurisdiction. Br. 22-23. Those cases ask whether the U.S. conduct falls outside the limitations period, and none performs the kind of "single claim" analysis that Plaintiffs now propose. *See Lehigh Valley Indus., Inc. v. Birenabaum*, 527 F.2d 87, 90 (2d Cir. 1975) (jurisdiction could not rest on conduct that was no longer actionable); *Wilder v. News Corp.*, No. 11 Civ. 4947(PGG), 2015 WL 5853763, at *11 n.6 (S.D.N.Y. Oct. 7, 2015) (court lacked personal jurisdiction where "[n]early all of the *statements* upon which Plaintiffs premise their specific jurisdiction arguments were made before" the limitations cutoff); *Skidmore v. Led Zeppelin*, 106 F. Supp. 3d 581, 588 (E.D. Pa. 2015) (court lacked personal jurisdiction where allegedly infringing concerts occurred outside the limitations period). In sum, the case law is fatal to Plaintiffs' view.

## IV. PLAINTIFFS FAIL TO ALLEGE THAT DEFENDANTS ENGAGED IN ANY "TRAFFICKING" AT ANY TIME.

In addition to the scienter, time-bar, and jurisdictional deficiencies, Plaintiffs' "trafficking" allegations fail to identify *any* particular item of confiscated property that Defendants used (or whose use benefited Defendants) in *any* particular transaction. Instead, their theory of trafficking is that BNC received property confiscated from Banco Nuñez; 40-50 years later, Defendants

---

[5] Neither *Carnival* case actually involved jurisdiction. *Garcia-Bengochea* also did not involve time-barred allegations. While *Havana Docks* did, the court held they were legally irrelevant because plaintiff had made timely allegations of trafficking. 2020 WL 5517590 at *12.

conducted transactions with BNC; and Defendants simply should be presumed to have benefited, in some undefined and nonspecific way, from the long-ago confiscations. Opp. 21-23. Plaintiffs frankly acknowledge that this would make liable anyone who does any business with any Cuban entity that received confiscated assets (see *id.* at 23)—generating limitless liability and sweeping up anyone who did business in Cuba. That improbable theory is wrong, in several respects.

***First***, Plaintiffs ignore the statutory language that limits a trafficking claim to a plaintiff "who owns the claim to *such property*." *See* Br. 25-32; 22 U.S.C. §§ 6023(13)(A)(ii), 6082(a)(1)(A) (emphasis added). Ignoring that language, Plaintiffs argue, without authority, that "trafficking does not require the direct use by a defendant of some discrete piece of property." Opp. 22. But that requirement is confirmed by the Act's text, and by contrasting the Act with embargo statutes that sanction "doing business" with Cuba in broader terms. Br. 25-28.

***Second***, Plaintiffs err in arguing that Defendants have not "explain[ed] why it is implausible to allege that they profited from BNC's use, operation, and management of Banco Nuñez" or that they "participated in and profited from BNC's provision of banking services…" Opp. 22. This is just false. *See* Br. 29-31. It is manifestly implausible to assume, as do Plaintiffs, that BNC *still* holds the Banco Nuñez assets, and that *all* BNC transactions with *all* counterparties occurring at *any* time made use of assets confiscated from Banco Nuñez. It would be a stretch to make even the first inference, that BNC still held any Banco Nuñez assets (which comprised only 10% of BNC's assets at the time of the confiscation) several decades after the Cuban government's confiscation (when the Defendants allegedly engaged in transactions with BNC). Br. 30-31. And nothing in the TAC supports the necessary *further* speculation—that BNC's alleged transactions *with the Defendants* made use of particular assets confiscated 40-50 years before. *See* Br. 31; 22

13

U.S.C. § 6021(1) (Congressional finding that Cuban economy "experienced a decline of at least 60 percent" in just the five years preceding enactment of Helms Burton).

As shown in the Moving Brief (at 31): BNC is a Cuban government-owned institution with many sources of funds; BNC received many financial institutions' assets when Castro took power; and BNC's original capitalization came from assets of many Cuban banks *other than* Banco Nuñez. Thus, even assuming that BNC still had specific assets from Banco Nuñez in 2000-2010, the TAC does not, and could not plausibly, allege that Defendants' transactions used *those* assets. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). If such allegations were sufficient, every enterprise that does business with Cuba *per se* engages in Helms-Burton trafficking. But as the Moving Brief (at 25-32) shows, that is not what Congress wrote or intended.[6]

***Third***, Plaintiffs' position that Banco Nuñez's assets made BNC "a more stable, less risky, and more desirable counterparty" is similarly unavailing. Opp. 22; TAC ¶¶ 49, 60. The allegation that property confiscated 40-50 years earlier (and even then allegedly comprised only 10% of BNC's equity) made BNC "less risky" decades later is both impermissibly conclusory and implausible. *See Freund*, 592 F. Supp. 2d at 559-60. All Helms Burton cases in which courts have

---

[6] *Simon v. Republic of Hung.,* 812 F.3d 127, 147 (D.C. Cir. 2016) and *Abelesz v. Magyar Nemzeti Bank,* 692 F.3d 661, 689 (7th Cir. 2012), do not cure this defect. Opp 23. Both held only that plaintiffs adequately alleged that governments held assets following historical confiscations. Neither held that a *third party's subsequent transactions with the government* can be presumed to have involved the confiscated assets. Indeed, the Second Circuit has held that even if a government is a bad actor, a defendant's interactions with it cannot be presumed to relate to the government's wrongful acts. *See Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) (rejecting conclusion that money defendants transferred to Iran was used by Iran to fund terrorism, given that Iran has "many legitimate agencies, operations, and programs to fund"). Furthermore, *Freund v. Société Nationale des Chemins de fer Français*, 592 F. Supp. 2d 540, 559-60 (S.D.N.Y. 2008), *aff'd*, 391 F. App'x 939 (2d Cir. 2010), which states the view affirmed by this Circuit, declined to infer even that specific confiscated assets remained in the state's hands decades later. Plaintiffs' attempt to distinguish *Freund* on the ground that the defendant there had transferred the confiscated property to a third party is wrong (Opp. 23 n. 11); the court (Judge Sullivan) did not rely on that rationale.

14

found Defendants to incur a "benefit" under the meaning of the Act have involved Defendants that directly and tangibly engaged with the Plaintiffs' specific confiscated property. *See, e.g.*, *Havana Docks Corp.*, 2020 WL 5517590 at *47 (finding Defendants benefited from their commercial use of a terminal, to which Plaintiffs held a claim); *de Fernandez v. Seaboard Marine*, No. 20-cv-25176-BLOOM/Otazo-Reyes, 2021 WL 3173213, at *5 (S.D. Fla. Jul. 27, 2021) (same). If Plaintiffs' theory were accepted, dealings with *all* Cuban enterprises were less risky due to property confiscations and *everyone* doing business with them has engaged in trafficking. The plain language of the Act refutes this boundless view; it defines trafficking through an extensive list of prohibited types of conduct (all involving confiscated property) that would be rendered superfluous if Congress intended trafficking to mean simply engaging in transactions with Cuban businesses. Had Congress wanted to premise Helms-Burton liability on doing business with Cuba, it knew how to say that—and chose not to. Br. 31-32.[7]

## V.    PLAINTIFFS FAIL TO SHOW THAT THE "CARLOS NUÑEZ" PLAINTIFFS OR THE FIVE ESTATE PLAINTIFFS TIMELY ACQUIRED THEIR PURPORTED "CLAIMS" TO BANCO NUÑEZ.

### A.    Plaintiffs Fail to Show That the Individual Plaintiffs Who Acquired Their Interests From Founder Carlos Nuñez Can Bring Title III Claims.

Plaintiffs cannot refute Defendants' showing (at Br. 32-36) that the Individual Plaintiffs who acquired their alleged claims from Founder Carlos Nuñez (the "Carlos Nuñez Plaintiffs") are barred under Section 6082(a)(4)(B) from pursuing those claims by alleging that they "rescinded" the 1997 Stockholders Agreement and the 2019 Assignment, through a post-hoc February 10, 2022

---

[7] Plaintiffs *expressly* contend the Act establishes doing-business liability. Opp. 23-26. But the materials they cite—passing statements appearing in newspaper columns referenced on the floor of Congress by the Act's *opponents*—are the least probative form of legislative history. *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017) ("floor statements by individual legislators rank among the least illuminating forms of legislative history"). In contrast, statements that appear in the enacted legislative findings (as well, of course, as the legislative text) and that were made by the Act's sponsors tie trafficking to the use of specific confiscated property. Br. 25-32.

"Rescission Agreement," thereby supposedly voiding *ab initio* the Individual Plaintiffs' assignment of their claims to the corporate Plaintiff Sucesores.

First, Plaintiffs cannot overcome the fact that the "Rescission Agreement" was not signed by all parties to the Stockholders' Agreement, which is fatal to their position. *See Hammond Realty Co. v. Wheaton*, 90 So. 2d 292, 294 (Fla. 1956) (Drew, J., dissenting on unrelated grounds) ("[t]o effect rescission by subsequent mutual agreement, it is necessary that [there is] consent of . . . *all the parties to the original contract*.") (quoting *Black, Rescission and Cancellation*, at 1291 (2d ed., 2019)) (emphasis added). The notion, urged by Plaintiffs, that the prior assignments consisted of multiple "mini-contract[s]," upon each of which the Individual Plaintiffs transferred their interest "individually" (Opp. 27), is fanciful and unsupported by any authority.[8] Even worse, it is contradicted by the text of the Stockholders' Agreement itself. *See* Lakatos Decl. Ex. A, ECF No. 137-1 at 8 ("This Agreement . . . shall constitute one Agreement.").

Plaintiffs' citation to *Moore v. State Farm Mut. Auto. Ins. Co.*, 916 So. 2d 871, 875 (Fla. Dist. Ct. App. 2005) gets them no further. *Moore* provides that in certain cases (*e.g.*, a representation contract that has separate fee arrangements for negligence and breach of contract cases) a document can be divisible where it covers separate "specific issue[s]." *Id*. But the Stockholders' Agreement deals with one issue—the transfer of the Individual Plaintiffs' interests in Banco Nuñez to Sucesores. And it creates rights (such as a right of first refusal to purchase those interests, Br. 35) that the parties remaining in the Agreement would lose as to the individuals who

---

[8] *In re Gardinier, Inc,* is inapplicable here. Opp. 27. There, the parties plainly entered into two separate contracts because the "nature and purpose of the agreements [were] different," each contained different consideration, and the agreements themselves were not interrelated. 831 F.2d 974, 976 (11th Cir. 1987). In contrast, the Stockholders' Agreement was entered into for a "sole purpose" (TAC ¶ 3), has one form of consideration, and sets forth obligations that are interdependent and common to one another.

withdrew. Accordingly, the Stockholders' Agreement is a single agreement that cannot be divided, which is what the document shows the parties intended. *See* Lakatos Decl. Ex. A, ECF No. 137-1 at 7 (requiring consent from all parties for any changes). If the parties intended to have separate individual agreements, the signatories would have had the right to alter or amend their "individual" agreements without consent from others at any time. But they have no such rights.

Likewise, Plaintiffs err in arguing that the Rescission Agreement may unwind "only the transfers of its signatories." Opp. 28. As a principle of equity, an indivisible contract may not be partially rescinded by less than all parties to the original contract. *See Gogoleva v. Soffer*, 187 So. 3d 268, 276 (Fla. Dist. Ct. App. 2016) (unjoined parties to indivisible contract are indispensable). Plaintiffs cannot circumvent the requirements under the Stockholders' Agreement (*see* Br. 34) by simply pointing to language in the later Rescission Agreement—to which not all parties agreed.

And even if all the parties had agreed, the Individual Plaintiffs still do not "return[]" to their original positions (Opp. 29). As Defendants' Moving Brief (at 35) explains, a contract will be voided *ab initio* only if it offends public policy or harms the public. *See, e.g.*, *New Testament Baptist Church Inc. of Mia. v. State, Dep't of Transp.*, 993 So. 2d 112, 113 (Fla. Dist. Ct. App. 2008). While a private agreement may reverse a prior contract, that simply is not the same as voiding the contract *ab initio*—and third parties cannot be forced to pretend that the contract never existed. On the contrary, the law is clear that although the parties to a contract can "voluntarily undo their contract and place themselves back in the position they occupied on the date of the [original transaction]," such an "agreement to rescind could not affect" the position of third parties. *Wolf, D. V.M. v. James G. Barrie, P.A.*, 858 So.2d 1083, 1086 (Fla. Ct. App. 2003).[9]

---

[9] Although Plaintiffs cite *Pino v. Union Bankers Ins. Co.*, 627 So. 2d 535 (Fla. Dist. Ct. App. 1993) and *Ganaway v. Henderson*, 103 So. 2d 693 (Fla. Dist. Ct. App. 1958) for the (unremarkable) proposition that parties can "rescind a contract by mutual consent," *id.* at 695, neither decision

Accordingly, a purported post-hoc agreement to "rescind" the 1997 assignment does not void *ab initio* the transfer of those rights to Sucesores; rather, at most it means that Plaintiffs "reacquired" their purported claims on February 10, 2022—years after the Act's cut-off date.

Further, Plaintiffs are wrong: the purpose of Section 6082(a)(4)(B) was "motivated only *in part*" by the desire to prevent foreigners, who could not assert a Title III claim, from transferring their claims to U.S. nationals. *Compare* Opp. 30 *with* MTD Opinion at *4 (citing *Glen v. Trip Advisor LLC*, 529 F. Supp. 3d 316, 330 (D. Del. 2021)) (emphasis added) (listing other potential congressional concerns, such as judicial economy and adequacy of evidence). As this Court held, it is "immaterial whether the U.S. nationals from whom Sucesores acquired its claims came into ownership of the claims prior to the statutory cutoff date." MTD Opinion at *3.

### B.     The Five Estate Plaintiffs Are Barred By the March 12, 1996 Cutoff.

Courts in at least eight cases have considered whether an individual may assert a Title III claim on behalf of a decedent, and all have held that the claim is unavailable if its owner died after the cut-off and before bringing suit—whether the claim is deemed to be in the hands of an heir, an estate, or the administrator of an estate. *See, e.g.*, *Glen v. Am. Airlines, Inc.*, 7 F.4th 331, 336 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 863 (2022); *Gonzalez v. Amazon.com, Inc.*, 835 F. App'x 1011, 1012 (11th Cir. Feb. 11, 2021); *Garcia-Bengochea v. Royal Caribbean Cruises, Ltd.*, No. 1:19-cv-23592, 2020 WL 6081658, at *2 (S.D. Fla. Oct. 15, 2020).

Plaintiffs contend that "[a]s long as the [decedents'] estates remain in administration," the Estate Plaintiffs may bring a Title III claim because the decedents' purported claims have not been

---

suggests that consensually unwinding a contract alters a third party's rights, much less contradicts *Wolf*. Plaintiffs' effort to distinguish *Wolf* by claiming that, in the present case, the 1997 assignment did not impact Defendants or "release" them from liability similarly fails. This Court has indeed held that the 1997 assignment to Sucesores in fact *did* affect Defendants' rights by triggering the statutory prohibition on claims being brought against them. MTD Opinion at *3.

acquired and do "not belong to anyone individually." Opp. 30-32. Plaintiffs are wrong. As explained in Defendants' Moving Brief (at 38-39), Florida law provides that the vesting of assets with a decedent's heirs occurs immediately upon the decedent's death. *See* Fla. Stat. § 732.514 (2021); *id.* § 732.101 (2021)); *Escalon v. Trafigura Trading LLC*, No. 4:21-cv-00659 (S.D. Tex. Mar. 15, 2022), ECF No. 49, at 6 (Helms-Burton plaintiffs lacked an actionable ownership interest in Cuban confiscated property because "any rights [the] [d]ecedents had . . . vested" in their heirs on the date of their deaths; "[w]hen the [d]ecedents' wills were probated does not affect" when those rights vested); *see also e.g.*, *Sorrels v. McNally*, 89 Fla. 457, 467 (1925) ("The overwhelming weight of authority is to the effect that devises vest at the death of the testator").

Plaintiffs argue that "acquir[ing]" property is not the same as property "vest[ing]" in an heir. Opp. 31. But the terms mean the same thing—to confer control, possession, or ownership. *Compare Acquire, Black's Law Dictionary* (11th ed. 2019) ("[t]o gain possession or control of; to get or obtain") *with Vest, Black's Law Dictionary* (11th ed. 2019) ("[t]o confer ownership (of property) on a person"); *see also Acquire, Black's Law Dictionary* 24 (6th ed. 1990) ( "[i]ncludes taking by devise"). Contrary to Plaintiffs' argument, Florida law does not provide that property vesting to a decedents' heirs is held in abeyance pending an estate's administration. The court in *In re Est. of Slater,* 437 So. 2d 1110, 1112 (Fla. Dist. Ct. App. 1983), merely stated that "property owned by an intestate decedent descends at death directly to the heirs *subject to* the administration of the estate," *i.e.*, if an estate has obligations (*e.g.*, taxes), the heirs own the property "subject to" such matters. *Id.*; *Ray v. Rotella*, 425 So. 2d 94, 96 (Fla. Dist. Ct. App. 1982) (estate vests "subject to possible divestment" if necessary "for the payment of debts and taxes").

Finally, Plaintiffs' argument—that the decedents' property is "in the hands of the personal representative[s]" who did not "acquire" any claim to it (Opp. 32)—is unconvincing. If the

personal representatives acquired a claim to the confiscated property, it was *after* the March 12, 1996 cutoff, barring them from bringing suit. *See* MTD Opinion at *4 ("[T]he Helms-Burton Act requires the person bringing suit to be the same person that acquired a claim to confiscated property before March 12, 1996.") (citing *Gonzalez*, 835 F. App'x 1012). Conversely, if a personal representative did not acquire the claim when the decedent died, the personal representative would have nothing on which to rest a Title III cause of action. *See Escalon*, ECF No. 49, at 6 (dismissing Helms-Burton claims because the estates and personal representatives of the deceased plaintiffs "no longer ha[d] an [actionable] ownership interest in the [c]onfiscated [p]roperty.").

## **CONCLUSION**

For the reasons above, the TAC should be dismissed with prejudice.

Respectfully submitted,

Dated: June 13, 2022

| | |
|---|---|
| **MAYER BROWN LLP** | **CLEARY GOTTLIEB STEEN & HAMILTON LLP** |
| | |
| /s/ Steven Wolowitz | */s/* Carmine D. Boccuzzi, Jr |
| Steven Wolowitz | Carmine D. Boccuzzi, Jr. |
| Alex Lakatos | One Liberty Plaza |
| Michelle Annunziata | New York, New York 10006 |
| 1221 Avenue of the Americas | Tel: (212) 225-2508 |
| New York, New York 10020 | Fax: (212) 225-3999 |
| Telephone: (212) 506-2500 | cboccuzzi@cgsh.com |
| swolowitz@mayerbrown.com | |
| alakatos@mayerbrown.com | |
| mannunziata@mayerbrown.com | *Attorneys for Defendant BNP Paribas* |
| | |
| *Attorneys for Defendant Société Générale* | |